Katharine S. Glover
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: kglover@earthjustice.org
E: ejorgensen@earthjustice.org

Charisse Arce
Maile Tavepholjalern
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: carce@earthjustice.org
E: mtave@earthjustice.org

*Attorneys for Plaintiffs Association of Village Council Presidents and
Tanana Chiefs Conference*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS and TANANA CHIEFS CONFERENCE, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE; UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, in their official capacity as Secretary of Commerce; and SAMUEL D. RAUCH, III, in their official capacity as Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service, <br><br> *Defendants*. | Case No. 3:23-cv-00074-SLG |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### (5 U.S.C. §§ 702, 706(1), 706(2)(A); 42 U.S.C. § 4332)

## INTRODUCTION

1.      This action challenges the Defendants' decision adopting annual catch limits for the groundfish fisheries of the Bering Sea and Aleutian Islands without conducting an analysis of the environmental effects of that decision in the context of the current environment, in violation of the National Environmental Policy Act (NEPA).

2.      In the last two decades, the ecosystem of the Bering Sea and Aleutian Islands has experienced rapid and unprecedented change.

3.      Sea surface and bottom temperatures have risen to temperatures not predicted to occur under climate models for another decade.  These changes have reverberated across the ecosystem, with changes in salinity and acidity, shifts in abundance and distribution of fish and other ocean life, massive seabird die-offs, decreased nutrient productivity, marine mammal mortality events, the collapse of crab stocks, declines in marine mammals and an ongoing and worsening catastrophic collapse of multiple species of salmon that originate from western Alaska rivers.

4.      Alaska Native communities in the Yukon-Kuskokwim region are salmon people who have, for thousands of years, harvested salmon that spend most of their lives in the North Pacific and Bering Sea.  Many communities in this region have been unable to meet their subsistence needs since at least 2010.  The collapse of Chinook, chum, and coho stocks that return to western Alaska rivers is both a cultural crisis and a food security crisis for this region.

5.      Thousands of salmon are caught as bycatch—much of it discarded dead or

dying—by the groundfish trawl fisheries that are authorized to fish under the harvest specifications adopted by Defendants.

6. Defendants did not consider the effects of the harvest specifications decision in the context of this changing ecosystem. Despite the monumental changes in the Bering Sea and Aleutian Islands ecosystem and the dramatic effects those changes are having for people in the region who depend on the marine environment, Defendants continue to rely on an environmental impact statement completed in 2007 for the harvest specifications and an environmental impact statement completed in 2004 for the groundfish fisheries management plan. Neither document satisfies the Defendants' obligations under NEPA. Defendants cannot make informed decisions based on severely outdated analyses.

**JURISDICTION AND VENUE**

7. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1361, 1346, and 1362, and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02. Judicial review, vacatur, and injunctive relief are available under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-704, 706.

8. Venue is appropriate under 28 U.S.C. § 1391(e) because a substantial part of the events and omissions giving rise to this action occurred in this District.

## PLAINTIFFS

9.      Plaintiff Association of Village Council Presidents (AVCP) is a regional non-profit tribal consortium comprised of the 56 federally recognized tribes of the Yukon-Kuskokwim Delta.  AVCP's region is approximately 55,000 square miles, with a population of 27,000 residing in 48 communities along the Yukon River, Kuskokwim River, and Bering Sea coast.  The residents of the region are primarily Yup'ik, Cup'ik, and Athabascan.  AVCP is dedicated to supporting the interests of its member tribes, including through community development, education, social services, culturally relevant programs, and advocacy.  AVCP promotes self-determination and protection and enhancement of cultural and traditional values.  As part of its mission, AVCP has long been committed to advocating for the protection of the Bering Sea and its resources.

10.     The subsistence way of life is critical to the health and wellbeing of the tribes of the Yukon-Kuskokwim region.  An important focus of AVCP's mission is to advocate for the protection of subsistence.  For communities in the Yukon-Kuskokwim region, reliance on the land is not just a way of life, it is a necessity. The people of the region—including individual citizens of AVCP's member tribes—have a connection to the land that is deeply rooted in culture and traditions.  Most communities in the region are located along either the Yukon or Kuskokwim rivers and originated from traditional hunting areas or fish camps.  The rivers are important resources that connect communities in the region and provide invaluable natural resources.  Ninety-eight percent of households in this region harvest fish and 70 percent harvest game.  Salmon is the main

fish that families rely on to feed them through the winter.  It is foundational to the cultures and ways of life of citizens of AVCP's member tribes.

11.    AVCP's natural resources department helps to protect the region's natural resources and unique subsistence way of life for both present and future generations. AVCP partners with tribes and other tribal groups to advocate for protection of subsistence rights and sustainable management of salmon, marine mammals, and waterfowl, including seabirds, that takes into account the needs of tribes.  It also consults with federal agencies and collaborates with state, federal, and international policy makers to provide a voice for tribes in the Yukon-Kuskokwim Delta.

12.    AVCP and its member tribes participate actively in federal and state processes related to salmon and fisheries management.  AVCP has been engaged in advocating for sustainable fisheries management through the North Pacific Fishery Management Council (Council) and the National Marine Fisheries Service's (Service) process for decades and has actively participated in committees, government-to-government consultation, and public comment processes related to salmon and fisheries management.  Most recently, AVCP has submitted written comments regarding the 2023-2024 groundfish harvest specifications decision at issue in this lawsuit.  It has also submitted letters and oral and written comments asking the Council and the Service to supplement the environmental impact statement for the groundfish fisheries management plans, participated in tribal consultations and listening sessions, and engaged in advocacy to change state fisheries management to better account for subsistence.

13.     Plaintiff Tanana Chiefs Conference (TCC), organized as Dena' Nena' Henash, or "Our Land Speaks," is a sovereign tribal consortium with 42 tribal members across Interior Alaska, including 37 federally recognized tribes.  TCC is an Alaska Native non-profit corporation that provides health and social services for the more than 13,000 Alaska Native people in the interior Alaska region.  TCC was formed in 1962, but its history dates back over 100 years, when tribal chiefs from throughout the region banded together to protect their Native land rights.

14.     TCC's region covers 235,000 square miles of Interior Alaska that comprises the Yukon Koyukuk, Yukon Tanana, Lower Yukon, Upper Kuskokwim, Yukon Flats, and Upper Tanana subregions.  TCC is charged by its member tribes with advancing tribal self-determination and enhancing regional Native unity.  Its mission is to provide a unified voice to advance sovereign tribal governments through the promotion of physical and mental wellness, education, socioeconomic development, and culture of the Interior Alaska Native people.  TCC's strategic plan calls for strong tribes, educated and empowered tribal members, healthy people, safe and strong communities, economic sovereignty, and stewardship of its lands and resources.  TCC works toward meeting the health and social service needs of tribal members and beneficiaries throughout the region. Its programs and services range from direct healthcare services to tribal development services, natural resources management, public safety, community planning, and transportation.

15.     TCC has long advocated for sustainable management of fisheries to support

the subsistence needs of citizens of its member tribes and beneficiaries, which is in alignment with the strategic priority of stewardship of its lands and resources. TCC's fisheries program works to build educational capacity and expertise in fisheries, using western science and traditional knowledge to enable sustainable fisheries and advocate for fishing and hunting rights throughout the region. Through the fisheries program, TCC works in collaboration with the United States Fish and Wildlife Service to operate a weir to collect abundance estimates and run timing for salmon; manages a Yukon River salmon genetic stock identification project for Yukon River chum and Chinook stocks to assist in-season and post-season management and evaluation of Yukon River salmon runs; provides summer science camps for youth to learn about traditional knowledge and western science related to fisheries; and conducts aerial surveys and remote sensing to characterize spawning habitat use for the Teedraanjik and Coleen River Chinook and chum salmon stocks.

16.    TCC also has a hunting, fishing, and gathering task force that advocates to protect Alaska Native hunting and fishing rights central to the traditional way of life and wellbeing of citizens of TCC's member tribes and beneficiaries. Traditional hunting and fishing practices, which include the ceremonies that accompany these practices, provide for the social, cultural, spiritual, and economic wellbeing and survival of the people and communities in TCC's region.

17.    Citizens of TCC's member tribes and beneficiaries depend on all species of salmon that mature in the North Pacific and return to the Yukon and Kuskokwim rivers

each year. Traditionally, citizens of TCC's member tribes and beneficiaries depend on salmon as a significant portion of their diets, but it has been increasingly difficult for them to meet their needs because of the collapse of multiple species of salmon in western and interior Alaska. The Eastern Interior Regional Advisory Council includes 20 TCC member tribes, and during the 1980s and 1990s, salmon species made up 68 percent of their subsistence harvest, which is about 1,051,366 edible pounds. In the 2000s and 2010s, salmon species made up 62 percent of their subsistence harvest, which is about 368,677 edible pounds. The Western Interior Regional Advisory Council includes 19 TCC member tribes, and during the 1980s and 1990s, salmon species made up 55 percent of their subsistence harvest, which was 974,385 edible pounds. In 2000s and 2010s, salmon species made up 44 percent of their subsistence harvest, which was about 200,199 edible pounds. It can be estimated that the tribal com munities of the TCC region relied on all salmon species as 53 percent, a significant portion, of their diet. For the past few years, TCC has spent a half million dollars or more each year to ship salmon that was commercially caught elsewhere to villages to ensure residents do not starve during the area's harsh winters.

18. TCC and its member tribes have participated actively in both federal and state processes related to salmon and fisheries management. TCC has been engaged in advocating for sustainable fisheries management through the Council's and the Service's processes for years and has actively participated in committees, government-to-government consultation, and public comment processes related to salmon and fisheries

management.  The salmon crisis and fisheries management have been a TCC advocacy priority for the last several years.  TCC has testified at listening sessions with multiple federal agencies, including the Department of the Interior and the Service; met with federal officials to discuss food security and fisheries management; invited fishery managers to listen to tribal members' concerns and priorities on sustainability and management at the Yukon River Salmon Summit on February 2, 2022; conducted trainings for tribal members to testify at the Federal Subsistence Board; and provided written and oral comments at Council meetings regarding salmon bycatch and fisheries management.  TCC has advocated at all levels and in many forums regarding the need for action and precautionary management measures to ensure a sustainable yield of salmon that meets escapement goals and allows TCC's tribal members in the Yukon-Kuskokwim region to fish.

19.     Citizens and beneficiaries of AVCP's and TCC's member tribes and communities depend on a healthy marine ecosystem and the resources it sustains, including salmon, to support their ways of life, traditional and cultural practices, and food security.  The activities authorized by Defendants will directly and irreparably injure these interests.

20.     AVCP and TCC monitor fisheries management decisions and policies, educate their members about these policies and processes, participate in relevant public processes and government-to-government consultations, and advocate for protection of subsistence resources and ways of life in fisheries management decisions.  They cannot

achieve these organizational purposes fully without adequate information and public participation in the processes as required by law. Their interests and organizational purposes are directly and irreparably injured by Defendants' violations of the laws as described in this complaint.

## DEFENDANTS

21.     Defendant Service is a federal agency within the United States Department of Commerce responsible for the management, conservation, and protection of living marine resources within about 200 miles of the United States coast. The Service issued the Final 2023 and 2024 harvest specifications for groundfish in the Bering Sea and Aleutian Islands (2023-2023 groundfish harvest specifications). It also issued the Alaska Groundfish Harvest Specifications Final Environmental Impact Statement (2007), Alaska Groundfish Harvest Specifications Supplementary Information Report (Feb. 2023), Alaska Groundfish Fisheries Programmatic Supplemental Environmental Impact Statement (2004), and Alaska Groundfish Fisheries Programmatic Supplemental Environmental Impact Statement Supplemental Information Report (2015).

22.     Defendant United States Department of Commerce is an agency of the United States responsible for oversight of the Service.

23.     Defendant Gina M. Raimondo is sued in their official capacity as Secretary of Commerce. The Secretary holds the highest position within the United States Department of Commerce and has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws. The

Secretary also has specific responsibilities related to the administration of the groundfish fisheries of Alaska.

24.     Defendant Samuel D. Rauch, III, is sued in their official capacity as Deputy Assistant Administrator for Regulatory Programs for the Service.  Defendant Rauch oversees the Service's regulatory actions and programs, including those to support the conservation and recovery of marine mammals and endangered species, ensure economically and biologically sustainable fisheries, and promote habitat stewardship through restoration and conservation.  Defendant Rauch signed the final 2023-2024 groundfish harvest specifications.

## STATEMENT OF FACTS

### A.     The groundfish fisheries of the Bering Sea and Aleutian Islands

25.     Defendant Service, along with the Council, manages the groundfish fisheries of the Bering Sea and Aleutian Islands under the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area (Groundfish Fisheries Management Plan) and regulations implementing the fishery management plan.

26.     Each year, Defendants authorize the removal of as much as two million metric tons of pollock and other groundfish from the Bering Sea and Aleutian Islands.

27.     Pollock is a member of the cod species and the most abundant groundfish in the eastern Bering Sea.  Pollock is a significant prey item for marine mammals and seabirds.

28.     Pollock are harvested by trawling, a non-selective fishing technique in

which large boats drag nets on or near the ocean floor. The nets scoop up everything they contact. They also destroy and disturb corals and seafloor habitat important to many fish species.

29. The Groundfish Fisheries Management Plan and its implementing regulations require vessels fishing for groundfish, including pollock, to minimize the catch of certain prohibited species, also called bycatch. When groundfish vessels catch prohibited species, they must, with certain exceptions, immediately return the fish to the sea.

30. In the course of trawling, pollock fishing boats catch thousands of salmon as bycatch.

31. Salmon are a critical resource for subsistence-dependent communities in western and interior Alaska. In these regions, Chinook, chum, and coho salmon stocks have hit historically low levels of abundance over the last decade or more.

32. The pollock trawl fishery catches the vast majority of all salmon bycatch in the Bering Sea and Aleutian Islands management area. In 2021, the pollock trawl fishery caught 99 percent of all chum salmon bycatch and 87 percent of all Chinook salmon bycatch in the area.

33. Regulations implementing the Groundfish Fishery Management Plan allow pollock fishing boats to catch as many as 60,000 Chinook salmon as bycatch. In years where salmon are less abundant, the cap on Chinook salmon bycatch is lowered to 45,000 Chinook salmon. The total number each year depends on an index of estimated Chinook

abundance from three western Alaska rivers: the Unalakleet, Upper Yukon, and Kuskokwim rivers.

34.     There is no limit on the number of chum salmon the pollock trawl fleet can catch as bycatch each year.

35.     The majority of Chinook bycatch happens during the A season for the pollock trawl fishery, which runs from January to April.

**B.     The harvest specifications process and the 2023-2024 groundfish harvest specifications**

36.     On March 10, 2023, the Service published in the Federal Register the 2023-2024 groundfish harvest specifications. The Service published a correction to this rule on March 28, 2023.

37.     In the annual harvest specifications decision, the Service establishes the total allowable catch for each groundfish species targeted by federally managed fisheries in the Bering Sea and Aleutian Islands.

38.     The total allowable catch is the amount of a species of fish that may be harvested each year.

39.     The total allowable catch is calculated based on stock assessments and other analysis prepared by the Council. In these assessments, the Council determines overfishing levels and acceptable biological catch for each fish species.

40.     Each year, the sum of the total allowable catch for all groundfish species caught in the Bering Sea and Aleutian Islands management areas must fall within a range

set under the Groundfish Fisheries Management Plan.  That range is between 1.4 million metric tons and 2.0 million metric tons.  50 C.F.R. § 679.20(a)(1)(i)(A).  This range is called the optimum yield range.

41.     The Service can adjust the optimum yield to account for socioeconomic and biological factors.  Adjustments to the optimum yield are constrained by the optimum yield range in the Groundfish Fisheries Management Plan.

42.     In addition to setting the total allowable catch in its annual harvest specifications decision, the Service apportions the total allowable catch among groundfish species and subareas.  The Service then allocates that amount to the different types of fisheries that catch groundfish.

43.     The Service also establishes allowances for prohibited species in its harvest specifications decision.

44.     The 2023-2024 groundfish harvest specifications increase the total allowable catch for pollock from 1,111,000 metric tons in 2022 to 1,300,000 metric tons in 2023.  87 Fed. Reg. 11,626, 11,628 (Tbl. 1) (Mar. 2, 2022).

45.     When the pollock total allowable catch is set higher, it is likely that more salmon will be caught as bycatch.

**C.     Salmon people:  food security and traditional ways of life**

46.     The Alaska Native peoples of the Yukon-Kuskokwim region are salmon people.  They have lived and fished along the coast of the Bering Sea and the Yukon and

Kuskokwim rivers for thousands of years.  Their traditions, culture, and ways of life are centered around salmon.  Salmon is essential to their physical, economic, cultural, and spiritual well-being.

47.     Many Alaska Native people in western and interior Alaska spend the fishing season in fish camps, catching and preserving fish to feed their families and communities throughout the year.  A traditional fish camp is a place where extended family and friends gather every year.  Elders, adults, and youth work side by side to gather, process and store fish, berries, and other food while passing down cultural knowledge.  With subsistence salmon fishing closures, many families have not been able to gather at fish camps, making it difficult to pass down cultural knowledge and language that is central to the survival of tribes and communities in the region.  For this reason, the salmon crisis is also a cultural crisis.

48.     The Yukon-Kuskokwim region is one of the most cash-poor regions of the state, making the salmon harvest particularly important for food security.  Households share salmon with other households and communities to ensure that all community members have enough to eat.

49.     Since at least 2007, western Alaska Chinook salmon stocks have been in decline, followed by collapses in chum and coho salmon stocks over the last three years.

50.     Fisheries disasters have been declared in multiple years because of closures and restrictions in both commercial and subsistence salmon fishing affecting western and interior Alaska communities.

51.     Amounts necessary for subsistence have not been met for Chinook salmon in western and interior Alaska communities since 2010.

52.     In 2022, the Yukon River had its lowest Chinook salmon run on record. No escapement goals were met on the Yukon River in 2022.

53.     The Chinook salmon run in the Kuskokwim River was also extremely low, at 41 percent below the long-term average in 2022.

54.     Western and interior Alaska communities have curtailed their harvests for many years to allow fish to escape to meet escapement goals and rebuild stocks.

55.     Tribes in the Kuskokwim River drainage formed the Kuskokwim River Inter-Tribal Fish Commission to engage with fisheries managers to cooperatively manage fish in the Kuskokwim River and rebuild salmon stocks. In each year of co-management, drainage-wide escapement goals have been met for the Kuskokwim River.

56.     Escapements nonetheless remain significantly below historical averages for the Kuskokwim River and people who depend on this river are unable to meet their subsistence needs.

57.     The collapse of chum and coho salmon stocks, on top of the severely depleted Chinook salmon stocks, compounds the subsistence crisis for Yukon and Kuskokwim communities. When one species of salmon is unavailable, communities rely on other species to fill their needs. With three species at historically low levels, there are no alternatives.

58.     While subsistence-dependent communities continue to curtail their

harvests, thousands of salmon are caught each year as bycatch in the groundfish fisheries.

59.    Bycatch of salmon in the pollock trawl fishery prevents salmon from returning to western Alaska rivers.

60.    On average, about half of the Chinook salmon caught as bycatch in the pollock fishery originate from western Alaska rivers.  In 2020, the most recent year for which genetic estimates are available, over 56 percent of the Chinook salmon caught as bycatch originated from coastal western Alaska and the Yukon River.

61.    In 2019 and 2020 combined, the pollock trawl fishery caught approximately 28,300 Chinook salmon from western Alaska as bycatch.  Between 2011 and 2020, the pollock trawl fishery caught an estimated total of 126,104 Chinook salmon that originated from western Alaska rivers.

62.    On average, between 2011 and 2021, the pollock trawl fishery caught an estimated 37,423 chum salmon annually that originated from western Alaska rivers.

63.    Marine heatwave conditions, river conditions, competition with hatchery fish, interception by commercial salmon fisheries, and nutritional stress also contribute to salmon declines.

64.    Salmon spawn in western Alaska rivers, including the Yukon and Kuskokwim, and spend several months to several years in the rivers, depending on the species, before migrating out to the ocean as fry or smolt.  They feed and grow to maturity in saltwater, ranging widely over the North Pacific Ocean and Bering Sea before returning to their natal rivers to spawn.

65.     Groundfish fisheries management decisions affect the health of western Alaska salmon populations.

**D.     The rapidly changing Bering Sea and Aleutian Islands ecosystem**

66.     The Bering Sea and Aleutian Islands ecosystem is among the most productive in the world.

67.     Any modification to this ecosystem may have a dramatic effect on the quality of the human environment.

68.     It is also one of the places that is experiencing the most pronounced effects from climate change.

69.     Among other changes, ocean temperatures in the Bering Sea have risen.  In about 2014, the Eastern Bering Sea entered an unprecedented warm phase.  Both surface and bottom temperatures remained above long-term averages through at least the fall of 2021.  An area of the ocean known as the "cold pool" dropped below its average extent.  This affected salinity and sea ice formation in areas of the Bering Sea.  In the winters of 2017-2018 and 2018-2019, sea ice was nearly absent in the Bering Sea.

70.     Warming trends in the Bering Sea have been more severe than predicted by regional climate models, with ocean temperatures reaching levels not predicted to occur for another 10-15 years.

71.     Warm ocean temperatures have effects across the ecosystem, including shifts in the abundance and distribution of forage fish and groundfish, northward

migration of some species, decreases in nutrient productivity, and increases in acidification and salinity. Changes in salinity can affect the structure of the water column and result in a mismatch of prey for surface-foraging seabirds and other species.

72. Copepods, an important prey species for seabirds, king crab, marine mammals, and fish species, have become less fatty and less abundant. Species that depend on copepods may have to eat more or shift to other food sources. These changes in an important prey species affect the health and abundance of seabirds, king crab, marine mammals, and fish species that eat copepods.

73. Similarly, decreases in nutrient productivity mean that less food is available for some species, resulting in below-average body condition, and even death from starvation, for those fish and other species. Increased acidification affects invertebrates that are the preferred prey of pollock and other species.

74. While these changes can be beneficial for some species, they are detrimental for others.

75. As climate change continues to affect the Bering Sea and Aleutian Islands ecosystem, studies project decreases in fish size and abundance as well as a decrease in overall biomass.

76. In 2015 and 2016, there were massive seabird die-offs in the Bering Sea, with similar large-scale die-offs of short-tailed shearwaters in 2019, and of black-legged kittiwakes, murres, and puffins in 2021.

77. Studies have concluded that starvation, linked to the marine heatwave and

competition for forage fish, is believed to be the cause of the seabird die-offs.  In warmer conditions, food demands increase for many fish at the same time the condition of prey species declines.  This means that sea birds and piscivorous fish need to eat more fish, increasing competition among fish species and seabirds.  Because seabirds have high metabolic needs, they are particularly susceptible to shifts in food web dynamics.

78.     Seabirds likely shifted their diets and were in direct competition with pollock and other groundfish for prey.  Seabirds may also have been forced to eat less-preferred prey species, including juvenile pollock, because of decreases and shifts in prey species.

79.     Planktonic larval crab are an important prey base for young pollock.  Snow crab are a key food source for Pacific cod.

80.     Between 2021 and 2023, Bering Sea snow crab and Bristol Bay red king crab populations collapsed.  State-managed commercial fisheries for Bristol Bay red king crab were closed in the 2021-2022 and 2022-2023 seasons and state-managed commercial fisheries for Bering Sea snow crab were closed for the 2022-2023 season. Defendant Secretary of Commerce declared fishery disasters for both crab fisheries in both seasons.

81.     The collapse of crab stocks is linked to changes in sea ice and the reduction in the extent of the cold pool.  Ocean acidification also affects some crab species, including red king crab.

82.     In addition to the ecosystem stressors affecting Bering Sea snow crab and

Bristol Bay red king crab, groundfish fishing vessels catch crab as bycatch. Trawl fishing also kills or injures crabs that are dragged across the ocean floor by the nets, but are not hauled in as bycatch. It is not known how many additional crabs are injured through interactions with fishing gear and left on the ocean bottom.

83.     Marine mammals are also affected by ocean conditions and fisheries management decisions.

84.     Whales and seals have died in large numbers in unusual mortality events linked to the marine heatwave.

85.     Northern fur seals have declined by 70 percent since the 1970s.

86.     The decline in northern fur seals may be partially attributed to low pup growth rates.

87.     Recent studies show that northern fur seals compete directly with the commercial pollock fishery for food, especially during the fur seal breeding and pup-rearing season.

88.     The studies also show that, when pollock catch is above about one million metric tons within about 300 kilometers of the Pribilof Islands, first-year survival of Pribilof fur seals is suppressed.

89.     In the last decade, expeditions have mapped previously unknown deep sea coral beds and documented damage from trawl fishing.

90.     The Bering Sea and Aleutian Islands ecosystem is continuing to change rapidly. These changes not only affect the species that live in or migrate through the

Bering Sea, but also the people who depend on marine resources for food and to support their traditional ways of life and culture.

91. These changes and new information are relevant to fisheries management decisions.

92. The interaction between fisheries management decisions and a changing climate is complex. Fishing can make targeted species less resilient and less capable of surviving in changing ocean conditions.

93. Current fisheries management measures may not be well adapted to a changing climate. Some measures, like the mandatory optimum yield range, could contribute to a long-term risk of sudden, climate-driven ecosystem collapse.

94. Fisheries management measures can also reinforce rapid environmental change, making it harder for species to adapt.

95. Fishing not only affects targeted fish species, but species caught as bycatch, such as salmon and crab, as well as seabirds and marine mammals that eat those fish. The removal of fish from the ocean reduces prey available for other fish, seabirds, and marine mammals. It affects food web dynamics across the ecosystem, including for seabirds and marine mammals. Fishing nets and activity kill and injure crabs and other bottom-dwelling species. Fishing nets also damage benthic habitat, including corals, that is important for rearing fish.

96. The effects of fisheries management on fish, seabirds, crustaceans, and marine mammals in turn affect people who depend on the marine ecosystem to sustain

their traditional ways of life and culture.

E.    **NEPA analysis for the harvest specifications decision and Groundfish Fisheries Management Plan**

97.    In the annual harvest specifications decision, Defendants apply the harvest specifications process described in the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement and required under the Groundfish Fisheries Management Plan.  Defendants receive recommendations from the Council to determine how many fish can be removed from the ocean, by which fishing vessels, when, and, in some cases, from where.

98.    The harvest specifications strategy was analyzed in the Alaska Groundfish Harvest Specifications Final Environmental Impact Statement, published in January 2007.

99.    Each year, the Service also prepares a supplementary information report to determine whether, in its view, any changes in fisheries management or new circumstances require the preparation of a supplemental environmental impact statement for the groundfish harvest specifications.  The most recent supplementary information report was completed in February 2023.

100.    In the February 2023 supplementary information report for the groundfish harvest specifications, the Service considered changes in fisheries management since the publication of the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement.  It also considered actions by other agencies.

101.   In the supplementary information report, the Service did not consider new information.  Instead, it explained that annual stock assessment and fishery evaluation reports reviewed information about stock conditions, marine ecosystems, and fisheries.

102.   Stock assessment and fishery evaluation reports are not NEPA documents. The reports assess the condition of various fish species and make recommendations about acceptable biological catch and overfishing limits under current fisheries management measures.

103.   The Service concluded, in the 2023 supplementary information report, that a supplemental environmental impact statement for the 2023-2024 groundfish harvest specifications was not needed because: 1) the 2023-2024 groundfish harvest specifications are not a substantial change in the action, and 2) there is no information presenting significant new circumstances or information relevant to environmental concerns and bearing on the proposed action that is not addressed through the annual stock assessment reports and fishery evaluation reports.

104.   The 2023-2024 groundfish harvest specifications decision is a project-level action that implements the Groundfish Fisheries Management Plan.

105.   The NEPA analysis for the Groundfish Fisheries Management Plan is the 2004 Alaska Groundfish Fisheries Programmatic Supplemental Environmental Impact Statement.

106.   The Groundfish Fisheries Management Plan sets the framework for groundfish fisheries management decisions.  It establishes the optimum yield range,

defines fish stocks and stock complexes, prescribes the procedure for setting and apportioning total allowable catch, describes time and area restrictions on fishing, determines some prohibited species catch limits, and identifies other management measures.

107.    One significant decision made in the Groundfish Fisheries Management Plan is the optimum yield range.  The optimum yield range is based on a determination of the maximum sustained yield, which is "the largest long-term average catch or yield that can be taken from a stock or stock complex under the prevailing ecological, environmental conditions and fishery technological characteristics (e.g., gear selectivity), and the distribution of catch among fleets."  50 C.F.R. § 600.310(e)(1)(i).

108.    Prevailing ecological and environmental conditions have changed significantly since the maximum sustained yield and optimum yield range were established under the Groundfish Fisheries Management Plan.

109.    In November 2015, the Council and the Service completed a supplemental information report for the 2004 Alaska Groundfish Fisheries Programmatic Environmental Impact Statement.

110.    In the 2015 supplemental information report, the Council and the Service concluded that a supplemental environmental impact statement for the groundfish fisheries was not necessary because: 1) management changes since 2004 were consistent with the preferred alternative in the 2004 Alaska Groundfish Fisheries Programmatic Environmental Impact Statement; 2) the status of fishery resources was within the range

of variability analyzed in 2004; and 3) new information about the impacts of the groundfish fisheries on resources would not lead to a conclusion that there was a significant impact where the 2004 analysis had concluded the impact was insignificant.

111. On February 11, 2023, the Council adopted a motion initiating the process of considering a new programmatic environmental impact statement to comprehensively analyze the impact of the groundfish fisheries on the human environment given the changes that have occurred since the last review.

112. Despite recognizing the need to initiate a new programmatic environmental impact statement, the Council and the Service continue to make fisheries management decisions, such as the 2023-2024 groundfish harvest specifications decision, based on the 2004 Alaska Groundfish Fisheries Programmatic Environmental Impact Statement.

113. Since the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement, there have been more than 25 amendments to the Groundfish Fisheries Management Plan. Since the 2004 Alaska Groundfish Fisheries Programmatic Environmental Impact Statement, there have been at least 35 amendments.

114. The amendments to the Groundfish Fisheries Management Plan that have been adopted since the 2004 Alaska Groundfish Fisheries Programmatic Environmental Impact Statement have not been comprehensively and cumulatively analyzed in a single NEPA document.

115. The Bering Sea and Aleutian Islands ecosystem has experienced massive change in the almost 20 years since the 2004 Alaska Groundfish Fisheries Programmatic

Environmental Impact Statement was adopted and the more than 15 years since the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement was adopted. These changes include ongoing and worsening salmon declines, warming ocean temperatures, seabird die-offs, marine mammal mortality events, fur seal declines, increasing salinity, shifts in abundance and distribution of forage species, and decreased nutrient productivity. The changes have significant effects on marine resources, subsistence, and fisheries management.

## CLAIMS FOR RELIEF

### Count I
### (Failure to analyze environmental impacts of harvest specifications decision as required under NEPA)

116. Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

117. NEPA requires federal agencies to prepare environmental impact statements for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C).

118. The decision to adopt the 2023-2024 groundfish harvest specifications is a major federal action.

119. The decision determines the acceptable biological catch and overfishing limits for groundfish species, sets the total allowable catch, apportions and allocates the total allowable catch, applies prohibited species catch limits, and makes adjustments for biological and socioeconomic factors. This decision has significant effects on the human

environment.

120.    In their 2023-2024 groundfish harvest specifications decision, Defendants rely on the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement and a 2023 supplementary information report to conclude that additional NEPA documentation is not required for the 2023-2024 groundfish harvest specifications decision.

121.    The 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement does not analyze the effects of the fisheries management decisions Defendants made in the 2023-2024 groundfish harvest specifications in light of the current environment.

122.    The Bering Sea and Aleutian Islands ecosystem has changed dramatically since the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement was completed.

123.    Declining salmon populations, restricted subsistence opportunities, warming ocean temperatures, changing ocean conditions, seabird die-offs, marine mammal mortality events, northern fur seal declines resulting from competition with fisheries, and shifts in abundance and distribution across all trophic levels are cumulatively significant new circumstances or information that must be analyzed in a supplemental environmental impact statement.

124.    Fisheries management decisions, including 2023-2024 groundfish harvest specifications decision, affect the marine ecosystem and may exacerbate climate-induced

changes.

125.    The 2007 Alaska Groundfish Harvest Specifications Environmental Impact Statement does not analyze the impact of harvest specifications decisions in light of these changes.  The 2023 supplemental information report is not a NEPA document.  It also does not analyze the effects of the 2023-2024 groundfish harvest specifications decision in light of these changes.

126.    Therefore, Defendants have not complied with NEPA and their decision to adopt the 2023-2024 groundfish harvest specifications was arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(1), (2)(A), (D); 42 U.S.C. § 4332(2)(C).

## Count II
**(Failure to complete a supplemental environmental impact statement analyzing the effects of the groundfish fishery management program as required under NEPA)**

127.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

128.    NEPA requires federal agencies to prepare environmental impact statements for "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(2)(C).

129.    Federal agencies are required to prepare supplements to final environmental impact statements if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(d)(1)(ii).

130.    The 2023-2024 groundfish harvest specifications implement both the

harvest specifications strategy and the Groundfish Fisheries Management Plan.

131. Defendants analyzed the harvest specifications strategy in the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement. Defendants analyze annual decisions implementing this strategy through supplementary information reports.

132. In the 2023 supplemental information report for the 2023-2024 groundfish harvest specifications, Defendants conclude that additional NEPA documentation is not required for the 2023-2024 harvest specifications decision.

133. The harvest specifications strategy implemented in the 2023-2024 groundfish harvest specifications decision is itself an implementation of the Groundfish Fisheries Management Plan.

134. Defendants analyzed the Groundfish Fisheries Management Plan in the 2004 Alaska Groundfish Fisheries Programmatic Supplemental Environmental Impact Statement. Defendants made a decision not to update that analysis in the 2015 Alaska Groundfish Fisheries Programmatic Supplemental Environmental Impact Statement Supplemental Information Report.

135. The Bering Sea and Aleutian Islands ecosystem has experienced radical change since the 2004 and 2007 environmental impact statements were completed.

136. Declining salmon populations, restricted subsistence opportunities, warming ocean temperatures, changing ocean conditions, sea bird die-offs, marine mammal mortality events, fur seal decline resulting from competition with fisheries, and

shifts in abundance and distribution across all trophic levels are cumulatively significant new circumstances or information that must be analyzed in a supplemental environmental impact statement.

137.    Fisheries management decisions, including the harvest specifications decision, affect the marine ecosystem and may exacerbate climate-induced changes.

138.    Neither the 2004 Alaska Groundfish Fisheries Programmatic Supplemental Environmental Impact Statement nor the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement analyzes the effect of fisheries management in the context of the current, rapidly-changing environment of the Bering Sea and Aleutian Islands ecosystem.

139.    Defendants' conclusion in the 2015 supplemental information report for the 2023-2024 harvest specifications that no supplemental environmental impact statement was required was arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(1), (2)(A), (D); 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.9(d)(1)(ii).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

1.    Enter a declaratory judgment that:

a.    Defendants' decision to adopt the final 2023 and 2024 harvest specifications for groundfish in the Bering Sea and Aleutian Islands was arbitrary, capricious, and not in accordance with NEPA; and

b.    Defendants' reliance on the 2004 Alaska Groundfish Fisheries

Programmatic Supplemental Environmental Impact Statement and the 2007 Alaska

Groundfish Harvest Specifications Final Environmental Impact Statement is arbitrary,

capricious, and not in accordance with NEPA.

2.       Vacate the final 2023 and 2024 harvest specifications for groundfish in the

Bering Sea and Aleutian Islands.

3.       Enter injunctive relief as needed to ensure Defendants comply with NEPA

and to prevent harm to Plaintiffs from the implementation of the Groundfish Fisheries

Management Plan without an updated NEPA analysis.

4.       Award Plaintiffs their costs, fees, and other expenses of this action,

including reasonable attorney's fees pursuant to the Equal Access to Justice Act,

28 U.S.C. § 2412.

5.       Grant such other relief as this Court deems just and proper.

Respectfully submitted this 7th day of April, 2023.

*s/ Katharine S. Glover*
Katharine S. Glover (Alaska Bar No. 0606033)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: kglover@earthjustice.org

*s/ Eric Jorgensen*
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*s/ Charisse Arce*

Charisse M. Arce (Alaska Bar No. 2303017)
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: carce@earthjustice.org

*s/ Maile Tavepholjalern*

Maile Tavepholjalern (Alaska Bar No. 1611094)
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: mtave@earthjustice.org

*Attorneys for Plaintiffs Association of Village
Council Presidents and Tanana Chiefs Conference*