Katharine S. Glover
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: kglover@earthjustice.org
E: ejorgensen@earthjustice.org

Charisse Arce
Maile Tavepholjalern
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: carce@earthjustice.org
E: mtave@earthjustice.org

*Attorneys for Plaintiffs Association of Village Council Presidents and
Tanana Chiefs Conference*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS and TANANA CHIEFS CONFERENCE,<br><br>    *Plaintiffs*,<br><br>CITY OF BETHEL,<br><br>    *Intervenor-Plaintiff*,<br><br>    v.<br><br>NATIONAL MARINE FISHERIES SERVICE *et al.*,<br><br>    *Defendants*,<br><br>AT-SEA PROCESSORS ASSOCIATION and UNITED CATCHER BOATS,<br><br>    *Intervenor-Defendants*. | Case No. 3:23-cv-00074-SLG |

## PLAINTIFFS' PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

I.      The harvest specifications decision and the fisheries management process. .......... 2

II.     The rapidly changing Bering Sea and Aleutian Islands ecosystem. ...................... 6

ARGUMENT .................................................................................................. 13

I.      Plaintiffs have standing. ........................................................................ 13

II.     Standard of review ............................................................................... 16

III.    The Service violated NEPA because it did not prepare either an EIS for its
        2023-2024 harvest specifications decision or a supplemental EIS for the
        harvest specifications strategy. .............................................................. 17

        A.      The 2023-2024 harvest specifications decision is a major federal
                action with potentially significant environmental effects and there is
                no EIS analyzing it in the current environmental context. ...................... 18

                1.      The harvest specifications decision is a major federal action. ......... 19

                2.      The 2023-2024 harvest specifications may have significant
                        effects. ............................................................................. 22

        B.      The 2007 EIS for the harvest specifications strategy does not analyze
                the effects of the 2023-2024 harvest specifications decision in the
                context of the current environment. .......................................... 25

                1.      Changed ocean conditions. ................................................... 27

                2.      Seabird and marine mammal mortality events. ............................. 29

                3.      Multi-species salmon collapse. .............................................. 31

                4.      The need to evaluate fisheries management in light of
                        significant change. .............................................................. 33

        C.      The Service cannot substitute the harvest specifications process for
                an analysis of significant information in a NEPA document. .................... 34

IV.     The Service violated NEPA by declining to complete a supplemental EIS analyzing the effect of its harvest specifications decision in the current environment. ......................................................................................................... 36

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Cooley*,
No. CV 21-136-M-DWM, 2023 WL2522945 (D. Mont. Mar. 14, 2023) ................... 25

*All. for the Wild Rockies v. U.S. Dep't of Agric.*,
772 F.3d 592 (9th Cir. 2014) ........................................................................ 38

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) ............................................ 19, 22, 27, 37, 39

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ...................................................................................... 16

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
341 F.3d 961 (9th Cir. 2003) .................................................................... 15-16

*Cottonwood Env't L. Ctr. v. Bernhardt*,
796 F. App'x 368 (9th Cir. 2019) .................................................................. 38

*Ctr. for Biological Diversity v. Kempthorne*,
588 F.3d 701 (9th Cir. 2009) .................................................................... 14-15

*Flaherty v. Bryson*,
850 F. Supp. 2d 38 (D.D.C. 2012) ................................................................ 15

*Friends of the Clearwater v. Dombeck*,
222 F.3d 552 (9th Cir. 2000) ....................................................... 26, 33, 36, 37, 39

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000) ...................................................................................... 13

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
55 F. Supp. 2d 1248 (W.D. Wash. 1999) ...................................................... 36

*Greenpeace Action v. Franklin*,
14 F.3d 1324 (9th Cir. 1992) ........................................................................ 22

*Idaho Sporting Cong. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) ........................................... 26, 34, 35, 36, 39

*Idaho Sporting Cong. v. Thomas*,
  137 F.3d 1146 (9th Cir. 1998) ............................................................ 19, 22

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
  468 F.3d 549 (9th Cir. 2006) .............................................. 18, 19, 22, 23, 25

*Kunaknana v. U.S. Army Corps of Eng'rs*,
  23 F. Supp. 3d 1063 (D. Alaska 2014) .............................................. 37

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S.
Forest Serv.*,
  549 F.3d 1211 (9th Cir. 2008) .............................................. 21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................. 16

*Marsh v. Or. Natural Res. Council*,
  490 U.S. 360 (1989) .............................................. 33, 36, 37, 39

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................. 16

*Nat. Res. Def. Council v. U.S. Forest Serv.*,
  421 F.3d 797 (9th Cir. 2005) .............................................. 18

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
  241 F.3d 722 (9th Cir. 2001) .............................................. 22

*Native Ecosystems Council v. Tidwell*,
  599 F.3d 926 (9th Cir. 2010) .............................................. 30

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) .............................................. 38

*Nw. Env't Def. Ctr. v. Brennen*,
  958 F.2d 930 (9th Cir. 1992) .............................................. 21

*Ocean Conservancy v. Gutierrez*,
  394 F. Supp. 2d 147 (D.D.C. 2005) .............................................. 4

*Oceana v. Locke*,
  831 F. Supp. 2d 95 (D.D.C. 2011) .............................................. 21, 22, 23

*Or. Natural Desert Ass'n v. Rose,*
921 F.3d 1185 (9th Cir. 2019) ................................................... 25

*Pac. Marine Conservation Council v. Evans,*
200 F. Supp. 2d 1194 (N.D. Cal. 2002) ..................................... 24

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.,*
113 F.3d 1505 (9th Cir. 1997) ................................... 34, 35, 39

*Ramsey v. Kantor,*
96 F.3d 434 (9th Cir. 1996) ...................................................... 20

*Renee v. Duncan,*
686 F.3d 1002 (9th Cir. 2012) .................................................. 16

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) .................................................................. 35

*Save the Yaak Comm. v. Block,*
840 F.2d 714 (9th Cir. 1988) .............................................. 19, 39

*Sierra Club v. Bosworth,*
465 F. Supp. 2d 931 (N.D. Cal. 2006) ...................................... 38

*Solar Energy Indus. Ass'n v. Fed. Energy Regulatory Comm'n,*
80 F.4th 956 (9th Cir. 2023) .............................................. 18, 19

*W. Org. of Res. Councils v. Zinke,*
892 F.3d 1234 (D.C. Cir. 2018) ................................................ 37

*Warm Springs Dam Task Force v. Gribble,*
621 F.2d 1017 (9th Cir. 1980) ............................................ 26, 29

*West v. Sec'y of Dep't of Transp.,*
206 F.3d 920 (9th Cir. 2000) .................................................... 16

## STATUTES

5 U.S.C. § 706(1), (2)(A) & (D) ...................................................... 16

16 U.S.C. § 1801(a)(6) ...................................................................... 4

16 U.S.C. § 1853 ............................................................................... 4

16 U.S.C. § 1854 ............................................................................................................ 3

42 U.S.C. § 4332(2)(C) (2022)...................................................................................... 18

42 U.S.C. § 4336b (2023)............................................................................................... 37

## REGULATIONS

40 C.F.R. § 1501.3..................................................................................... 18, 22, 35

40 C.F.R. § 1501.4......................................................................................................... 18

40 C.F.R. § 1502.9(d) .............................................................................................. 36, 37

40 C.F.R. § 1502.14....................................................................................................... 35

40 C.F.R. § 1508.1(q) ............................................................................................... 19, 20

40 C.F.R. § 1508.18(2020).............................................................................................. 20

40 C.F.R. § 1508.27....................................................................................................... 20

50 C.F.R. § 600.305(a)(2) ................................................................................................ 3

50 C.F.R. § 600.310(e) ................................................................................................... 34

50 C.F.R. § 600.310(f) .................................................................................................... 34

50 C.F.R. §§ 679.20-.26 ................................................................................................. 21

50 C.F.R. § 679.20(a)(1)(i)(A) ......................................................................................... 4

50 C.F.R. § 679.21(f)...................................................................................................... 21

## FEDERAL REGISTER NOTICES

46 Fed. Reg. 18,026 (Mar. 23, 1981) ........................................................................... 37

75 Fed. Reg. 18,356 (Apr. 9, 2010)............................................................................... 21

85 Fed. Reg. 43,304 (July 16, 2020) ............................................................................. 20

87 Fed. Reg. 11,626 (Mar. 2, 2022) ............................................................................... 5

**OTHER AUTHORITIES**

Env't Prot. Agency, *Reviewing Environmental Impact Statements for Fishery Management Plans* (Sept. 2005), https://www.epa.gov/sites/default/files/2014-08/documents/reviewing-eiss-fishery-management-plans-pg.pdf......................................................................... 37

NOAA Fisheries, Fishery Disaster Determinations (Oct. 8, 2023), https://www.fisheries.noaa.gov/national/funding-and-financial-services/fishery-disaster-determinations..................................................................... 10

# INTRODUCTION

The Bering Sea and Aleutian Islands ecosystem is one of the most productive ecosystems in the world, but it is undergoing extreme change. After an unprecedented, multi-year heatwave and record low sea ice over the last decade, this ecosystem may be less productive and resilient than it once was.

The National Marine Fisheries Service (Service) manages some of the world's largest fisheries in the Bering Sea, authorizing the removal of 4.4 billion pounds of pollock and other groundfish from the ocean each year. The majority of those fish are caught in trawl nets that bring up everything in their path, including salmon. The tens of thousands of salmon caught as bycatch are casualties of the trawl fishery and never return to their natal rivers to spawn. At the same time salmon from now depleted populations are caught in the trawl fishery, people in western and interior Alaska have been unable to fish for the salmon they have depended on for thousands of years.

This case challenges the Service's annual harvest specifications decision—a decision that establishes parameters for the annual fishery. When the Service adopted the 2023-2024 harvest specifications for the groundfish fisheries, it did not prepare an environmental impact statement (EIS) to analyze the effects of the decision. The Service last analyzed the environmental consequences of its harvest specifications process in an EIS completed in 2007 that, in turn, relies on an even older analysis from 2004. By adopting harvest specifications this year without completing an EIS for this specific decision that considers the effects of the harvest specifications in the context of the

current, radically different environment, or a supplemental EIS for the harvest specifications strategy as a whole that does the same, the Service violated the National Environmental Policy Act (NEPA).

## BACKGROUND

I.     **The harvest specifications decision and the fisheries management process.**

The federal pollock trawl fishery off the coast of Alaska is the largest trawl fishery in the world.  *See* SUPP00179.  It is the largest of the Bering Sea groundfish fisheries, which, combined, catch up to two million metric tons—4.4 billion pounds—of fish each year.  NMFS06099.  In addition to their commercial value, pollock are an important food source for other groundfish, seals, whales, seabirds, and Chinook and sockeye salmon. NMFS23908; SUPP00165; NMFS05534.

Pollock is caught exclusively with pelagic trawls, NMFS00081, a method of fishing that involves dragging large nets through the ocean.  NMFS18089.  Pelagic trawls are cone-shaped nets with openings between 160 and 400 feet wide, roughly the size of a football field.  NMFS00081.  While pelagic trawls are also called mid-water trawls, they frequently contact the ocean floor.  *E.g.*, NMFS06770; NMFS24174; NMFS26322; SUPP05184.  The nets scoop up everything they encounter, including non-target fish, deep sea corals, crabs, and other invertebrates.  *See, e.g.*, NMFS24110-11; NMFS06770; SUPP05184-85.  Pollock and salmon swim in the same areas, NMFS18089, and pollock trawls catch tens to hundreds of thousands of Chinook and chum salmon as bycatch every year.  SUPP00013 (1991-2022 Chinook bycatch ranging from 8,342 to 130,011 fish);

SUPP00015 (1991-2022 non-Chinook bycatch ranging from 13,283 to 711,520 fish annually);[1] NMFS00078 (majority of non-Chinook bycatch is chum salmon annually); SUPP00062 (Barry, Chum Genetics) (similar).[2]  Many of these salmon originate from western Alaska rivers, where multiple stocks of salmon have collapsed.  NMFS05453.

In addition, benthic, or bottom-dwelling, species like shellfish and invertebrates are caught in trawls.  Even when they are not captured in the nets, they can be injured by the nets.  *See, e.g.*, NMFS18770-01 (crabs); NMFS24183-84 (damage to seastars, bivalves, and sponges).  Trawls disturb spawning and nursery habitat for crabs, NMFS2628-69, and reduce benthic habitat productivity for forage fish important to species ranging from seabirds to marine mammals, *see, e.g.*, NMFS26322-23 (cormorants), NMFS26328 (eiders), NMFS26357 (seals), NMFS26369 (gray whales); NMFS06761 (eider habitat).  Damage to long-lived, slow-growing species can be irreversible.  NMFS23561, NMFS24569, NMFS26545.

The Service and the North Pacific Fisheries Management Council (Council) jointly manage the groundfish fisheries under the Magnuson Stevens Act.[3]  Among the overarching purposes of the Magnuson Stevens Act is to provide for "conservation and

---

[1] Both charts show "0" fish for 2023 because they are dated January 9, 2023.  The vast majority of salmon bycatch is caught by the pollock trawl fishery.  SUPP00301.

[2] Four record documents, SUPP00060.pdf through SUPP00081.pdf, have overlapping bates numbers.  One of these documents is cited in this brief.  It is identified with the following parenthetical: (Barry, Chum Genetics).  Counsel for Plaintiffs are working with Counsel for the Service to resolve this issue.

[3] Under the Magnuson Stevens Act, the Council recommends management measures and the Service is responsible for ensuring they comply with the law and approving them. 16 U.S.C. § 1854; 50 C.F.R. § 600.305(a)(2).

management of the fishery resources…." 16 U.S.C. § 1801(a)(6). To that end, the Council and the Service develop fishery management plans employing various tools to control who can fish and where, for what species, and with what gear. NMFS23807; *see also* 16 U.S.C. § 1853; *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 156-57 (D.D.C. 2005).

The groundfish fisheries at issue are managed under the groundfish fisheries management plan for the Bering Sea and Aleutian Islands. NMFS00083. The current fishery management plan, adopted before the changes in the environment of today, set a range for the total annual catch for all groundfish species combined between 1.4 and 2.0 million metric tons. 50 C.F.R. § 679.20(a)(1)(i)(A); NMFS23811.

The Service analyzed the effects of the plan in a 2004 programmatic EIS for the groundfish plan. NMFS23604-26827. It reviewed that analysis in 2015 in a supplemental information report considering whether an update to the 2004 EIS was warranted. In that 2015 supplemental information report, the Service concluded that, although there were some resources for which experts indicated a new analysis could lead to different conclusions about fishery impacts, on the whole, the "status of the resources can be considered within the range of variability analyzed in the 2004 [programmatic EIS]…." NMFS23444.

Each year, the Service and the Council make a variety of fisheries management decisions that implement the groundfish plan and rely on the analysis in the 2004 programmatic EIS that supports it. *See* NMFS26843-45 (describing tiering to

programmatic EIS).  The adoption of the harvest specifications each year is one important

decision under the plan.  This decision follows a process required under the groundfish

plan and analyzed in a 2007 EIS that considers alternative "harvest strategies" for the

groundfish fisheries.  NMFS06536.  In that EIS, the Service describes the harvest

specifications as "a project-level action within the fishery management program[] under

the … [Bering Sea and Aleutian Island] groundfish [fishery management plan]."

NMFS06565.  The annual specifications establish catch limits and other parameters for

the annual fishery.  *See* NMFS06556-57, NMFS06563-64; NMFS00018-48.

    In March 2023, the Service published the final 2023-2024 harvest specifications

for the Bering Sea and Aleutian Islands.  NMFS00018-48; NMFS00049-53.  The

decision set the catch limit, or total allowable catch, for all groundfish at 2.0 million

metric tons for 2023 and 2024.  NMFS00018.  For pollock, the catch limit was set at 1.3

million metric tons, a 17 percent increase above the 2022 limit.  *Compare* NMFS0020-21

*with* 87 Fed. Reg. 11,626, 11,628 (Mar. 2, 2022).

    The Service did not complete an EIS or environmental assessment for the 2023-

2024 harvest specifications decision.  Instead, it completed a supplementary information

report to consider whether additional NEPA analysis was necessary to support its

decision.  NMFS00587.  In this 2023 supplementary information report, the Service

concluded that any new information was either addressed through the annual harvest

specifications process or within the scope of effects analyzed in the 2007 EIS.

NMFS00635.  The Service therefore determined that no further NEPA documentation

was required to support its decision.  *Id.*

The 2007 harvest specifications strategy EIS is now 16 years old and the 2004 programmatic EIS that it relies on is nearly two decades old.  There has been no cumulative analysis of the effects of the harvest specifications strategy since that time.

## II.    The rapidly changing Bering Sea and Aleutian Islands ecosystem.

The last decade has been a time of upheaval in the Bering Sea and Aleutian Islands, with significant changes cascading across the ecosystem.  The Bering Sea entered a warm period from 2014 through at least 2021 that, according to the Service's own experts, was "unprecedented in terms of magnitude and duration."  NMFS05440. The breadth and extent of change is staggering:  unprecedented collapse of multiple species of salmon, unprecedented marine heatwaves, disappearance of the cold pool, record low sea ice extent, changes in recruitment, shifts in size and condition of fish, changing physical and chemical ocean conditions, seabird die-offs, and unusual marine mammal mortality events.  *See* NMFS05437; NMFS05440; NMFS26855-56; NMFS15080; NMFS06272; SUPP00318-20; SUPP00722; SUPP01060.  While ocean temperatures in the last year have cooled somewhat, the changes from these warm years are expected to continue:  "[T]here is increasing evidence from ongoing responses of species to the [marine heat wave] that climate shocks and long-term warming are likely to impact future distribution and productivity of stocks in the region."  NMFS01280; *see also, e.g.*, SUPP00921 (more normal sea ice extent "appeared to have only minimal mitigating effects on the warmth in the upper water column").  The new, post-heat wave

ecosystem may have "reduced resiliency" and lower carrying capacity.  SUPP00337-38, SUPP00335.

Sea ice is an integral part of the resilience of the Bering Sea ecosystem, and its loss is a foundational change.  *See* NMFS23887.  Sea ice not only affects the temperature of the water column, but also salinity and density, vertical mixing, and nutrient transport.  NMFS23888.  This affects energy flow within the ecosystem, availability of high-quality prey for fish, including juvenile salmon, seabirds, and marine mammals, and the overall productivity of the ecosystem.  NMFS05438-42; NMFS05453-55; NMFS23887-88.  Sea ice extent declined steeply in the Bering Sea from 2012 through 2018, with the two lowest years on record in 2017-18 and 2018-19.  NMFS05438; SUPP01057.  In 2018, there was no cold pool in the southeastern Bering Sea and the two following years it was historically small.  SUPP01284; NMF05438; NMFS26855.  The Aleutian Islands have similarly experienced persistently warm surface and bottom water temperatures since 2013.  NMFS26855; NMFS03404; NMFS01280.

These warmer temperatures increase the metabolic needs of many species, including forage fish.  NMFS05442; SUPP00591.  At the same time, warmer ocean temperatures result in lower production of zooplankton, a normally abundant food source, and a shift to small, less nutrient-dense types of zooplankton.  *E.g.*, SUPP01138-39; SUPP01289; NMFS05439, NMFS05481.  These changes in the building blocks of the food chain are important for food web dynamics and carrying capacity.  SUPP00335; NMFS05504; SUPP00207-09.  The reduction in high-quality food sources means that, at

a time when fish need more food to meet metabolic needs, less food is available and it is of lower quality. SUPP01289; SUPP00338. This can result in a mismatch of prey available for some species, including seabirds and juvenile salmon, "exacerbat[ing] increased metabolic demands under increased thermal conditions." SUPP00337-38; *see also* NMFS03404. The decline in productivity at the base of the food chain is likely to continue in a changing climate "with uncertain outcomes for major fisheries." SUPP00213-14.

These food supply changes also affect forage fish and groundfish. Forage fish biomass "declined steeply" from 2015 through 2017 and was still below average in 2022. SUPP00331; NMFS05435. In 2021, pelagic foragers were at their second lowest biomass. SUPP00338. Pollock biomass dropped by nearly 60 percent between 2014 and 2018, though juvenile biomass increased in 2017. SUPP01284; SUPP00338. Groundfish body condition generally deteriorated between 2019 and 2021. SUPP00338. These declines have cascading effects for other species that prey on forage fish and groundfish. *See* SUPP00337 (shifts in food web decrease resiliency).

While the warming began around 2014, SUPP00334, there was an "abrupt and dramatic change" in the northern Bering Sea in 2017: "2018 was extraordinarily different in the [Northern Bering Sea] than in the past experience of scientists visiting the region or in the oral histories of local residents." SUPP01288; SUPP00335. High numbers of dead pollock washed ashore in Bristol Bay, something that subsistence and commercial fishers had never seen before. SUPP01292-93. With warmer ocean

temperatures, Pacific cod moved north, leading to the first ever stock assessment for northern Bering Sea Pacific cod. SUPP00722-23; SUPP01289. The northward movement of boats following groundfish also led to the first reported interaction between groundfish boats and threatened spectacled eiders. SUPP00336; *see also* NMFS26328-30.

These changes in ecosystem dynamics are linked with seabirds die-offs and unusual mortality events for marine mammals. In 2018 and 2019, there were seabird die-offs "unprecedented in terms of spatial and temporal scale," and, even in colonies where birds survived, catastrophic reproductive failures occurred. SUPP01290, SUPP01293; SUPP01075. Over 11,000 seabird carcasses of multiple species were counted in the region, SUPP01196, with starvation identified as the predominant cause of death. SUPP01290; SUPP01075, SUPP01194.

There were also unusual mortality events for large whales, including fin and humpback whales, in 2015-2016, SUPP03852-53, followed by an unusual mortality event in 2019 for gray whales—an "ecosystem sentinel for the North Pacific"— with 49 found in Alaskan waters, SUPP01083-84; SUPP1060. Preliminary studies identified emaciation as a cause of death for gray whales. SUPP01083. Similarly, an unusual mortality event was declared for ice seals in 2018 and 2019, with 282 seal carcasses counted along the Bering and Chukchi seas. SUPP01060; SUPP01083-84. The loss of sea ice pupping habitat was cited as one factor in the deaths, with "follow-on ecosystem effects such as competition for prey from northward shifts in distribution of large fish

predators" as another possibility.  SUPP01084.

Warming ocean conditions further exacerbated western Alaska Chinook salmon declines, which started around 2007, and contributed to the collapse of chum and coho salmon stocks in the last three years.  SUPP01995; SUPP00292-97.  There have been significant restrictions and closures of subsistence harvests since 2013 in the Yukon, Kuskokwim, and Norton Sound regions, with the lowest Chinook runs on record for the Kuskokwim in 2010-2013.  NMFS18165; SUPP00292.  In 2022, the Chinook run on the Yukon River was the lowest on record and no escapement goals were met.[4] NMFS06531.  Chinook salmon escapement for the Unalakleet River weir was the lowest on record in 2022.  NMFS06530-31.  Federal disasters were declared in multiple years and amounts necessary for subsistence have not been met since 2010.  *See* SUPP00294; NOAA Fisheries, Fishery Disaster Determinations (Oct. 8, 2023), https://www.fisheries.noaa.gov/national/funding-and-financial-services/fishery-disaster-determinations.  Several factors contribute to the decline, including marine and river conditions, bycatch in commercial groundfish fisheries, competition with hatchery fish, and nutritional stress.  NMFS33837 (Chinook); NMFS05453 (Chinook); NMFS33420 (chum); SUPP00242 (Chinook, chum); SUPP00169 (chum); SUPP00163-69 (Chinook).  Juvenile Chinook and chum salmon at sea show poor body condition and empty stomachs resulting from diet shifts forced by warm seas.  NMFS0543; SUPP00171-73.

Because of the steep decline across multiple species of salmon, western and

---

[4] Escapement is "the annual estimated size of the spawning salmon stock."  NMFS18159.

interior Alaska communities have had to curtail salmon harvests to meet escapement goals and allow stocks to rebuild. Western Alaska communities have depended on salmon for thousands of years; their ways-of-life are intertwined with salmon. Families gather at fish camps each year to process and store fish, while passing down cultural traditions. *See infra* pp. 13-14. This loss of salmon is both a food security crisis and a cultural crisis.

While communities are unable to feed themselves or carry on their cultures, these same salmon are caught as bycatch in the groundfish fisheries. On average, about half the Chinook salmon caught as bycatch in the groundfish fisheries originate from western Alaska rivers. In 2020, over 56 percent of the Chinook salmon caught as bycatch were from coastal western Alaska and the Yukon River. SUPP00009. From 2011 through 2020, the groundfish fisheries caught approximately 77,052 total western Alaska Chinook salmon as bycatch. SUPP00027. Over the same time period, the groundfish fisheries caught an estimated *annual* average of 49,290 chum salmon that originated from western Alaska rivers. SUPP00061 (Barry, Chum Genetics). While all these fish may not have returned to rivers as adults to spawn, bycatch takes several thousand fish out of the spawning stock, a loss of 3,000 to 14,000 eggs for each female Chinook alone. NMFS18156.

Multiple species of crab stocks have also collapsed. Between 2020 and 2023, the Secretary of Commerce approved fishery disaster declarations for the Bristol Bay red king crab, Bering Sea snow crab, and Norton Sound red king crab fisheries.

NMFS18836.  Since 2014, Bristol Bay red king crab have been decreasing in abundance. SUPP00471-72; SUPP01280.  The Service declared Eastern Bering Sea snow crab overfished in 2021.  NMFS18720; NMFS00615.  Climate change, reduced ice cover, the smaller size of the cold pool, and distributional shifts all suggest "a challenging future for the [Eastern Bering Sea] snow crab stock," NMFS28974, which "require[s] the use of a forward-looking perspective for managing snow crab and other Bering Sea fisheries…." NMFS18757.

These changes, individually and cumulatively, significantly affect subsistence. Without salmon, communities in western and interior Alaska are unable to meet their subsistence needs or practice long-held traditions.  Both seabird eggs and birds are also important for subsistence, but with massive die-offs and reproductive failures, some communities have been unable to gather eggs or harvest birds.  SUPP01061; SUPP01290, SUPP1293.  On St. Lawrence Island, "local people were stunned and there was a complete lack of harvest" of murres in 2018 because the birds were not there. SUPP01291.  Similarly, on St. Paul and St. George Islands, residents could not collect murre eggs or auklets and took only low numbers of kittiwakes for elders.  SUPP01293. Likewise, in coastal communities that harvest marine mammals, harvest opportunities are changing as seals are stranded or out of range with decreased ice.  *See* SUPP01291.

These changes in the ecosystem present a significantly different picture of the marine and human environment than that analyzed by the Service in 2007 and 2004.

I.      **Plaintiffs have standing.**

Association of Village Council Presidents (AVCP) and Tanana Chiefs Conference

(TCC) have standing to bring this case because their members have standing in their own

right, the interests at stake are germane to AVCP's and TCC's organizational purposes,

and the lawsuit does not require the participation of their individual members.  *Friends of*

*the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000).

Members and citizens of AVCP's and TCC's tribes and communities depend on—

and will continue to depend on—a healthy Bering Sea and Aleutian Islands ecosystem

because their traditions and cultures are intertwined with salmon and the resources of the

Bering Sea.  AVCP and TCC are Alaska Native non-profit regional tribal organizations

that, together, support the interests of 98 member tribes and communities stretching from

the southern shore of Norton Sound to Kuskokwim Bay and from Nunivak Island to

Eagle, an area with a population of about 45,000 people.  *See* Ex. 1, ¶¶6-8; Ex. 5, ¶¶8-9.

A central part of AVCP's and TCC's missions is to protect and enhance traditional and

cultural values, including subsistence.  Ex. 1, ¶¶10, 13, 16, 17-21; Ex. 5, ¶¶10-12, 18-26.

Citizens and members of AVCP's and TCC's tribes and communities are located

along the Yukon and Kuskokwim rivers, their tributaries, and the Bering Sea coast.

Ex. 1, ¶8; Ex. 5, ¶9.  The culture and traditions of citizens and members of AVCP's and

TCC's tribes and communities are fundamentally linked with salmon and have been for

thousands of years:  they are salmon people.  Harvesting salmon and other traditional

foods "is fundamental to our cultural traditions, maintaining traditional language, and sustaining communities." Ex. 1, ¶12; *see also* Ex. 2, ¶13; Ex. 3, ¶11; Ex. 4; ¶¶9-13; Ex. 5, ¶37; Ex. 6, ¶¶8-11. Salmon is the most important subsistence fish for households in these regions and the collapse of three species of salmon has had devastating effects. *See* Ex. 1, ¶¶13, 24; Ex. 2, ¶¶19, 21; Ex. 5, ¶12; Ex. 6, ¶15. Citizens and members of AVCP's and TCC's tribes and communities have been unable to meet their subsistence needs for many years, affecting their ability to provide food for their families and pass traditions to their children. Ex. 2, ¶¶19-20; Ex. 4, ¶13; Ex. 5, ¶¶13, 16, 35; Ex. 6, ¶15. It has also led to social and public health issues, including suicide, alcohol, and substance abuse. Ex. 1, ¶¶28, 31; Ex. 2, ¶21; Ex. 3, ¶¶22-23, 31.

In addition to salmon, members of AVCP's and TCC's tribes and communities depend on other marine resources not only as food, but as integral parts of their cultures. Residents of coastal communities hunt seals, walruses, seabirds, crabs, and other animals that depend on the ocean ecosystem. *See* Ex. 1, ¶14; Ex. 3, ¶¶12-13, 18; Ex. 4, ¶¶17-19; Ex. 5, ¶11. They use these marine resources to feed their families and to share with others. Ex. 2, ¶¶16-17; Ex. 3, ¶¶14, 17; Ex. 4, ¶17. The changes in the ocean have negatively affected marine mammals, seabirds, crabs, and other ocean resources on which citizens and members of AVCP's and TCC's member tribes and communities depend. *See supra* pp. 7-12.

The harms to these interests in the Bering Sea ecosystem and the marine wildlife it sustains are imminent, concrete, and particularized. *See Ctr. for Biological Diversity v.*

*Kempthorne*, 588 F.3d 701, 707-08 (9th Cir. 2009) (standing established where plaintiffs viewed polar bears across broad geographic region affected by regulation).

The Service's decision to authorize the groundfish fisheries across the Bering Sea and Aleutian Islands directly and irreparably harms the subsistence, economic, and cultural interests of citizens and members of AVCP's and TCC's tribes and communities. *See supra* p. 14. For example, citizens and members of AVCP's and TCC's tribes and communities face imminent harm to their interests in salmon because authorization of the groundfish fishery results in bycatch that reduces the number of salmon returning to western Alaska rivers. *See Flaherty v. Bryson*, 850 F. Supp. 2d 38, 48 (D.D.C. 2012) (finding standing in challenge to herring fishery management plan because plaintiffs were less likely to be able to fish for striped bass if fewer herring were available for bass to eat). The decision also affects when, where, and how much fishing is authorized, and those decisions affect marine resources—including salmon, marine mammals, and seabirds—on which citizens and members of AVCP's and TCC's tribes and communities depend. *See* Ex. 2, ¶¶24, 26; Ex. 6, ¶16.

The Service's authorization of the groundfish fishery, including the bycatch of salmon, using outdated analyses means that the Service has not analyzed the effects of its management choices on salmon and other marine resources in the context of today's dramatically changed ecosystem. This uninformed decision-making increases the risk to marine resources, and therefore, to citizens and members of AVCP's and TCC's tribes and communities. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971

(9th Cir. 2003) (recognizing injury in the form of "added risk to the environment" when decisionmakers do not make decisions based on an adequate analysis (quoting *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 930 n.14 (9th Cir. 2000))).

These harms constitute concrete injury in fact, are fairly traceable to the actions taken by the Service challenged in this litigation, and are likely to be redressed by the relief sought. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) ("Plaintiffs need not demonstrate that there is a guarantee that their injuries will be redressed by a favorable decision.") (quotation marks and citation omitted).

## II. Standard of review.

This challenge arises under the Administrative Procedure Act, which directs courts to "set aside" agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(1), (2)(A) & (D). An agency action is arbitrary if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

**III.    The Service violated NEPA because it did not prepare either an EIS for its 2023-2024 harvest specifications decision or a supplemental EIS for the harvest specifications strategy.**

By authorizing fishing for up to two million metric tons of fish without completing any NEPA document disclosing the effects of that decision in the context of today's environment, Defendants violated NEPA.  The 2023-2024 harvest specifications decision is a major federal action with potentially significant effects on the environment.  When the Service adopted that decision, it did not prepare an EIS.  Instead, it completed a supplementary information report pointing to the EIS for the 2007 harvest specifications strategy as providing the necessary NEPA analysis.  The 2007 EIS does not analyze the effects of the 2023-2024 harvest specifications in the context of today's environment. The Service acted arbitrarily, in violation of NEPA, by adopting the annual harvest specifications without producing an EIS.

Even if the 2023-2024 harvest specifications decision does not, itself, require an EIS, the Service violated NEPA by declining to supplement the 2007 harvest specifications strategy EIS.  The annual harvest specifications decision is an implementation of the harvest specifications strategy adopted in 2007.  The Service concluded, in its 2023 supplementary information report, that it need not prepare a supplemental EIS because there is no new information not analyzed in either the 2007 EIS or through the harvest specifications process.  That conclusion is arbitrary.  The dramatic changes in the Bering Sea and Aleutian Islands ecosystem are significant, and must be analyzed in an EIS; considering this substantial new information outside a NEPA

process is insufficient. The Service's adoption of the 2023-2024 harvest specifications decision without either a project-specific EIS or a supplemental EIS for the harvest specifications strategy violated NEPA.

A. **The 2023-2024 harvest specifications decision is a major federal action with potentially significant environmental effects and there is no EIS analyzing it in the current environmental context.**

The adoption of harvest specifications authorizing the removal of up to two million metric tons of fish from the ocean is a major federal action with significant environmental effects. NEPA requires agencies to prepare an EIS for every major federal action that may have significant effects on the human environment. 42 U.S.C. § 4332(2)(C) (2022). If an action is not categorically excluded from NEPA, an agency must generally either prepare an environmental assessment and determine the effects of the action are not significant or it must prepare an EIS. 40 C.F.R. §§ 1501.3, 1501.4; *Solar Energy Indus. Ass'n v. Fed. Energy Regulatory Comm'n*, 80 F.4th 956, 991-92 (9th Cir. 2023). This requirement serves to ensure that agencies take a "hard look" at the environmental effects of a proposed action, consider alternatives to it, and "inform the public in an EIS of the relevant factors that were considered in the decision-making process." *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 811 (9th Cir. 2005) (citations omitted).

The requirement to complete an EIS is triggered when "substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562

(9th Cir. 2006) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)).  It is not necessary to "show that significant effects *will in fact occur*," it is enough that there are "substantial questions whether a project may have a significant effect"; this is a low standard.  *Id.* (quoting *Idaho Sporting Cong.*, 137 F.3d at 1150); *see also Solar Energy Indus.*, 80 F.4th at 991 (9th Cir. 2023).  "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)).

### 1.    The harvest specifications decision is a major federal action.

The 2023-2024 harvest specifications decision is a major federal action because it is a final rule approving fishing subject to federal control.  Regulations implementing NEPA define a major federal action as "an activity or decision subject to Federal control and responsibility."  40 C.F.R. § 1508.1(q)  The definition includes "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; [and] new or revised agency

rules, regulations, plans, policies, or procedures….” *Id.* § 1508.1(q)(2).[5] Authorizing

commercial fishing is a major federal action. *See Ramsey v. Kantor*, 96 F.3d 434, 443-44

(9th Cir. 1996) (concluding that issuing an incidental take statement for salmon “is

functionally equivalent to a permit,” allowing fishing to happen and therefore a major

federal action).

The Service apparently recognized the adoption of the harvest specifications is a

major federal action because it completed a supplementary information report to consider

whether NEPA analysis was required, but erroneously concluded there was no significant

new information to assess. *See infra* pp. 26-36. The adoption of the harvest

specifications each year is necessary to allow fishing to proceed, consistent with the

fishery management plan. *See* NMFS00018 (rule “establish[es] harvest limits for

groundfish”); NMS06609-10. In this decision, the Service determines how many fish can

be removed from the ocean, making adjustments for social and economic factors,

NMFS00018; chooses which of six analytical “tiers” to use for determining limits for

each stock, *id.*; uses those tiers to set overfishing limits and acceptable biological catch

levels, *id.*; divides catch limits among seasons and sectors, NMFS00020-32; may split or

combine groupings of fish species, NMFS00119; establishes annual prohibited species

---

[5] Former NEPA regulations included a similar definition for “major federal action,” but specified that “[m]ajor reinforces but does not have a meaning independent of significantly.” 40 C.F.R. § 1508.18(2020); *see also id.* § 1508.27 (defining “significantly”). In 2020, the regulations were replaced and the new definition of “major federal action” appears at 40 C.F.R. § 1508.1(q). In adopting the regulations, the Council on Environmental Quality specified that “major” and “significant” should have independent meanings. *See* 85 Fed. Reg. 43,304, 43,345 (July 16, 2020).

catch limits for crab and herring, NMFS00033; and puts into effect the prohibited species catch limit for Chinook salmon based on prior year's abundance estimates.[6]  NMF00032-33; *see also* NMFS00119-28 (describing process); 50 C.F.R. §§ 679.20-.26.  The harvest specifications process adopted in the fishery management plan establishes a structure for making these decisions, but it leaves the Council and the Service with considerable discretion to make critical choices about what type of boats can fish for how many fish of each kind in a given year.  *See League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1217 (9th Cir. 2008) (where the agency "has statutory authority to regulate the environmental consequences of the Project," it must comply with NEPA).

In other fisheries, the Service has prepared, at a minimum, environmental assessments to consider whether the adoption of catch limits and similar fisheries management tools may have significant environmental effects.  *See, e.g.*, *Nw. Env't Def. Ctr. v. Brennen*, 958 F.2d 930, 933, 936 (9th Cir. 1992) (Service prepared EA for amendment to regulations setting abundance-based limits for annual salmon escapement goals); *Oceana v. Locke*, 831 F. Supp. 2d 95, 104, 125 (D.D.C. 2011) (Service prepared EIS for amendment to plan modifying trip limits, establishing mechanism for specifying catch limits, and calculating control rule, but concurrently adopted annual catch limits with an EA); *see also* 75 Fed. Reg. 18,356, 18,356 (Apr. 9, 2010) (final rule and notice of

---

[6] Salmon bycatch is regulated under 50 C.F.R. § 679.21(f), which sets a range of limits for Chinook bycatch and establishes a savings area, but no overall cap, for chum bycatch

EA for concurrent adoption of annual catch limits and other specifications discussed in *Oceana*); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1327-28 (9th Cir. 1992) (new EA prepared before reopening fishery for final quarter of a season).  In this case, the Service did not even prepare an environmental assessment to consider the significance of the action.

> **2.** **The 2023-2024 harvest specifications may have significant effects.**

These choices made in the harvest specifications decision have significant effects. To determine whether the effects of an action may be significant, "agencies shall analyze the potentially affected environment and degree of the effects of the action."  40 C.F.R. § 1501.3(b).  This requires considering the affected environment and its resources, including short and long-term effects, beneficial and adverse effects, and public health and safety.  *Id.*; *see also Blue Mountains Biodiversity Project*, 161 F.3d at 1213 (citing former regulation listing relevant factors for significance under NEPA); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 569 U.S. 139, 157 (2010) (significance requires considering context and intensity).  If a project *may* have significant effects, the agency must prepare an EIS.  *Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 562 (citing *Idaho Sporting Cong.*, 137 F.3d at 1150).  Authorizing fishing for the largest trawl fishery in the world, SUPP00179, is likely to have significant effects, particularly when considered in the context of a dramatically altered, potentially less-

resilient ecosystem.

The authorization of fishing under the harvest specifications affects targeted and non-targeted fish, habitat, marine mammals, and other ecosystem components. As the Service recognized in its 2007 EIS for the harvest specifications strategy,

> [a]nnual target species harvests, conducted in accordance with the annual specifications, will impact the stocks of the target species themselves. Annual harvest activity may change total mortality for the stocks, may affect stock characteristics through time by selective harvesting, may affect reproductive activity, may increase the annual harvestable surplus through compensatory mechanisms, may affect the prey for the target species, and may alter [essential fish habitat].

> The annual target species harvests also impact the environmental components described in this EIS: nontarget fish species, seabirds, marine mammals, living and nonliving benthic habitat, and a more general set of ecological relationships.

NMFS06621. Some of the effects of fishing may be irreversible. NMFS19126 (biological opinion for fisheries stating models show species will not recover pre-fishing biomass over a 100-year timeframe). These acknowledged effects of harvests conducted under the annual specifications are both short- and long-term effects that may have consequences for marine resources and the people who depend on them, and they should be considered in an EIS. *See Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 562.

Because, "as a practical matter, the volume of a fishery's total annual catch is inextricably linked to the amount of its bycatch," the authorization of fishing affects the amount of bycatch in the fishery. *Oceana*, 831 F. Supp. 2d at 108. Trawling is non-selective and bycatch is inevitable; at higher levels of fishing, more bycatch is likely.

*See* NMFS06713 (projecting higher bycatch under higher catch limits); NMFS26847 (similar). Trawling for pollock results in bycatch of tens to hundreds of thousands of Chinook and chum salmon, some of which would otherwise return to western Alaska rivers to spawn and produce more salmon. *See supra* pp. 10-11; *see also* NMFS18142 ("Any additional fish returning to those rivers improves the ability to meet escapement goals, which is necessary for long-term sustainability of the stocks and the people reliant on this fishery."). Crabs, including from stocks that have recently collapsed, are also caught as bycatch. *See supra* pp. 2-3, 11-12. With the collapse of salmon and crab stocks, added bycatch may have a greater impact. *See Pac. Marine Conservation Council v. Evans*, 200 F. Supp. 2d 1194, 1206 (N.D. Cal. 2002) (finding "unpersuasive" the agency's argument that serious decline in a fish population caught as bycatch in groundfish fishery was not significant where fishery contributed to decline).

Trawling and other groundfish fishing can also "influence the structure and function of marine ecosystems," NMFS24544, remove top predators, NMFS26434, change predator-prey relationships, NMFS00233-34, damage bottom habitat and kill benthic organisms, NMFS00234, affect food web dynamics, "alter the amount and flow of energy in an ecosystem," NMFS26436, influence species diversity, NMFS26436-37, and cause direct stress to marine mammals and birds. NMFS00118. While the Service may have concluded that some of these impacts were not significant in 2004 or 2007, it cannot make that conclusion now without analyzing the effects of fishing in the context of today's dramatically changed environment. The removal of 2.0 million metric tons of

fish—without considering spatial shifts, changes in abundance of forage fish, increased metabolic needs, or how these changes affect subsistence—could exacerbate the ecosystem-wide impacts of these changes. *See Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019) (understanding baseline conditions is critical to assessing effects of agency action); *see also All. for the Wild Rockies v. Cooley*, No. CV 21-136-M-DWM, 2023 WL2522945, at *10-11 (D. Mont. Mar. 14, 2023), *appeal filed*, No. 23-35436 (9th Cir. June 26, 2023) (presence of grizzly bears in locations they previously did not exist was a significant new circumstance).

The agency itself acknowledges, in its 2007 EIS for the harvest specifications strategy, that authorizing fishing under the annual harvest specifications process affects many components of the ecosystem. *See supra* p. 23. These effects are significant and should have been considered in an EIS. *See Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 562.

**B.    The 2007 EIS for the harvest specifications strategy does not analyze the effects of the 2023-2024 harvest specifications decision in the context of the current environment.**

In an attempt to justify its failure to comply with NEPA, the Service completed a supplementary information report for the 2023-2024 harvest specifications in which it concluded 1) the effects of the 2023-2024 specifications fall "within the scope of those analyzed and disclosed in the [2007 harvest specifications] EIS"; and 2) there is no information or circumstances "not addressed through the annual process of using the preferred harvest strategy to set the harvest specifications." NMFS00592, NMFS00635.

The Service did not actually consider any new information about the status of the ecosystem and explain its significance, or lack thereof, in the supplementary information report, as NEPA requires. *See Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024 (9th Cir. 1980). Its explanation does not constitute a "reasoned decision," because 1) new information about collapsing salmon stocks and the state of the ecosystem is not within the scope of effects previously disclosed and, 2) the Service cannot rely on an evaluation outside the NEPA process to consider significant new information. *See Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) ("[O]nce an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute."); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000).

The last decade has been a time of turbulence in the North Pacific ecosystem, with unprecedented, record-setting events and the most restrictive subsistence fishing seasons in living memory for salmon-dependent communities in western and interior Alaska. *See supra* pp. 10-11. These events—described as unexpected and unprecedented by the Service's own scientists—did not occur until years after the 2004 and 2007 EISs were

completed and were not analyzed in either of those documents.[7] *See Blue Mountains Biodiversity Project*, 161 F.3d at 1214 (when a significant event occurred several years after the completion of an EIS, the EIS "does not, and could not, evaluate the impacts of" the event).

### 1. Changed ocean conditions.

Warming ocean temperatures and loss of sea ice over the last decade drove changes in physical oceanography affecting productivity of the overall marine ecosystem and its ability to support a variety of organisms. *See supra* pp. 6-12. The 2004 programmatic EIS and 2007 harvest specifications EIS discuss normal variability in the North Pacific and historical warm and cold periods, but do not analyze the type of upheaval that has characterized the past decade. The 2007 EIS for the harvest

---

[7] Although, in the 2023-2024 harvest specifications decision, the Service states that the 2004 programmatic EIS is "outside the scope of this action," NMFS00042, the annual harvest specifications decision is a central component of groundfish management that is both an implementation of and constrained by the harvest specifications strategy and the fisheries management plan. NMFS06565 (harvest specifications strategy is "a project-level action within the fishery management programs under the . . . groundfish FMPs"). Further, the 2007 harvest specifications EIS relies extensively on the 2004 programmatic EIS, incorporating it by reference and relying on the 2004 EIS as the "overarching analytical framework" and "baseline analysis for evaluating subsequent management actions." NMFS06565-66; *see also* NMFS06621 (explaining that all future harvest specifications will be part of the management process "subject to" the 2004 programmatic EIS). In the 2007 harvest specifications EIS's analysis of subsistence, for example, the Service stated that a "description of subsistence use of natural resources potentially affected by commercial groundfish fisheries was outlined in detail in the [2004 programmatic EIS]...." NMFS06862; *see also, e.g.*, NMFS06720, NMFS06577, NMFS06645, NMFS06658, NMFS06680, NMFS06684, NMFS06690, NMFS06701, NMFS06705, NMFS06738, NMFS06742, NMFS06752, NMFS06754, NMFS06759, NMFS06761, NMFS06783, NMFS6786, NMFS06790, NMFS06802, NMFS06825.

specifications strategy, for example, includes a short overview of regime shifts, warming ocean conditions, and acidification, but does not anticipate the accelerated rate of change now occurring. NMFS006632-35. It does not, for example, discuss shifts in zooplankton production and corresponding metabolic stress for different species, or shifts in abundance and spatial distribution. *See id.*; *supra* pp. 6-8 (describing these changes).

The 2004 programmatic EIS includes even less information related to today's ocean conditions. In it, the Service similarly describes historical interannual fluctuations in atmospheric and oceanic parameters. NMFS23888-92. The analysis postulates that climate drivers have a greater effect on the ecosystem than fisheries, but also concludes "groundfish management areas generally exhibit sustainable ecosystem-level characteristics with regard to overall productivity and the ability to maintain structural and functional patterns in the face of disturbance." NMFS24555. In the 2015 supplemental information report, the expert analysis of ecosystem factors described then-recent changes as within the "short- or medium-term (3 to 5 year) range of natural variability, as measured over the last 30 years" and concluded that ecosystem indicators were within one standard deviation of the mean. NMFS23435, NMFS23415.

Today, agency reports describe the current warming as "greater in both magnitude and duration than that of the early 2000s," SUPP00723, and explain that recent warm years "have been warmer than average throughout the year," where earlier warming was more limited. SUPP01061. They also show many ecosystem indicators more than one standard deviation above or below the mean, NMFS05437, in direct contrast to the

conclusion in the 2015 supplemental information report that all indicators were within one standard deviation. According to the Service's own reports, the changes suggest that structural and functional patterns of the ecosystem changed during this warming, affecting productivity across all levels of the food web with "ongoing responses" to "climate shocks and long-term warming…." NMFS01280; *see also* SUPP00331-38; NMFS05439-42. These concerns about productivity and never-before-seen events do not fall within the range analyzed in the Service's 2004 and 2007 EISs and call into question the Service's conclusions about the ability of the ecosystem to maintain structural and functional patterns in the face of disturbance. SUPP00337 (discussing inability to recover from heatwave); SUPP00336 ("[S]ome linkages across these collapses may help inform the need for near-term precautionary management decisions."). If considered in an updated EIS, this information could lead the Service to consider changes in the harvests specifications process to mitigate the effects of fishing in this new environment. *See Warm Springs Dam Task Force*, 621 F.2d at 1024-25 (information that undermines agency's assumptions may require supplementation of EIS).

### 2. Seabird and marine mammal mortality events.

Changes in ocean temperature and productivity are linked with seabird die-offs, "unprecedented in terms of spatial and temporal scale," SUPP01289, and large-scale unusual mortality events for humpback whales, gray whales, and ice seals. SUPP01060; SUPP01289; SUPP03852-53; *supra* p. 9. These recent events are not discussed in either the 2004 programmatic or 2007 harvest specifications strategy EISs because events of

this scale have not occurred previously.

The 2007 harvest specifications strategy EIS recognized that fisheries can reduce or disperse prey species for birds, NMFS06753, NMFS06759-60, result in direct mortality through bycatch, NMFS06753-56, and affect foraging habitat, NMFS06761-62. With respect to habitat, the EIS acknowledged that fishing can affect habitat for spectacled and Steller's eiders that feed on the ocean bottom, but stated that fishing effects were unlikely because there is little spatial overlap between groundfish fisheries and eider critical habitat.  NMFS06761.

Since that time, however, seabirds have experienced massive die-offs.  *See supra* p. 9.  In addition, the Service acknowledged, in a report for the 2020 harvest specifications, that "[s]eabird bycatch rates are influenced, in part, by prey supply and a link exists between poor ocean conditions and peak bycatch years."  SUPP00720.  In the context of recent die-offs and ongoing disruption in the marine ecosystem, this information could be significant to fisheries management choices.  The Service has also recently documented the first interactions between fishing vessels and eider habitat. *See supra* p. 9.  This information contradicts the Service's previous analysis and should be considered in an EIS.  *See Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937-38 (9th Cir. 2010) (new information showing sage grouse habitat in project area was significant where agency had previously concluded there was none).

With respect to marine mammals, the 2007 harvest specifications EIS is similarly silent regarding unusual mortality events.  *See* NMFS06724-37.  It discusses how many

Steller sea lions, seals, whales, and walruses are killed by fisheries annually, either directly or indirectly, and determines fishing is having limited effect on these animals because fisheries do not exceed specified mortality goals for most species. *See* NMFS06725-37. For western North Pacific humpbacks, however, the level of fishery-caused mortality at the time the 2007 EIS was written exceeded this goal. NMFS06737. In 2015, the Service declared an unusual mortality event for large whales that included 22 humpbacks. SUPP03852-53. The deaths were linked with warm ocean conditions. NMFS03853. This information is significant because increased mortality outside of fisheries could affect the Service's assessment of the significance of fishery-related mortalities.

### 3. Multi-species salmon collapse.

The precipitous decline of Chinook salmon began around 2007, when the harvest specifications strategy EIS was produced, and has steadily heightened with the collapse of chum and coho stocks. *See supra* pp. 10-11.

In contrast with the current situation, when the 2007 harvest specifications EIS was produced, western Alaska Chinook and chum salmon stocks were meeting or exceeding escapement goals. The 2007 EIS stated that western Alaska Chinook and chum salmon met or exceeded escapement goals in 2004, 2005, and 2006 and "escapement in excess of minimum needs has generally increased in recent years as well, allowing for subsistence use, recreational fishing, and commercial fishing activities." NMFS06712, NMFS06704. The EIS characterized Kuskokwim chum stocks as

"rebuilt", NMFS06826, and predicted "continued strong production" of Chinook. NMFS06825. While Yukon stocks were not doing as well, "continued improvement in run size" was expected for chum salmon. NMFS06826.

The 2004 programmatic EIS estimated an annual subsistence harvest of over 50,000 Chinook and 160,000 chum for the Yukon region, NMFS24473, and over 77,000 Chinook and 47,000 chum salmon in the Kuskokwim area. NMFS24474. There were "approximately 300,000 chinook salmon" harvested on average for commercial and subsistence use from 1998 through 2000. NMFS26248. By contrast, in 2022, there were only half as many salmon returning to the Upper Yukon, Unalakleet, and Kuskokwim rivers combined as were harvested on an annual basis when the 2004 programmatic EIS was produced. NMFS06530 (three-system index for 2022 was 158,646 Chinook). In 2022, run sizes were at record, or near record, lows on two of the three rivers. Although the programmatic EIS described western Alaska Chinook salmon as depressed, subsistence and commercial fishing were still happening. NMFS26250, NMFS26253. Today, there is no commercial salmon fishing in the Yukon and Kuskokwim rivers and subsistence fishing is closed or severely restricted.

Both the 2004 programmatic EIS and the 2007 harvest specifications strategy EIS recognized that "[i]f individual stocks become so depressed that full closure of direct fisheries is insufficient to enable a rebound in the population, then any additional mortality, including bycatch, could negatively impact the stock." NMFS24475; NMFS06866; NMFS24544. There have now been full and partial closures of directed

Chinook fisheries for many years in western Alaska rivers.  SUPP00228-29.  Instead of "continued improvement" or "continued strong production," NMFS06825-26, salmon stocks hit record lows, leading to an ongoing and worsening subsistence crisis.  SUPP00292-97; NMFS05453-54.  At the same time, juvenile Chinook ocean abundance started declining around 2013, and both Chinook and chum salmon at sea have shown poor body condition and empty stomachs during recent warm years.  SUPP00163-68, SUPP00170-73.  The precipitous, ongoing decline of salmon stocks is significant information that must be analyzed in a supplemental EIS.  *See Friends of the Clearwater*, 222 F.3d at 557 (supplemental EIS is required where new information shows the action "will affect the quality of the human environment in a significant manner or to a significant extent not already considered" (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989))).

### 4. The need to evaluate fisheries management in light of significant change.

These changes undermine numerous assumptions in the 2007 harvest specifications strategy EIS and the 2004 programmatic EIS.  Fisheries management decisions can either exacerbate environmental changes or support a more resilient ecosystem in the face of unprecedented changes.  As the Service recognized in 2004, "[b]oth climate and commercial fishing activity currently influence the structure and function of the North Pacific Ecosystem."  NMFS24545.  If the Service considered the effects of fisheries management decisions in the context of significant changes across the

ecosystem, it could lead the Service to consider new approaches to management to better address these concerns. For example, the information could be important not only for incorporating ecosystem considerations into the existing process for calculating total allowable catch, but also for considering alternatives to that process in an EIS, potentially including spatiotemporal changes to the process for setting catch limits, reconsidering harvest control rules, or changing how subsistence and ecological factors are considered. *See* 50 C.F.R. § 600.310(e)(1)(v)(C) ("ecological and environmental information should be taken into account" in specifying maximum sustained yield); *id.* § 600.310(e)(3)(A)(i), (e)(3)(A)(iii), (f)(4)(iv) (requiring consideration of economic, social, and ecological factors).

### C. The Service cannot substitute the harvest specifications process for an analysis of significant information in a NEPA document.

The Service's second conclusion in its 2023 supplementary information report— that it did not need to consider new information because it was considered through the harvest specifications process—is also erroneous. NMFS00590-92. While an agency may use a non-NEPA document to consider the significance of new information, it may not substitute a non-NEPA process or document for a supplemental EIS if the information is significant. *Idaho Sporting Cong. v. Alexander*, 222 F.3d at 566. Allowing agencies to use non-NEPA documents to assess significant information would subvert NEPA's "twin aims" of achieving "active public involvement and access to information." *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505,

1511 (9th Cir. 1997) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

The stock assessments the Service considers during the annual harvest specifications process are not NEPA documents and are not a substitute for a supplemental EIS. *Idaho Sporting Cong. v. Alexander*, 222 F.3d at 565-66. An EIS provides a detailed discussion of the environmental consequences of a proposed action along with a comparison of alternatives to the action so that the agency and the public can consider the environmental trade-offs of these different approaches. *See Price Rd. Neighborhood Ass'n*, 113 F.3d at 1511; 40 C.F.R. § 1502.14; *see id.* § 1503.1. By contrast, stock assessments consider the status of individual groundfish stocks and are focused on identifying the overfishing limits and catch levels for those stocks, following the parameters of the current harvest specifications process and fisheries management plan. *See, e.g.*, NMFS01264-315 (summarizing stock assessment reports); NMFS06563-64 (describing harvest specifications process). The reports focus on how the ecosystem affects the fishery rather than how the fishery affects components of the ecosystem. The 2022 pollock stock assessment for the Eastern Bering Sea, for example, includes only three paragraphs assessing the effects of the pollock fishery on the ecosystem, while the remainder of the report focuses on how the ecosystem affects pollock. *Compare* NMFS02531 (effects of pollock fishing on ecosystem) *with, e.g.*, NMFS02526 (concluding declining western Alaska salmon stocks could mean less competition for pollock prey); *id.* (suggesting declining fur seal populations could reduce

pollock consumption).  This is not a substitute for the effects analysis required under NEPA.

Critically, stock assessment reports do not consider any alternative approaches to the existing harvest specifications process.  They do not, for example, consider whether more precautionary approaches to setting catch limits would have ecosystem benefits in light of unprecedented ecosystem change.  Nor do they consider how the catch limits they recommend interact with different management measures to affect the ecosystem or whether additional set-asides or reserves may be needed to provide a buffer for decreased resiliency.  *See, e.g.*, *Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1273-74 (W.D. Wash. 1999) (discussing need to assess interaction of fisheries management measures together in an EIS).  The stock assessment reports do not satisfy NEPA's purpose of informed agency decision-making and public participation and cannot be used as a substitute for a supplemental EIS.  *Idaho Sporting Cong. v. Alexander*, 222 F.3d at 566.

## IV.    The Service violated NEPA by declining to complete a supplemental EIS analyzing the effect of its harvest specifications decision in the current environment.

Even if the Service was not required to complete a NEPA analysis for the 2023-2024 harvest specifications decision, it violated NEPA by failing to complete a supplement to the 2007 EIS for the harvest specifications strategy.  When major federal action "remains to occur," an agency must supplement its EIS to address significant new information.  40 C.F.R. § 1502.9(d).  In view of NEPA's "'action-forcing' purpose",

*Marsh*, 490 U.S. at 371, an agency "that has prepared an EIS cannot simply rest on the original document." *Friends of the Clearwater*, 222 F.3d at 557. The agency "must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval.'" *Id.* (quoting *Marsh*, 490 U.S. at 374). Thus, an agency "[s]hall prepare," 40 C.F.R. § 1502.9(d)(1), a supplement to its EIS when, among other things, "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(d)(1)(ii). Agency guidance provides that "[a]s a rule of thumb,… if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if" a supplemental EIS is needed.[8] 46 Fed. Reg. 18,026, 18,036 (Mar. 23, 1981) (question 32); *see also Kunaknana v. U.S. Army Corps of Eng'rs*, 23 F. Supp. 3d 1063, 1070-71 (D. Alaska 2014); Env't Prot. Agency, *Reviewing Environmental Impact Statements for Fishery Management Plans* at 20 (Sept. 2005). An agency may not rely on or tier to an *outdated* programmatic EIS to support a site-specific or project-level action. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1245 (D.C. Cir. 2018); *see also Blue Mountains Biodiversity Project*, 161 F.3d at 1214.

The harvest specifications strategy is an ongoing action that provides direction for

---

[8] This has now been codified at 42 U.S.C. § 4336b (2023), which provides that agencies may rely on programmatic environmental reviews after five years only if "the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid."

the annual harvest specifications decisions. *See Marsh*, 490 U.S. at 374 (agency need

only supplement an EIS if there "remains federal action to occur"). While agencies may

not need to supplement environmental analyses for actions, like land use plans, that are

complete when approved, they must supplement environmental analyses for ongoing

actions where there is remaining federal action. *See Norton v. S. Utah Wilderness All.*,

542 U.S. 55, 73 (2004). When an agency retains ongoing oversight in administering the

action, there is action remaining to occur. *See Sierra Club v. Bosworth*, 465 F. Supp. 2d

931, 939 (N.D. Cal. 2006). A management plan that requires an agency to take specific

actions, in contrast to a policy-level document, is ongoing. *See Cottonwood Env't L. Ctr.

v. Bernhardt*, 796 F. App'x 368, 370-71 (9th Cir. 2019) (distinguishing between bison

management plan and policy-level land management plan); *see also All. for the Wild

Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 606 n.10 (9th Cir. 2014) (assuming,

without deciding, that bison management plan is ongoing action).

The harvest specifications strategy "is the choice of a harvest strategy for the

federally managed groundfish fisheries" and "determine[s] annual harvest specifications

in compliance with" federal laws and the fishery management plans. NMFS06556. It is

a "project-level action," NMFS06565, "that will take place in every one of the years

considered" in the 2007 harvest specifications strategy EIS. NMFS06620; *see also*

NMFS00586 (description of process). The harvest specifications strategy is not a policy-

level document like the land use plan considered in *Norton*. It creates a specific process

and defines the parameters within which the Service must make its annual management

decisions.  *See* NMFS06577-78.  To operate the fishery, the Service must continue to make distinct decisions on an annual basis:  "A harvest strategy is needed for the management of the groundfish fisheries and the conservation of marine resources….  Each year the harvest strategy uses the best scientific information available in the annual [stock assessment and fishery evaluation] reports to derive the annual harvest specifications…."  NMFS00041.  Recognizing the ongoing nature of the action, the Service completed a supplementary information report for the 2023-2024 harvest specifications decision, relying on the 2007 harvest specifications strategy EIS to support its annual decision.[9]  *See* NMFS000584.

In deciding whether to prepare a supplemental EIS for an ongoing action, the agency "must 'ma[ke] a reasoned decision based on … the significance—or lack of significance—of the new information'…."  *Friends of the Clearwater*, 222 F.3d at 557 (quoting *Marsh*, 490 U.S. at 378).  An agency may prepare a supplemental information report to determine whether new information requires the preparation of a supplemental EIS, but if the information is significant, it must prepare a supplemental EIS.  *Idaho Sporting Cong. v. Alexander*, 222 F.3d at 566; *see also Price Rd. Neighborhood Ass'n*, 113 F.3d at 1510.  "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant."  *Blue Mountains Biodiversity Project*, 161 F.3d at 1212 (quoting *Save the Yaak Comm.*,

---

[9] By contrast, the Service argued that the 2004 programmatic EIS is outside the scope of the annual decision.  NMFS00042; *but see supra* n.9.

840 F.2d at 717).

The changes to the Bering Sea and Aleutian Islands ecosystem in the last decade constitute significant changes to every aspect of the marine ecosystem. *See supra* pp. 25-34. They are relevant to fisheries management decisions, including the harvest specifications strategy, and, if considered in a supplemental EIS, could lead the Service to consider different approaches to setting the harvest specifications, including more precautionary management. *See supra* pp. 33-34. The Service's reasons for not completing a supplemental EIS—that any new information is not significant or that it was considered in the harvest specifications process—are arbitrary for the reasons described above. *See supra* pp. 25-36. The Service therefore violated NEPA.

## CONCLUSION

The Service's refusal to complete any NEPA analysis to analyze the effects of its fisheries management choices in the context of today's environment was arbitrary and violates NEPA. Plaintiffs ask the Court to remand the 2023-2024 harvest specifications decision to the Service and order the parties to submit supplemental briefing to address the appropriate remedy. *See* Doc. 25 at 2.

Respectfully submitted this 9th day of October, 2023.

*s/ Katharine S. Glover*
Katharine S. Glover (Alaska Bar No. 0606033)
Eric P. Jorgensen (Alaska Bar No. 8904010)
Charisse Arce (Alaska Bar No. 2303017)
Maile Tavepholjalern (Alaska Bar No. 1611094)
EARTHJUSTICE

*Attorneys for Plaintiffs Association of Village
Council Presidents and Tanana Chiefs
Conference*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this document contains 9,997 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 9th day of October, 2023.

      *s/ Katharine S. Glover*
      Katharine S. Glover

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2023, a copy of foregoing PLAINTIFFS'

PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1), with attachments, was served

electronically through the CM/ECF system on the following counsel of record:  Jennifer

Sundook, James C. Feldman, Jeffrey M. Feldman, and Elizabeth M. Bakalar.


    *s/ Katharine S. Glover*
    Katharine S. Glover

# TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration of Vivian Korthuis |
| 2 | Declaration of Jennifer Hooper |
| 3 | Declaration of Thaddeus Tikiun Jr. |
| 4 | Declaration of Joseph Joseph |
| 5 | Declaration of Brian Ridley |
| 6 | Declaration of Karma Ulvi |