James C. Feldman, (Alaska Bar #1702003)
Jeffrey M. Feldman (Alaska Bar #7605029)
SUMMIT LAW GROUP, PLLC
315 Fifth Avenue S., Suite 1000
Seattle, WA  98104
(206) 676-7000
*jamesf@summitlaw.com*
*jefff@summitlaw.com*

**Counsel for At-Sea Processors Association
and United Catcher Boats**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA
## AT ANCHORAGE

| | |
|---|---|
| ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS, *et al.*, | NO.  3:23-cv-00074-SLG |
| Plaintiffs, | |
| and | |
| CITY OF BETHEL, | |
| Intervenor-Plaintiff, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, *et al.*, | |
| Defendants, | |
| and | |
| AT-SEA PROCESSORS ASSOCIATION, *et al.*, | |
| Intervenor-Defendants. | |

**AT-SEA PROCESSORS ASSOCIATION'S AND UNITED CATCHER BOATS'
RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT (L.R. 16.3(c)(2))**

**Ass'n of Vill. Council Presidents, et al. v. National
Marine Fisheries Serv., et al.**
**Case No. 3:23-cv-00074-SLG**

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ..................................................................................................... 3

    A.   The Magnuson-Stevens Fishery Conservation and Management Act and Regional Fishery Management Council Framework. ............................ 3

    B.   The Bering Sea and Aleutian Islands Fishery Management Plan and the Harvest Specifications Strategy EIS. ....................................................... 4

        1.   The Bering Sea and Aleutian Islands Groundfish Fishery Management Plan. ........................................................................... 4

        2.   The Harvest Specifications Strategy EIS established the framework for setting annual harvest specifications and reviewing new information. ............................................................. 6

    C.   The Annual Harvest Specifications Are Set Through an Iterative Public Process Guided by the Best Available Science. ................................. 8

    D.   The 2023-2024 and 2024-2025 BSAI Harvest Specifications and Procedural History. ..................................................................................... 11

III. STANDARD OF REVIEW ................................................................................... 13

IV.  ARGUMENT ....................................................................................................... 13

    A.   Plaintiffs Have Waived Any Argument that the Annual Harvest Specifications Require Preparation of a Standalone EIS By Failing to Raise It in Comments Before the Agency. ................................................. 14

    B.   The 2023-2024 and 2024-2025 Harvest Specifications Do Not Require a Standalone EIS. ......................................................................... 16

        1.   NEPA does not require a new EIS where the agency's decision falls within the scope of an existing EIS. ..................................... 17

        2.   The Harvest Strategy EIS is the EIS for the annual Harvest Specifications. ....................................................................... 19

        3.   For the previous seventeen years, NMFS has consistently issued annual BSAI Harvest Specifications without a separate NEPA document. .................................................................... 20

        4.   The resource-intensive process of completing a new EIS is impractical and ill-suited for annual BSAI Harvest Specifications. ................................................................. 22

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

i

C.    NMFS Carefully Considered Current Environmental Conditions in Issuing the 2023-2024 and 2024-2025 Harvest Specifications and Determined that Supplementing the Harvest Strategy EIS Was Not Necessary .................................................................................... 23

    1.    Legal standard for supplementation of an EIS. ............................. 24

    2.    NMFS properly used Supplementary Information Reports to evaluate the need to supplement the Harvest Strategy EIS. ............. 25

    3.    The Supplementary Information Reports and their appendices comprehensively considered new information about the BSAI ecosystem. .................................................................................. 27

        a.    NMFS considered changing ocean conditions. ..................... 29

        b.    NMFS considered seabird and marine mammal mortality events. ................................................................... 30

        c.    NMFS considered current Chinook and chum salmon abundance. .......................................................................... 32

D.    NMFS's Decision Not to Supplement the Harvest Strategy EIS is Based on the Best Available Science and Entitled to Deference. ............... 36

V.    CONCLUSION ...................................................................................... 37

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

ii

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 3 of 48

# TABLE OF AUTHORITIES

**CASES**

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
  273 F.3d 1229 (9th Cir. 2001) ................................................................. 23, 37

*Cnty. of Amador v. U.S. Dep't of the Interior*,
  872 F.3d 1012 (9th Cir. 2017) ........................................................................ 21

*Coker v. Skidmore*,
  941 F.2d 1306 (5th Cir. 1991) ........................................................................ 25

*Cook Inletkeeper v. Raimondo*,
  533 F. Supp. 3d 739 (D. Alaska 2021) ......................................................... 16

*Ctr. for Biological Diversity v. Kempthorne*,
  588 F.3d 701 (9th Cir. 2009) .......................................................................... 14

*Davis v. Latschar*,
  202 F.3d 359 (D.C. Cir. 2000) ........................................................................ 24

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ......................................................................................... 22

*Friends of the Bow v. Thompson*,
  124 F.3d 1210 (10th Cir. 1997) ...................................................................... 26

*Friends of the Clearwater v. Dombeck*,
  222 F.3d 552 (9th Cir. 2000) .................................................................... 26, 27

*Great Old Broads for Wilderness v. Kimbell*,
  709 F.3d 836 (9th Cir. 2013) .................................................................... 25, 26

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) .......................................................................... 23

*Havasupai Tribe v. Robertson*,
  943 F.2d 32 (9th Cir. 1991) ............................................................................ 15

*Idaho Sporting Cong. Inc. v. Alexander*,
  222 F.3d 562 (9th Cir. 2000) .......................................................................... 26

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
*Case No. 3:23-cv-00074-SLG*

iii

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 4 of 48

*Kunaknana v. U.S. Army Corps of Eng'rs*,
    3:13-CV-00044-SLG, 2015 WL 3397150 (D. Alaska May 26, 2015)...........................25

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
    42 F.3d 517 (9th Cir. 1994) ..................................................................................26

*Marsh v. Oregon Nat. Res. Council*,
    490 U.S. 360 (1989)...........................................................................22, 24, 25, 26

*Mayo v. Reynolds*,
    875 F.3d 11 (D.C. Cir. 2017) ...............................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Ins. Co.*,
    463 U.S. 29 (1983).............................................................................................13

*N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior*,
    983 F.3d 1077 (9th Cir. 2020) ..............................................................18, 19, 20

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004)......................................................................................24, 36

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*,
    377 F.3d 1147 (10th Cir. 2004) ...........................................................................26

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
    501 F.3d 1009 (9th Cir. 2007) ......................................................................15, 16

*Protect Our Communities Found. v. LaCounte*,
    939 F.3d 1029 (9th Cir. 2019) ......................................................................14, 24

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)...........................................................................................17

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ...............................................................................13

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ...............................................................................13

*Sierra Club v. Army Corps of Eng'rs*,
    701 F.2d 1011 (2d Cir. 1983) .......................................................23, 24, 25, 36

*Westlands Water Dist. v. U.S. Dep't of Interior*,
    376 F.3d 853 (9th Cir. 2004) ...............................................................................24

***Ass'n of Vill. Council Presidents, et al. v. National***
***Marine Fisheries Serv., et al.***
**Case No. 3:23-cv-00074-SLG**
                  iv

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 5 of 48

**STATUTES**

5 U.S.C. § 706(2)(A) ................................................................................................ 13

16 U.S.C. § 1801 *et seq* ............................................................................................ 3

16 U.S.C. § 1802(33)(A) ............................................................................................ 5

16 U.S.C. § 1851 ...................................................................................................... 4

16 U.S.C. § 1852 ...................................................................................................... 3

16 U.S.C. § 1852(a)(1)(G) ......................................................................................... 3

16 U.S.C. § 1852(h) ................................................................................................. 3

16 U.S.C. § 1853 ...................................................................................................... 3

16 U.S.C. § 1854 .................................................................................................. 3, 4

42 U.S.C. § 4332(C) ................................................................................................ 17

**OTHER AUTHORITIES**

72 Fed. Reg. 9,451 (Mar. 2, 2007) .......................................................................... 21

73 Fed. Reg. 10,160 (Feb. 26, 2008) ....................................................................... 21

74 Fed. Reg. 7,359 (Feb. 17, 2009) ......................................................................... 21

75 Fed. Reg. 11,778 (Mar. 12, 2010) ....................................................................... 21

76 Fed. Reg. 11,111 (Mar. 1, 2011) ......................................................................... 21

76 Fed. Reg. 11,139 (Mar. 1, 2011) ......................................................................... 21

77 Fed. Reg. 10,669 (Feb. 23, 2012) ....................................................................... 21

78 Fed. Reg. 13,813 (Mar. 1, 2013) ......................................................................... 21

79 Fed. Reg. 12,108 (Mar. 4, 2014) ......................................................................... 21

80 Fed. Reg. 11,919 (Mar. 5, 2015) ......................................................................... 21

81 Fed. Reg. 14,773 (Mar. 18, 2016) ....................................................................... 21

*Ass'n of Vill. Council Presidents, et al. v. National*
*Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

v

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 6 of 48

82 Fed. Reg. 11,826 (Feb. 27, 2017) .................................................................. 21

83 Fed. Reg. 8,365 (Feb. 27, 2018) .................................................................... 21

84 Fed. Reg. 9,000 (Mar. 13, 2019) ................................................................... 21

85 Fed. Reg. 13,553 (Mar. 9, 2020) ................................................................... 21

86 Fed. Reg. 11,449 (Feb. 25, 2021) .................................................................. 21

87 Fed. Reg. 11,626 (Mar. 2, 2022) .............................................................. 11, 21

88 Fed. Reg. 13,238 (Mar. 2, 2023) ................................................................... 21

**REGULATIONS**

40 C.F.R. § 1500.1 ............................................................................................ 17

40 C.F.R. § 1500.4 ............................................................................................ 17

40 C.F.R. § 1502.1 ............................................................................................ 17

40 C.F.R. § 1502.9 ............................................................................................ 24

40 C.F.R. § 1502.9(d)(1) ................................................................................... 24

50 C.F.R. § 600.305 *et seq* ............................................................................... 4

50 C.F.R. § 600.305(a)(2) ................................................................................... 3

50 C.F.R. § 600.310(e)(3) ................................................................................... 5

50 C.F.R. § 600.310(f)(3)-(4) .............................................................................. 9

50 C.F.R. § 679.1(b) ........................................................................................... 4

50 C.F.R. § 679.20(a)(1)(i)(A) ............................................................................ 4

50 C.F.R. § 679.20(a)(2) ..................................................................................... 4

50 C.F.R. § 679.20(c)(1)(iv) ............................................................................... 5

50 C.F.R. § 679.21(b) ....................................................................................... 10

50 C.F.R. § 679.21(e) ....................................................................................... 10

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

vi

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 7 of 48

50 C.F.R. § 679.21(f)............................................................................................. 10

50 C.F.R. § 679.21(f)(2) ..................................................................................... 5, 32

*Ass'n of Vill. Council Presidents, et al. v. National*
*Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

vii

# GLOSSARY OF TERMS

ABC          Acceptable Biological Catch
AP           Advisory Panel
APA          Administrative Procedure Act or At-Sea Processors Association
BLM          Bureau of Land Management
BSAI         Bering Sea and Aleutian Islands
EA           Environmental Assessment
EIS          Environmental Impact Statement
FMP          Fishery Management Plan
IPA          Incentive Plan Agreement
MSA          Magnuson-Stevens Fishery Conservation and Management Act
NEPA         National Environmental Policy Act
NMFS         National Marine Fisheries Service
OFL          Overfishing Level
PSC          Prohibited Species Catch
SAFE         Stock Assessment and Fishery Evaluation
SSC          Scientific and Statistical Committee
SIR          Supplementary Information Report
TAC          Total Allowable Catch
UCB          United Catcher Boats

*Ass'n of Vill. Council Presidents, et al. v. National*
*Marine Fisheries Serv., et al.*
*Case No. 3:23-cv-00074-SLG*

viii

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 9 of 48

# I. INTRODUCTION

The Bering Sea and Aleutian Islands ("BSAI") groundfish fishery is one of the most sustainable and productive fisheries in the world. For over forty years, the National Marine Fisheries Service ("NMFS") has meticulously managed the BSAI groundfish fishery in consultation with the North Pacific Fishery Management Council in accordance with the Magnuson-Stevens Fishery Conservation and Management Act and the comprehensive Fisheries Management Plan for the fishery. As part of this comprehensive management process, NMFS issues annual harvest specifications establishing the total allowable catch ("TAC") for several species of groundfish. NMFS and the Council establish these annual specifications through an iterative public process guided by the best available science.

The BSAI harvest specifications process has proved to be a model of sustainability and good fishery management practices—NMFS has determined that no groundfish stocks are overfished or approaching an overfished condition,[1] and the BSAI Alaska pollock fishery is regarded as one of the cleanest fisheries in the world and is independently certified by the Marine Stewardship Council and the Alaska Responsible Fisheries Management Program.[2]

Unhappy that NMFS increased the TAC for pollock from previous years while correspondingly decreasing the TAC for other species, Plaintiffs have challenged NMFS's issuance of the annual BSAI harvest specifications for 2023 and 2024, and through a supplemental complaint for 2024 and 2025, alleging that the process by which the agency arrived at the harvest specifications violated the National Environmental Policy Act ("NEPA"). Specifically, Plaintiffs claim (1) that there was no NEPA document associated with the decision and, therefore, NMFS was required to produce a new, standalone Environmental Impact Statement ("EIS") or (2) alternatively, that NMFS was required to

---

[1] NMFS00592; 2SUPP00079.

[2] Dkt. 10-1 ¶ 11; Dkt. 10-2 ¶ 10.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

1

supplement the applicable Harvest Strategy EIS and failed to do so. Plaintiffs' arguments are contrary to applicable law and the extensive administrative record supporting NMFS's decision.

As for their first claim, Plaintiffs ignore that NMFS issued the annual harvest specifications pursuant to a NEPA document: the Harvest Strategy EIS. NEPA does not require the agency to produce a new standalone EIS for the annual harvest specifications. In any event, Plaintiffs waived this claim by failing to raise it before the agency.

The only issue properly before the Court is whether NMFS followed the correct process in determining there was no need to supplement the Harvest Strategy EIS. It did. In compliance with NEPA, NMFS prepared a Supplementary Information Report ("SIR") to evaluate the significance of new information and, accordingly, the need to supplement the existing EIS. The voluminous administrative record reflects that NMFS considered the very same environmental conditions Plaintiffs wield in this appeal—including changed ocean conditions, seabird and marine mammal mortality events, and declining salmon runs in Western Alaska—and concluded a Supplemental EIS was not necessary. This decision was reasonable and is entitled to deference.

At-Sea Processors Association ("APA") and United Catcher Boats ("UCB") intervened in this case to defend the BSAI Harvest Specifications from claims that are irreconcilable with applicable law and the extensive administrative record supporting NMFS's decision. For the reasons articulated below, APA and UCB respectfully request that the Court deny Plaintiffs' motion for summary judgment and grant Federal Defendants' and APA's and UCB's cross-motions for summary judgment.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

2

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 11 of 48

## II.  BACKGROUND

**A.  The Magnuson-Stevens Fishery Conservation and Management Act and Regional Fishery Management Council Framework.**

Marine fisheries management in U.S. Federal waters is governed primarily by the Magnuson-Stevens Fishery Conservation and Management Act ("MSA").[3]  Fisheries management under the MSA is a transparent, public process guided by science and collaboration.  Enacted in 1976, the MSA established eight regional fishery management councils with representation from coastal states and fishery stakeholders.[4]  These regional councils are comprised of members from commercial and recreational fishing interests as well as environmental, academic, and government representatives.[5]  Among other responsibilities, the regional councils develop fishery management plans ("FMPs") that comply with the MSA's requirements to promote sustainable fisheries.[6]  The North Pacific Fishery Management Council ("the Council") is the regional council with "authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska."[7]  In consultation with the Council, NMFS manages the BSAI groundfish fisheries and ensures that the Council's proposed management objectives and measures comply with the MSA and its implementing regulations.[8]

---

[3] 16 U.S.C. § 1801 *et seq.*

[4] *Id.* § 1852.

[5] *Id.* § 1852(h).

[6] *Id.*; *see also* 16 U.S.C. § 1853 (contents of fishery management plans).

[7] 16 U.S.C. § 1852(a)(1)(G).

[8] *Id.* § 1854; 50 C.F.R. § 600.305(a)(2).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

3

**B.** **The Bering Sea and Aleutian Islands Fishery Management Plan and the Harvest Specifications Strategy EIS.**

NMFS implements fisheries management decisions, including the BSAI Harvest Specifications, pursuant to two management tools that ensure compliance with the MSA, NEPA, and other Federal laws: (1) the Fishery Management Plan for the Groundfish of the Bering Sea and Aleutian Islands Management Area ("BSAI FMP") and (2) the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement ("Harvest Strategy EIS"). Both documents are important to understanding the process underlying the annual BSAI harvest specifications; each is briefly described below.

**1.** **The Bering Sea and Aleutian Islands Groundfish Fishery Management Plan.**

The BSAI FMP and its implementing regulations govern commercial fishing for groundfish in the BSAI.[9] NMFS, in consultation with the Council, issued the most recent BSAI FMP in November 2020.[10] The BSAI FMP facilitates a sustainable and productive fishery by establishing adaptive management and conservation policies based on sound scientific research and analysis.[11] Significant to this litigation, the BSAI FMP requires that the Council recommend and NMFS approve the annual catch limits, or TAC, for each species of groundfish targeted by the BSAI groundfish fishery.[12] The sum of all TACs for all groundfish species in the BSAI fishery must be within the optimum yield—which is set by regulation at a range of 1.4 million to 2.0 million metric tons ("mt") annually.[13] This

---

[9] NMFS00085; 50 C.F.R. § 679.1(b); 16 U.S.C. § 1854.

[10] NMFS00083-257; *see also* NMFS00258-583 (BSAI FMP Appendices).

[11] SUPP03969. Like all FMPs, the BSAI FMP conforms to the MSA's ten national standards for fishery conservation and management. 16 U.S.C. § 1851 (national standards for fishery conservation and management); 50 C.F.R. § 600.305 *et seq.*

[12] NMFS00018; 50 C.F.R. § 679.20(a)(2).

[13] 50 C.F.R. § 679.20(a)(1)(i)(A). The MSA and its implementing regulations define "optimum yield" as the amount of fish that "will provide the greater overall benefit to the

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

4

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 13 of 48

optimum yield range is purposefully conservative and serves to reduce impacts of the fishery by limiting fishing even if the fishery can support a substantially larger harvest of groundfish.[14] The BSAI FMP also requires that the Council and NMFS set forth regulation-based allowances for prohibited species catch ("PSC") which, if reached, result in the closure of the target fishery for the remainder of the year or season.[15]

Because fisheries management is dynamic, FMPs are regularly amended to adjust management policies based on new circumstances and new information about the environment.[16] For example, in 2010 the Council recommended establishing a Bering Sea Chinook Salmon Bycatch Management Program to reduce Chinook bycatch in the groundfish fishery.[17] NMFS accepted that recommendation and adopted Amendment 91 to the BSAI FMP to create the program. Amendment 91 imposed PSC limits on the amount of Chinook salmon that may be incidentally caught as bycatch in the groundfish fishery and established a performance standard and Incentive Plan Agreements ("IPAs") creating strong financial incentives for vessels to avoid approaching the Chinook bycatch limit.[18]

---

Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems." 16 U.S.C. § 1802(33)(A); 50 C.F.R. § 600.310(e)(3).

[14] *See* 2SUPP00048 (Response to Comment 8).

[15] NMFS00148; 50 C.F.R. § 679.20(c)(1)(iv). Although the harvest specifications identify the PSC limits for a particular species, the limits are set according to the FMP's implementing regulations, and NMFS and the Council have no discretion in setting the PSC. *See* NMFS00032; 50 C.F.R. § 679.21(f)(2).

[16] The BSAI FMP has been amended over 120 times since the first iteration of the FMP was adopted in 1982. *See* NMFS00262-280 (BSAI FMP App'x A – History of the BSAI FMP).

[17] NMFS00275; NMFS00611; 2SUPP01433.

[18] NMFS00039. To the extent possible, food grade salmon captured as bycatch are processed for donations through the Prohibited Species Donation program and distributed to rural communities in Alaska. NMFS00083.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

5

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 14 of 48

In 2016, the Council and NMFS adopted Amendment 110, further strengthening salmon bycatch avoidance by reducing the PSC limit for Chinook salmon in years of low Chinook abundance and by incorporating chum salmon avoidance incentives into IPAs.[19] Each FMP amendment is accompanied by its own NEPA environmental review document— in the case of Amendment 91, a 760-page EIS;[20] and in the case of Amendment 110, a 356-page Environmental Assessment ("EA").[21] Each comprehensively examined the impacts of the BSAI groundfish fishery on salmon. These measures effectively "reduced salmon bycatch in the pollock fishery compared with what they would have been without the measures."[22]

> 2.     **The Harvest Specifications Strategy EIS established the framework for setting annual harvest specifications and reviewing new information.**

Annual harvest specifications for the BSAI management area also are guided by the Harvest Strategy EIS.[23] Issued in 2007, the Harvest Strategy EIS provided decision-makers and the public with a comprehensive evaluation of the environmental, social, and economic effects of alternative harvest strategies for the groundfish fisheries in the BSAI and the Gulf of Alaska management areas.[24] Through this document, NMFS and the Council established the Harvest Strategy—the dynamic process and methodology that NMFS and the Council

---

[19] NMFS00278; NMFS00613.

[20] 2SUPP36147-36906; 2SUPP00104 n.63.

[21] NMFS18062-417; NMFS00613.

[22] NMFS00038; *see also* NMFS17565 (Chinook salmon mortality in BSAI groundfish fisheries from 1991-2023).

[23] NMFS00639-1093.

[24] NMFS00641.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**
                                                                          6

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 15 of 48

use to set the annual harvest specifications in a manner that balances a sustainable groundfish harvest with ecosystem needs.[25]

The Harvest Strategy EIS is *not* a static review of environmental conditions as they existed in 2007. It established a framework by which NMFS and the Council continually evaluate the BSAI groundfish fishery in the context of current environmental conditions.[26] In fact, the Harvest Strategy EIS "anticipated that changes in information would be used each year in setting the annual harvest specification since the process is flexible to adjust to new information on stock abundance and environmental and socioeconomic factors (like climate change)."[27]

As for NEPA process, each year since the Harvest Strategy EIS was published in 2007, NMFS has prepared an SIR which analyzes new information and changed circumstances with the primary purpose of evaluating the need to supplement the Harvest Strategy EIS.[28] The annual SIR process surveys the best available science—namely, continuously-updated reports assessing the health of the ecosystem and the groundfish fishery.[29] As a result, "the annual process of setting the harvest specifications accounts for new information and circumstances on bycatch species like salmon, ecosystem factors, and climate change."[30]

---

[25] *Id.* The annual harvest specifications establish harvest limits for groundfish for a two-year period; however, NMFS promulgates new specifications annually. When issued, the new specifications supersede the harvest limits set for the second year of the preceding specifications. NMFS00019; 2SUPP00020.

[26] *See* NMFS01096 ("The Council and NMFS continually evaluate the fisheries to identify potential ecosystem issues, and the Council process addresses new issues as they arise.").

[27] NMFS00041; NMFS00614.

[28] NMFS00041; 2SUPP00046.

[29] *Id.*

[30] NMFS00614.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

7

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 16 of 48

**C.    The Annual Harvest Specifications Are Set Through an Iterative Public Process Guided by the Best Available Science.**

The Council and NMFS develop the annual harvest specifications through a collaborative and transparent public process guided by the best available scientific information on the BSAI ecosystem and the health of the fisheries.[31]  This process begins with the Council's BSAI Groundfish Plan Team—composed of scientists from NMFS, academia, and state fish and wildlife agencies.[32]  Each year, the Groundfish Plan Team prepares a series of Stock Assessments, Ecosystem Status Reports, and Economic Status Reports, collectively called the Stock Assessment and Fishery Evaluation ("SAFE") Reports.  The annual SAFE Reports comprehensively evaluate the overall health of the BSAI ecosystem and environment.  These reports constitute the best available science and serve as the foundation of the Council's decision-making for the annual harvest specifications.[33] For each stock managed under the BSAI FMP, these reports include a recommendation from the Plan Team for (1) the Acceptable Biological Catch ("ABC"), the measure of the size of the acceptable target harvest level the ecosystem can sustain,[34] and (2) the Overfishing Level ("OFL"), the harvest level in excess of a prescribed maximum allowable rate above which overfishing is occurring.[35]    The ABC and OFL inform the Council's TAC

---

[31] NMFS00018; 2SUPP00048.

[32] *Id.*; *see also* North Pacific Fishery Management Council, BSAI and GOA Groundfish Plan Teams, https://www.npfmc.org/about-the-council/plan-teams/bsai-and-goa-groundfish/.

[33] NMFS01266; *see* NMFS01264-5429 (Draft and Final 2022 SAFE Reports); *see also* NMFS27307 (December 2022 Action Memo); 2SUPP00043; 2SUPP06150-6693 (2023 Economic and Ecosystem Status Reports).

[34] NMFS00662.

[35] NMFS00117; NMFS01270; *see also* NMFS27295 (BSAI Groundfish Plan Team's Recommended OFL and ABC for Groundfish for 2023-2024).

*Ass'n of Vill. Council Presidents, et al. v. National*
*Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

8

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 17 of 48

recommendations—the total tonnage of fish that may be harvested in a particular year.[36] The catch limits represented by the TAC cannot exceed the ABC, and the ABC, in turn, cannot exceed the OFL.[37]

Next, the Groundfish Plan Team's recommendations and the updated draft SAFE Reports are presented to the Council's Scientific and Statistical Committee ("SSC") and Advisory Panel ("AP") during the October Council meeting.[38] The SSC is composed of leading experts in biology, economics, statistics, and social science, and advises the full Council on scientific and technical matters.[39] The AP's membership represents various fishing industry sectors and conservation groups and provides "a direct link to fishermen, processors, communities, subsistence harvesters, and other stakeholders with interest in the ecosystems, fishing industry, and fishery management issues."[40] The AP advises the Council on how fisheries management alternatives will affect the industry and local economies.[41]

After reviewing the SAFE Reports, hearing from experts, and considering public testimony, the SSC recommends OFLs and ABCs for each species group to the full

---

[36] NMFS00040.

[37] *Id.*; 50 C.F.R. § 600.310(f)(3)-(4); 2SUPP00043.

[38] The Council meets five times a year. Each Council meeting lasts for approximately eight days: https://www.npfmc.org/how-we-work/navigating-the-council-process/.

[39] Like the Groundfish Plan Team, the SSC's members are composed of members from state and federal government and academia. North Pacific Fishery Management Council, Scientific and Statistical Committee, https://www.npfmc.org/about-the-council/advisory-groups/scientific-and-statistical-committee/.

[40] *See* North Pacific Fishery Management Council, Advisory Panel Handbook, https://www.npfmc.org/wp-content/PDFdocuments/membership/AP/AdvisoryPanelHandbook.pdf at 3.

[41] *Id.*

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

9

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 18 of 48

Council.[42]   At its December meeting, the Council considers the SAFE Reports; recommendations from the Groundfish Plan Team, SSC, and AP; and public testimony. With few exceptions, all Council, SSC, AP, and Groundfish Plan Team meetings are open to the public and there are numerous opportunities for public participation and testimony during each step of the process.[43]   Based on this robust, science-driven, and transparent public process, the Council votes to recommend ABCs, OFLs, and TACs for each species of groundfish.

In addition to setting the ABCs, OFLs, and TACs, the harvest specifications allocate the pollock TAC among the various participants in the groundfish fishery and identify the PSC limits for non-target species.[44]   Both PSC limits and pollock TAC sector allocations are established by law and are not dependent on recommendations made by the Council.[45]

After the full Council recommends annual harvest specifications, NMFS reviews the Council's recommendations to ensure that they comply with the MSA, the BSAI FMP, the Harvest Strategy EIS, and all applicable regulations.[46]   Once NMFS confirms these requirements are met, the agency publishes draft harvest specifications in December, which

---

[42] NMFS00043.

[43]   North Pacific Fishery Management Council, https://www.npfmc.org/how-we-work/navigating-the-council-process/.

[44]   NMFS00032; 2SUPP00026, 2SUPP00035; *see also* 50 C.F.R. § 679.21(b) (halibut limits), *id.* § 679.21(e) (crab and herring limits), *id.* § 679.21(f) (salmon limits).

[45] NMFS00024; 2SUPP00035.  The TAC allocations are proscribed by a formula set in the American Fisheries Act and its implementing regulations, and apportion the pollock TAC among (1) the Inshore Sector that processes the harvest received from catcher vessels at shoreside processing facilities, (2) the Catcher-Processor Sector made up of vessels that both catch and process their harvest onboard, and (3) the Mothership Sector made up of vessels that have onboard processing capabilities but do not catch their own fish.

[46] Contemporaneously with this process, NMFS prepares its SIR to assess whether changes to the action or new information causing significantly different effects from those already studied require that the Harvest Strategy EIS be supplemented.  NMFS00587.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**                                                    10

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 19 of 48

provide another opportunity for public comment.[47]   After reviewing comments, NMFS makes any necessary adjustments before issuing final harvest specifications in late February or early March, bringing this exhaustive public process to culmination—but only temporarily, as by that point the process of conducting surveys and collecting fishery data and ecosystem information to update the SAFE Reports for the upcoming year's harvest specifications has already begun.

**D.     The 2023-2024 and 2024-2025 BSAI Harvest Specifications and Procedural History.**

The 2023-24 and 2024-25 Harvest Specifications were adopted pursuant to the process described above—in much the same way as each of the annual harvest specifications for the prior fifteen years.  NMFS issued draft BSAI Harvest Specifications in December.[48] The Groundfish Plan Team and the SSC recommended OFLs and ABCs for each species of groundfish using the most recent SAFE Reports.[49]   Based on significantly increased recruitment and spawning biomass estimates for pollock than in previous years, the Council recommended a pollock TAC of 1.3 million mt in 2023 and 2024 (up from 1.111 million mt in 2022).[50]  These increases were offset by corresponding reductions in the TACs for several other groundfish species to maintain the total TAC for all groundfish harvested in the BSAI within the Optimum Yield range specified by the BSAI FMP.[51]   None of the TACs recommended by the Council exceeds the ABC for any species or species group, and the

---

[47]   *See, e.g.* NMFS00001 (soliciting public comments on draft 2023-24 Harvest Specifications).

[48]  NMFS00001-17; 2SUPP00001-19.

[49]  NMFS00020; 2SUPP00021.

[50]  *See* NMFS00020-21 (Table 1a); 87 Fed. Reg. 11,626, 11,628 (Mar. 2, 2022) (2022-23 Harvest Specifications); 2SUPP00023 (Table 1).

[51]  NMFS00020. The pollock TAC for 2023 and 2024 is also 18,000 mt below the past ten-year average of Bering Sea pollock TACs. NMFS00040.

*Ass'n of Vill. Council Presidents, et al. v. National*
*Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**
11

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 20 of 48

total TACs for all species of groundfish for the 2024-25 Harvest Specifications represent a 42 percent reduction below total ABCs.[52]  The Bering Sea pollock TAC of 1.3 million mt is well below the ABC and OFL for pollock, set at 2.313 million mt and 3.162 million mt respectively.[53]  NMFS determined that the Council's recommended Harvest Specifications were consistent with the MSA, the BSAI FMP, and the Harvest Strategy; the agency issued final Harvest Specifications in March of 2023 and 2024.[54]

In conjunction with the annual harvest specifications, NMFS prepares comprehensive SIRs to "evaluate[] the need to prepare a Supplemental EIS (SEIS) for the [annual] groundfish specifications."[55]  The SIRs rely on and incorporate into their appendices thousands of pages of scientific analysis,[56] including the 2022 and 2023 BSAI SAFE Reports (Appendix A),[57] the 2022 and 2023 Ecosystem Status Reports (Appendix C),[58] and the most recent Groundfish Economic Status Reports (Appendix D).[59]  After careful consideration of the best available science and whether new circumstances or information warrant preparation of a Supplemental EIS, NMFS determined that "the new information available is not of a scale and scope that require an SEIS."[60]

---

[52] 2SUPP00049.

[53] *See* NMFS00020-21 (Table 1); *see also* 2SUPP00023 (Table 1).

[54] NMFS00018-19; 2SUPP00020-21.

[55] NMFS00587; 2SUPP00073.

[56] *See* NMFS00637; 2SUPP00146 ("These documents are included by reference.").

[57] *See* NMFS01264-3047; 2SUPP05276-6353 (Final SAFE Reports).

[58] *See* NMFS05430-5802; 2SUPP06345-6693 (2022 and 2023 Ecosystem Status Reports for Eastern Bering Sea and Aleutian Islands).

[59] *See* NMFS06090-6230; 2SUPP06150-6353 (2021 and 2023 Economic Status of the Groundfish Fisheries Off Alaska).

[60] NMFS00592; *see also* 2SUPP00143 ("At this time, the available information does not indicate a need to prepare additional supplemental NEPA documentation for the 2024 and 2025 harvest specifications. Therefore, a supplemental EIS is not necessary…").

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**                                              12

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 21 of 48

Unhappy with the relatively modest increase in pollock TAC, and mistakenly believing it necessarily would increase incidental salmon bycatch,[61] Plaintiffs filed this action alleging NMFS relied on stale environmental analyses in issuing the 2023-24 and 2024-25 Harvest Specifications.[62]

## III. STANDARD OF REVIEW

The Administrative Procedure Act ("APA") directs courts to "hold unlawful and set aside" an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[63] "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."[64] Additionally, APA review is highly deferential and the agency's decision is entitled to a presumption of regularity.[65] "This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise."[66]

## IV. ARGUMENT

Plaintiffs contend NMFS violated NEPA because the agency did not prepare a standalone EIS for the 2023-24 and 2024-25 Harvest Specifications or, alternatively, a Supplemental EIS to the Harvest Strategy EIS. Plaintiffs contend these additional NEPA documents were required because of recent ecosystem changes stemming from global

---

[61] *See* Part IV.C.3.c *infra*.

[62] Dkt. 1 ¶¶ 44-45; Dkt. 66 at 1; *see also* NMFS01113 ("These harvest specifications propose to increase this TAC in the 2023 and 2024 seasons").

[63] 5 U.S.C. § 706(2)(A).

[64] *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

[65] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

[66] *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

13

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 22 of 48

climate change and declining salmon returns.[67]  Plaintiffs' contentions are factually incorrect, legally flawed, and ignore a voluminous administrative record demonstrating that NMFS carefully considered climate change and the health of the BSAI ecosystem in issuing the 2023-24 and 2024-25 Harvest Specifications.  Considering the best available science, NMFS reasonably determined that the condition of the BSAI ecosystem did not present significant new information requiring preparation of a Supplemental EIS.  This expert determination is both reasonable and entitled to deference.

## A. Plaintiffs Have Waived Any Argument that the Annual Harvest Specifications Require Preparation of a Standalone EIS By Failing to Raise It in Comments Before the Agency.

Plaintiffs assert that the 2023-24 and 2024-25 Harvest Specifications require a standalone EIS or EA.[68]  This is a new argument that Plaintiffs never raised in comments to NMFS during the lengthy administrative process for the 2023-24 or 2024-25 Harvest Specifications and is advanced for the first time in Plaintiffs' opening brief.  By failing to raise this issue before the agency, Plaintiffs have waived their right to judicial review of this argument.

"A participant in an administrative process must alert the agency to their position and contentions.  Failure to raise such particular objections may result in forfeiture of any objection to the resulting regulation."[69]  This rule serves to "protect[] the agency's

---

[67] Dkt. 32 at 12.

[68] Dkt. 32 at 18-25; Dkt. 66 at 3-5.

[69] *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 710 (9th Cir. 2009) (brackets, internal quotation marks, and citations omitted); *see also Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1036 (9th Cir. 2019) ("Plaintiffs must structure their participation in the agency's decisionmaking process so as to alert[ ] the agency to the parties position and contentions, in order to allow the agency to give the issue meaningful consideration. Otherwise, the issue is waived.") (internal quotation marks and citations omitted).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

14

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 23 of 48

prerogative to apply its expertise, to correct its own errors, and to create a record for [the court's] review."[70] "Absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision."[71]

Only five substantive written comments were submitted on the 2023-24 and 2024-25 Harvest Specifications, none of which contend that the annual harvest specifications decision requires a standalone EIS or EA.[72] The Association of Village Council Presidents' comment letter on the 2023-24 Harvest Specifications shares a common refrain with the four other comments, generally criticizing the Harvest Strategy EIS (and a related but separate 2004 Programmatic Supplemental EIS) as outdated and urging NMFS to *revisit and supplement* those comprehensive NEPA documents.[73] NMFS was fairly on notice that Plaintiffs believed the Harvest Strategy EIS required supplementation, and the agency thoroughly responded to this comment.[74] But nowhere in their comments do Plaintiffs—or any of the commenters—assert that the annual harvest specifications require a *standalone*

---

[70] *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007).

[71] *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).

[72] *See* NMFS01112-16 (AVCP Comment Letter); NMFS01110 (Salmon State Comment Letter); NMFS01099 (Ocean Conservancy Comment Letter); NMFS01104 (Alaska Bering Sea Crabbers Comment Letter); NMFS01106 (Kuskokwim River Inter-Tribal Fish Commission Comment Letter). Plaintiffs did not submit a comment letter to NMFS on the draft 2024-25 Harvest Specifications, and none of the letters submitted contend that NMFS must prepare a new standalone NEPA document. *See also* 2SUPP01453-62 (At-Sea Processors Comment Letter); 2SUPP01463 (Center for Biological Diversity Comment Letter); 2SUPP05183 (Salmon State Comment Letter); 2SUPP05185-91 (two public comment submissions).

[73] NMFS01112. This argument is also pursued by Plaintiffs and is addressed in Part IV.C *infra*.

[74] *See* NMFS00040-42 (Response to Comment 6).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

15

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 24 of 48

NEPA document.[75]  NMFS could not reasonably have been expected to respond to this specific criticism that Plaintiffs raise for the first time in their opening brief.

Nor would the "so obvious" exception to the waiver rule apply.[76]  As explained in Part IV.B.3 *infra*, NMFS prepared the annual Harvest Specifications without a separate NEPA document following the *exact same process* it engaged in for each of the previous fifteen iterations of the annual BSAI harvest specifications.  It would not be "so obvious" to NMFS that its standard, longstanding practice of issuing annual harvest specifications without a separate NEPA document was being challenged.  Plaintiffs have waived this argument, and it cannot provide a basis for reversing the agency's decision.[77]

**B.  The 2023-2024 and 2024-2025 Harvest Specifications Do Not Require a Standalone EIS.**

Even had Plaintiffs properly preserved this argument, NMFS did not violate NEPA by declining to prepare a standalone EIS for the annual harvest specifications.  NEPA does not require an agency to produce a standalone EIS for actions like the BSAI harvest specifications that are within the scope of an existing EIS.  Plaintiffs' argument ignores the defined purpose of the Harvest Strategy EIS, disregards seventeen years of past agency practice of issuing annual harvest specifications without a standalone NEPA document, and

---

[75] *See* n.72 *supra*.

[76] Courts sometimes find an exception to the waiver rule if "[a] flaw is 'so obvious' that it does not result in waiver 'where the agency had independent knowledge of the issues that concerned Plaintiffs.'" *Cook Inletkeeper v. Raimondo*, 533 F. Supp. 3d 739, 752 (D. Alaska 2021).

[77] *See Portland Gen. Elec.*, 501 F.3d at 1023 ("Petitioners have waived their right to judicial review of these final two arguments as they were not made before the administrative agency, in the comment to the proposed rule, and there are no exceptional circumstances warranting review.") (internal quotation marks and citations omitted); *see also Cook Inletkeeper*, 533 F. Supp. 3d at 752 (plaintiffs waived challenge to NMFS's "small numbers" determination by failing to raise it during administrative proceedings).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

16

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 25 of 48

badly misapprehends the process—preparing an EIS takes years to complete and could not be accomplished annually.

> 1. **NEPA does not require a new EIS where the agency's decision falls within the scope of an existing EIS.**

NEPA requires agencies to prepare a "detailed statement" of the environmental impact of "major Federal actions significantly affecting the quality of the human environment."[78] NEPA "is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."[79] NEPA does not mandate particular results or substantive outcomes.[80] NEPA's implementing regulations provide that the "purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action."[81]

Consistent with this purpose, NEPA does not require agencies to prepare a *new* EIS for actions supported by an existing NEPA document. In such cases, an agency may rely on

---

[78] 42 U.S.C. § 4332(C).

[79] 40 C.F.R. § 1500.1.

[80] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 333 (1989) ("[I]t is well settled that NEPA itself does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed—rather than unwise—agency action.").

[81] 40 C.F.R. § 1500.1; *see also* 40 C.F.R. § 1502.1 ("The primary purpose of an environmental impact statement…is to ensure agencies consider the environmental impacts of their actions in decision making."); 40 C.F.R. § 1500.4 (directing agencies to "reduce excessive paperwork").

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

17

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 26 of 48

an already-prepared NEPA analysis.[82]  The "only remaining hard look obligation" is "to analyze new circumstances and new information under the supplementation rubric."[83]

For example, in *Mayo v. Reynolds*,[84] the D.C. Circuit rejected an argument that "the Park Service was required to issue a new EA or EIS every year" before authorizing recreational elk hunting—including the number of elk authorized for hunting in a given year.[85]  The court held that "even if each hunting authorization is a 'major Federal action' which may 'significantly affect' the environment, the 2007 EIS relieved the Park Service of the obligation to prepare fresh NEPA documentation each year it implements the elk-reduction program in conformity with the 2007 Plan."[86]

Likewise, in *Northern Alaska Environmental Center v. U.S. Department of the Interior*,[87] the Ninth Circuit affirmed this Court's grant of summary judgment in favor of the Bureau of Land Management ("BLM") against a challenge to the NEPA analysis for oil and gas lease sales in the National Petroleum Reserve-Alaska.  In so doing, the Ninth Circuit rejected the argument that NEPA required BLM to prepare an entirely new EIS to support the lease sale, holding that because the agency action fell within the scope of an existing EIS, NEPA's supplementation framework provided the proper rubric for evaluating whether

---

[82] *N. Alaska Envtl. Ctr. v. U.S. Dep't of Interior*, 983 F.3d 1077, 1096 (9th Cir. 2020).

[83] *Id.*

[84] 875 F.3d 11 (D.C. Cir. 2017).

[85] *Id.* at 19.

[86] *Id.* at 19-20; *see also N. Alaska Envtl. Ctr.*, 983 F.3d at 1091-93 (endorsing the D.C. Circuit's conclusion in *Mayo*, although disagreeing with the D.C. Circuit's decision to examine the adequacy of the earlier NEPA analysis where the statute of limitations had run).

[87] 983 F.3d 1077 (9th Cir. 2020).

***Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.***
**Case No. 3:23-cv-00074-SLG**

18

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 27 of 48

the agency complied with NEPA.[88]  The Court further held, "[I]n deciding whether a previous EIS *is* the EIS for a subsequent action, we find it appropriate to rely on an EIS's defined scope."[89]  If the scope of the initial EIS is "ambiguous with regard to whether it does or does not include the precise subsequent action at issue," courts defer to the agency's interpretation of the EIS, so long as it is reasonable.[90]

### 2. The Harvest Strategy EIS is the EIS for the annual Harvest Specifications.

The annual BSAI harvest specifications undoubtedly fall within the scope of the Harvest Strategy EIS—a point Plaintiffs acknowledge.[91]  The first page of the Federal Register notice for the 2023-24 and 2024-25 Harvest Specifications identifies the Harvest Strategy EIS as the primary document supporting those decisions.[92]  The Harvest Strategy EIS's full title is the "Alaska Groundfish *Harvest Specifications* Final Environmental Impact Statement"[93] and its defined scope is "adopt[ing] a harvest strategy *to determine the annual harvest specifications* for the federally managed groundfish fisheries in the GOA and BSAI

---

[88] *See id.* at 1093 ("If the defined scope of the initial EIS included the subsequent action, NEPA requirements for the subsequent action would fall under the supplementation rubric.").

[89] *Id.*

[90] *Id.* at 1094.

[91] *See* Dkt. 32 at 37-38 ("The harvest specifications strategy is an ongoing action that provides direction for the annual harvest specifications decisions.").

[92] NMFS00018; 2SUPP00020.

[93] NMFS00639 (emphasis added).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

19

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 28 of 48

management areas."[94]  Moreover, even if the defined scope were ambiguous, courts defer to an agency's reasonable interpretation.[95]

Because the Harvest Strategy EIS *is* the EIS for the annual harvest specifications challenged here, the only issue properly before the Court is whether the agency acted arbitrarily and capriciously in deciding not to *supplement* the Harvest Strategy EIS.[96]

### 3.  For the previous seventeen years, NMFS has consistently issued annual BSAI Harvest Specifications without a separate NEPA document.

Plaintiffs also ignore that for seventeen years, NMFS has issued the annual harvest specifications without preparing a standalone NEPA document, instead analyzing whether changed circumstances or new information require the agency to supplement the Harvest Strategy EIS.[97]  The Harvest Strategy EIS, being the NEPA document covering the annual harvest specifications, shifted the agency's inquiry from whether to prepare a NEPA document in the first instance to whether to supplement the existing one.  Thus, since adopting the Harvest Strategy EIS in 2007, NMFS has followed the same procedure *every year* in issuing the annual BSAI harvest specifications: NMFS has relied on the analysis and framework established by the Harvest Strategy EIS while also preparing SIRs to examine

---

[94] NMFS00643 (emphasis added); *see also* NMFS00661-62 ("The alternative harvest strategies determine annual harvest specifications.… The harvest strategies are applied to the best available scientific information to determine the harvest specifications, which are the annual limits on the amount of each species of fish, or of each group of species, that may be taken.").

[95] *N. Alaska Envtl. Ctr.*, 983 F.3d at 1094.

[96] *See id.* at 1096 (holding supplementation was the proper rubric to evaluate sufficiency of agency decision supported by prior EIS).

[97] *See* 2SUPP00046 ("A SIR for the Final EIS is prepared each year to take that "hard look" and document the evaluation and decision whether a supplemental EIS (SEIS) is necessary to implement the annual groundfish harvest specifications…").

*Ass'n of Vill. Council Presidents, et al. v. National*
*Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

20

changed conditions and determine whether supplementation is necessary.[98]  NMFS issued the 2023-24 and 2024-25 Harvest Specifications in exactly the same manner as the prior fifteen iterations.  NMFS has also followed the identical procedure for issuing the annual harvest specifications for the Gulf of Alaska groundfish fishery.[99]

Tellingly, in the fifteen prior iterations of the annual BSAI harvest specifications, Plaintiffs have never suggested this process violates NEPA or that the annual harvest specifications require a separate NEPA document.  If Plaintiffs' argument was correct, then NMFS has violated NEPA with every annual harvest specification it has issued for the BSAI *and* the Gulf of Alaska fisheries for the last seventeen years.  As the Ninth Circuit has cautioned, "[a] court should hesitate before construing a statute in a way that renders years of consistent agency practice unlawful."[100]  Plaintiffs fail to offer a compelling argument as

---

[98] *See* 87 Fed. Reg. 11,626 (Mar. 2, 2022) (2022-23 Harvest Specifications rely on the Programmatic Alaska Groundfish Harvest Specifications Final EIS and Supplementary Information Reports to the Final EIS); 86 Fed. Reg. 11,449 (Feb. 25, 2021) (2021-22 Harvest Specifications); 85 Fed. Reg. 13,553 (Mar. 9, 2020) (2020-21 Harvest Specifications); 84 Fed. Reg. 9,000 (Mar. 13, 2019) (2019-20 Harvest Specifications); 83 Fed. Reg. 8,365 (Feb. 27, 2018) (2018-19 Harvest Specifications); 82 Fed. Reg. 11,826 (Feb. 27, 2017) (2017-18 Harvest Specifications); 81 Fed. Reg. 14,773 (Mar. 18, 2016) (2016-17 Harvest Specifications); 80 Fed. Reg. 11,919 (Mar. 5, 2015) (2015-16 Harvest Specifications); 79 Fed. Reg. 12,108 (Mar. 4, 2014) (2014-15 Harvest Specifications); 78 Fed. Reg. 13,813 (Mar. 1, 2013) (2013-14 Harvest Specifications); 77 Fed. Reg. 10,669 (Feb. 23, 2012) (2012-13 Harvest Specifications); 76 Fed. Reg. 11,139 (Mar. 1, 2011) (2011-12 Harvest Specifications); 75 Fed. Reg. 11,778 (Mar. 12, 2010) (2010-11 Harvest Specifications); 74 Fed. Reg. 7,359 (Feb. 17, 2009) (2009-10 Harvest Specifications); 73 Fed. Reg. 10,160 (Feb. 26, 2008) (2008-09 Harvest Specifications); 72 Fed. Reg. 9,451 (Mar. 2, 2007) (2007-08 Harvest Specifications).

[99] *See, e.g.*, 88 Fed. Reg. 13,238 (Mar. 2, 2023) (2023-24 Gulf of Alaska Harvest Specifications premised on 2007 Harvest Strategy EIS and annual SIR); 76 Fed. Reg. 11,111 (Mar. 1, 2011) (same for 2011-12 Gulf of Alaska Harvest Specifications).

[100] *Cnty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1024 (9th Cir. 2017).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

21

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 30 of 48

to why the Court should find unlawful nearly two decades of consistent agency practice in issuing annual harvest specifications.

### 4. The resource-intensive process of completing a new EIS is impractical and ill-suited for annual BSAI Harvest Specifications.

Finally, Plaintiffs' position that the 2023-24 and 2024-25 Harvest Specifications required NMFS to prepare a separate EIS is also impractical and unrealistic given the time and agency resources needed to prepare an EIS. An EIS is a massive undertaking, involving numerous procedural steps starting with a notice of intent, scoping period, public comment period, draft EIS, and an additional round of public comment, followed by the agency's consideration and response to comments, final EIS, and eventually a Record of Decision.[101] This process typically takes several years.[102] If NMFS was required to produce a standalone EIS before issuing annual harvest specifications, NMFS would be engaged in a never-ending process of constantly preparing new NEPA documents each year for each of the fisheries that it oversees. Such a scenario is not feasible, and the Supreme Court has declined to interpret NEPA as a "paperwork" exercise requiring agencies to engage in such "intractable" decision making.[103]

---

[101] Council on Environmental Quality, A Citizen's Guide to the NEPA, *available at* https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf (Dec. 2007).

[102] The Council on Environmental Quality found that across all Federal agencies the average EIS completion time from Notice of Intent to Record of Decision was 4.5 years. *See* Environmental Impact Statement Timelines (2010-2018), *available at* https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Report_2020-6-12.pdf (June 12, 2020).

[103] *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989) ("An agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decision making intractable."); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768-69 (2004) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action.").

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

22

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 31 of 48

In short, whether NMFS was obligated to supplement the Harvest Strategy EIS is the only claim for the Court's consideration.[104]

**C.  NMFS Carefully Considered Current Environmental Conditions in Issuing the 2023-2024 and 2024-2025 Harvest Specifications and Determined that Supplementing the Harvest Strategy EIS Was Not Necessary.**

Plaintiffs argue in the alternative that NMFS violated NEPA by deciding not to supplement the Harvest Strategy EIS.[105]  This argument is similarly flawed and is premised on Plaintiffs' incorrect assertion that NMFS "last analyzed the environmental consequences of its harvest specifications process in an EIS completed in 2007."[106]  Plaintiffs' argument disregards the flexible framework established by the Harvest Strategy EIS by which new information is continuously evaluated, ignores NMFS's extensive analysis of current BSAI ecosystem conditions documented in the SIR, and elevates Plaintiffs' subjective judgments over the agency's expert determination regarding the significance of new scientific information.  Ultimately, Plaintiffs simply disagree with the agency's reasoned determination that—having considered the significance of changed environmental conditions—a Supplemental EIS was not necessary.  But this determination is left to the sound discretion of NMFS as the expert agency.[107]

---

[104] Plaintiffs suggest that for certain fisheries NMFS has prepared at least an EA.  Dkt. 32 at 21. The examples Plaintiffs provide, however, involved decisions for which there was no existing NEPA document.  *See, e.g.*, *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1330 (9th Cir. 1992) (reviewing the "agency's decision not to prepare an initial EIS").

[105] Dkt. 32 at 36-40; Dkt. 66 at 5-6.

[106] Dkt. 32 at 1.

[107] *See Sierra Club v. Army Corps of Eng'rs*, 701 F.2d 1011, 1037 (2d Cir. 1983) ("[T]he ultimate determination as to whether a SEIS is required is left to the agency."); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) ("Deference is particularly important when the agency is making predictions, within its area of special expertise, at the frontiers of science.") (internal quotation marks and citation omitted).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

23

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 32 of 48

### 1.  Legal standard for supplementation of an EIS.

NEPA's implementing regulations provide that a Supplemental EIS should be prepared if (1) the agency makes substantial changes in the proposed action that are relevant to environmental concerns, or (2) significant new circumstances or information exist relevant to environmental concerns bearing on the proposed action or its impacts.[108] Agencies are required "to take a hard look at the new information to assess whether supplementation might be necessary."[109]  However, "not every change requires a supplemental EIS."[110]  Significantly, "[a]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decision making intractable."[111]

The environmental analysis contained in an EIS does not have an expiration date, and there are no specific time limits mandating when an EIS must be supplemented.  The Council on Environmental Quality's NEPA guidance provides "[a]s a rule of thumb… if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in [40 C.F.R. §] 1502.9 compel preparation of an EIS supplement."[112]  However, the "mere passage of time rarely warrants an order to update the information to be considered by the agency."[113]  Courts have upheld an agency's continued

---

[108] 40 C.F.R. § 1502.9(d)(1).

[109] *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 72-73 (2004); *see also LaCounte*, 939 F.3d at 1040.

[110] *Davis v. Latschar*, 202 F.3d 359, 369 (D.C. Cir. 2000); *see also Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004).

[111] *Marsh*, 490 U.S. at 373.

[112] 40 Most Asked Questions Concerning the CEQ's National Environmental Policy Act, at 32 (Supplements to Old EISs) *available at* https://www.energy.gov/nepa/articles/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.

[113] *Sierra Club*, 701 F.2d at 1036.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

24

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 33 of 48

reliance on an older EIS where the agency determines that new information or circumstances do not rise to a level of significance warranting the preparation of a Supplemental EIS.[114]

"[T]he ultimate determination as to whether a SEIS is required is left to the agency."[115] "An agency must document its decision that no SEIS is required to ensure that it remains alert to new information that may alter the results of its original environmental analysis, and continue[s] to take a hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval."[116] "Accordingly, as long as the [agency's] decision not to supplement the [EIS] was not 'arbitrary or capricious,' it should not be set aside."[117]

### 2. NMFS properly used Supplementary Information Reports to evaluate the need to supplement the Harvest Strategy EIS.

Plaintiffs criticize NMFS for using SIRs to evaluate the significance of new information and mistakenly argue that the agency "cannot rely on an evaluation outside the NEPA process to consider new information."[118] Settled law provides otherwise.

---

[114] *See Coker v. Skidmore*, 941 F.2d 1306 (5th Cir. 1991) (upholding agency's reliance on 15-year-old EIS over Plaintiffs' claims that the analysis was outdated); *Sierra Club*, 701 F.2d at 1036 (rejecting "the district court's feeling that the January 1977 EIS 'is probably seriously out-of-date' as a valid basis for ordering that a nonfisheries SEIS be prepared.").

[115] *Sierra Club*, 701 F.2d at 1037; *see also Kunaknana v. U.S. Army Corps of Eng'rs*, 3:13-CV-00044-SLG, 2015 WL 3397150, at *3 (D. Alaska May 26, 2015) ("A dispute as to whether an SEIS is required must be resolved in favor of the expert agency so long as the agency's decision is based on a reasoned evaluation of the relevant factors.") (internal citations and quotations omitted).

[116] *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 855 (9th Cir. 2013) (internal quotations and citations omitted).

[117] *Marsh*, 490 U.S. at 377.

[118] Dkt. 32 at 26.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

25

NMFS properly used SIRs to take a "hard look" and determine whether new information or circumstances are "significant" such that a Supplemental EIS is required.[119] Both the Supreme Court and the Ninth Circuit routinely have approved an agency's use of SIRs or similar "non-NEPA" documents to evaluate whether supplemental NEPA documentation is required.[120] "Specifically, courts have upheld agency use of SIRs and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS."[121] National Oceanic and Atmospheric Administration policies—which are applicable to its sub-agency NMFS— also authorize use of SIRs for this purpose.[122] The use of SIRs helps avoid a scenario where "the threshold decision not to supplement an EIS would become as burdensome as preparing

---

[119] *See Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 565-66 (9th Cir. 2000) (listing cases).

[120] *Marsh*, 490 U.S. at 383-85 (upholding decision of Army Corps of Engineers to proceed with dam project without supplementing existing NEPA documents where Corps used an SIR to analyze significance of new reports questioning environmental impact of project); *Kimbell*, 709 F.3d at 855 ("the Forest Service often presents this threshold determination in a supplemental information report[.]"); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) (rejecting argument that Forest Service should have supplemented an EIS where agency used SIRs to document whether new information warranted supplementation); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 529-30 (9th Cir. 1994) (upholding use of "Memorandum of Record" to assess significance of recent wildfires in project area); *see also Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir. 1997) (upholding decision of Forest Service to proceed with logging project without supplementing existing NEPA documents where agency used an SIR to evaluate significance of new information about area to be logged); *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1162 (10th Cir. 2004) ("As stated, agencies may use non-NEPA procedures to determine whether new NEPA documentation is required.").

[121] *Idaho Sporting Cong.*, 222 F.3d at 566.

[122] NMFS00041; Companion Manual for NOAA Admin Order 216-6A, Policy and Procedures for Compliance with NEPA, https://www.noaa.gov/sites/default/files/2021-10/NOAA-NAO-216-6A-Companion-Manual-03012018%20%281%29.pdf at App'x C-14 (Jan. 13, 2017).

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

26

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 35 of 48

the supplemental EIS itself, and the continuing duty to gather and evaluate new information . . . could prolong NEPA review beyond reasonable limits."[123]

Plaintiffs mistakenly suggest that "significance" is a threshold determination an agency must make before using an SIR.[124] It is *through an SIR* that the agency properly determines whether new information is significant.[125] Only then—"once *an agency determines* that new information is significant"—must it "prepare a supplemental EA or EIS; SIRs cannot serve as a substitute."[126] Plaintiffs' contention that NMFS cannot use an SIR to consider new information misunderstands the very purpose of an SIR and is without merit.

### 3. The Supplementary Information Reports and their appendices comprehensively considered new information about the BSAI ecosystem.

NMFS properly determined that new information did not require a Supplemental EIS. Plaintiffs' substantive attack on the agency's analysis fails for several reasons:

1) Plaintiffs are factually incorrect that NMFS did not consider any new information about the status of the ecosystem in the SIRs;[127]

2) NMFS thoroughly considered the very same changing ocean conditions, seabird and marine mammal mortality events, and declining salmon returns that Plaintiffs claim the agency ignored; and

---

[123] *Dombeck*, 222 F.3d at 560.

[124] Dkt. 32 at 25-26.

[125] *See Dombeck*, 222 F.3d at 560 ("[C]ourts have upheld agency use of SIRs and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS . . . . We have permitted agencies to use SIRs for this purpose, in part, because NEPA and the CEQ regulations are silent on the issue of how agencies are to determine *the significance of new information*.") (emphasis added).

[126] *Id.* at 566.

[127] Dkt. 32 at 26.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

27

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 36 of 48

3) The agency's reasoned decision that new information did not necessitate a supplemental EIS is entitled to deference.

To begin, Plaintiffs misapprehend the SIRs, asserting the agency concluded "that it did not need to consider new information because it was considered through the harvest specifications process."[128]  NMFS never concluded it did not need to consider new information.[129]  Indeed, the agency considered new information, including in the very pages Plaintiffs cite, concluding, "*according to this new information*, there has been no change in any stock's status relative to the established status determination criteria . . . . [T]he new information available is not of a scale and scope that require an SEIS."[130]  Likewise, the SIRs never suggest, as Plaintiffs contend, that the agency views stock assessments as a substitute for a NEPA document.[131]  Rather, NMFS appropriately utilized the SIRs to analyze the information contained in 2022 and 2023 SAFE Reports and Ecosystem Status Reports.[132]

---

[128] *Id.* at 34.

[129] Of course, the agency *also* considers new information during the harvest specifications process, as contemplated by the Harvest Strategy EIS.  To set annual harvest specifications using the best available science, NMFS and the Council continuously evaluate the BSAI groundfish fishery in the context of current environmental conditions.  *See* NMFS01096.  The Harvest Strategy EIS "anticipated that changes in information would be used each year in setting the annual harvest specification since the process is flexible to adjust to new information on stock abundance and environmental and socioeconomic factors (like climate change)."  NMFS00041.  But the agency *also* prepares an SIR yearly to evaluate whether, applying NEPA, new information requires supplementing the Harvest Strategy EIS.  *Id.*

[130] NMFS00592; *see also* 2SUPP00081 (concluding new "information presented on species abundance and condition, environmental and ecosystem factors, and socio-economic conditions used to set the 2024 and 2025 harvest specifications does not represent a significant change relative to the environmental impacts of the harvest strategy analyzed in the Harvest Specifications EIS.").

[131] Dkt. 32 at 35.

[132] NMFS00587; *see also* 2SUPP00046 ("The SIR prepared each year for the annual harvest specifications analyzes the information contained in the most recent SAFE reports

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

28

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 37 of 48

Plaintiffs also erroneously argue that NMFS failed to consider (a) changing ocean conditions, (b) seabird and marine mammal mortality events, and (c) declining salmon returns in Western Alaska.[133]  Again, Plaintiffs disregard the SIRs and their appendices, which reflect the considerable attention NMFS paid to each of these topics before issuing the 2023-24 and 2024-25 Harvest Specifications.[134]

### a. NMFS considered changing ocean conditions.

Plaintiffs contend that the Harvest Strategy EIS does not account for changed ocean conditions and speculate that if NMFS considered changing ocean conditions in a Supplemental EIS, it "could lead the Service to consider changes in the harvests specifications process to mitigate the effects of fishing in this new environment."[135]  Cherry-picking statements out of context, Plaintiffs argue that current ocean conditions differ from those considered in the Harvest Strategy EIS.[136]  But this criticism fundamentally misunderstands the flexible framework provided by the Harvest Strategy EIS to evaluate new information and ignores the extensive science related to climate change and current ocean conditions considered by NMFS in issuing the 2023-24 and 2024-25 Harvest Specifications, and considered by NMFS through annual SIRs.

As NMFS explained in its response to comments, "the framework process for the preferred harvest strategy under the Final EIS allows for the effects of climate change to be

---

and all information available to NMFS and the Council to determine whether an SEIS must be prepared to implement the annual harvest specifications.").

[133] Dkt. 32 at 27-33.

[134] The Appendices to the SIR incorporate by reference the 2022 Ecosystem Status Reports, the 2022 SAFE Reports, and the 2021 Economic Status Report.  NMFS00637 ("These documents are included by reference.").

[135] Dkt. 32 at 29.

[136] *Id.* at 28-29.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

29

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 38 of 48

considered in the annual process for setting the harvest specifications."[137]  Significantly, the annual SAFE Reports and particularly the Ecosystem Status Reports developed to support the annual harvest specifications contain a comprehensive discussion of changing environmental conditions informing the Council's annual recommendations and NMFS's consideration and approval of the same.[138]  Indeed, the SSC and Groundfish Plan Teams have responded to information regarding climate change and changing ocean conditions by recommending reduced ABCs on which the TAC is based.[139]  Contrary to Plaintiffs' suggestion, "the annual harvest specifications process, which implements the preferred harvest strategy under the EIS, allows for the consideration of the best scientific information available on climate change."[140]  Having surveyed current ecosystem conditions including those related to changed ocean conditions, NMFS determined "[t]he new information available is not of a scale and scope that require an SEIS."[141]

### b. NMFS considered seabird and marine mammal mortality events.

Plaintiffs are similarly mistaken in their contention that NMFS did not account for seabird and marine mammal mortality events in issuing the harvest specifications.[142]  The

---

[137] NMFS00043; 2SUPP00047.

[138] *See, e.g. id.* (noting ongoing ecological factors like climate change are addressed annually in the SAFE Reports); *see also* NMFS27385-88 (2022 Eastern Bering Sea Ecosystem Status Report in Brief); NMFS05438-42 (ecosystem assessment of the "recent warm stanza" and physical and biological responses to the same); NMFS05456-59 (High Resolution Climate Change Projections for the Eastern Bering Sea); NMFS05686-710 (surveying climate and temperature conditions in the Aleutian Islands).

[139] *See* NMFS00043 ("In some instances, the Plan Teams and SSC have recommended ABC reductions based on climate change considerations."); *see also* 2SUPP00048 (explaining how changing ocean conditions impact the risk tables used for TAC setting).

[140] NMFS00043; 2SUPP00048.

[141] NMFS00592; 2SUPP00143.

[142] Dkt. 32 at 29-31.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

30

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 39 of 48

voluminous administrative record demonstrates that NMFS did consider seabird and marine mammal mortality events.[143]  Directly rebutting Plaintiffs' suggestion that NMFS ignored the health of seabirds, the NMFS Ph.D. biologist responsible for coordinating with other experts and assembling the Seabird Status Report section of the 2022 Ecosystem Status Report remarked, "I am blown away (and I know the SSC and Council will be as well) by the quantity AND quality of information that is provided in real time (i.e., 2022 data) for the fisheries managers to consider in their decision making!"[144]  This same wealth of information is incorporated into the SIRs and demonstrates that NMFS evaluated the health of seabirds in issuing the annual harvest specifications in a manner consistent with the framework established by the Harvest Strategy EIS.

The same is true for marine mammals.  Plaintiffs contend that the Harvest Strategy EIS is "silent regarding unusual mortality events."[145]  But the 2023-24 Harvest Specifications clearly state that "[a]dverse impacts on marine mammals . . . resulting from fishing activities conducted under this rule are discussed in the Final EIS *and its accompanying annual SIRs*."[146]  The SIRs evaluate the status of Steller Sea Lions,[147] Pacific walruses,[148] seals,[149] and whales.[150]  The Ecosystem Status Reports for the Eastern Bering

---

[143] *See, e.g.* NMFS05571-77 (2022 ESR's discussion of "Integrated Seabird Information"); NMFS05574 (2022 Seabird Report Card); NMFS05575-77 (discussion of seabird mortality); SUPP3613 (2022 Marine Mammal Stock Assessment); 2SUPP00117-120 (seabirds); 2SUPP06525-31 (2023 ESR's discussion of "Integrated Seabird Information").

[144] NMFS34245.

[145] Dkt. 32 at 30.

[146] NMFS00047 (emphasis added).

[147] NMFS00617-18; *see also* NMFS05744; NMFS19727; NMFS20091; NMFS21541; NMFS21824.

[148] NMFS00619; *see also* NMFS21885.

[149] NMFS00622-24; *see also* NMFS22273; NMFS22404.

[150] NMFS00624-26.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

31

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 40 of 48

Sea and Aleutian Islands, which are incorporated into the SIRs by reference,[151] discuss the health of Steller Sea Lions, the status and trends in marine mammal strandings as well as unusual mortality events for ice seals and gray whales.[152] Additionally, the SIRs rely on and are supported by annual Alaska Marine Mammal Stock Assessments.[153] Plaintiffs' contention that NMFS did not consider contemporaneous information about the health of seabirds and marine mammals in issuing the 2023-24 and 2024-25 Harvest Specifications is simply incorrect.

<strong>c.     NMFS considered current Chinook and chum salmon abundance.</strong>

Plaintiffs argue NMFS neglected to consider the current Chinook and chum salmon abundance in establishing the 2023-24 and 2024-25 Harvest Specifications.[154] Once again, the voluminous administrative record and the SIRs demonstrate otherwise. Plaintiffs also make several misleading statements about the BSAI pollock fishery and salmon bycatch which warrant clarification. It bears mentioning that while the annual harvest specifications identify the limit on bycatch of Chinook salmon and several other protected species, the harvest specifications themselves do not regulate salmon bycatch or industry efforts to minimize bycatch—the BSAI FMP and its implementing regulations do.[155] Notably, substantive measures geared towards minimizing salmon bycatch (or bycatch of any species) are addressed through amendments to the FMP—with its own separate NEPA process—and not through the annual harvest specifications.[156]

---

[151] *See* NMFS000637 (2023 SIR App'x C: 2022 Ecosystem Status Report).

[152] NMFS05578-80 (Eastern Bering Sea); NMFS05744-48 (Aleutian Islands).

[153] NMFS00623 n.77; NMFS22408-806; 2SUPP29786-884.

[154] Dkt. 32 at 31-33.

[155] NMFS00039; 50 C.F.R. § 679.21(f)(2).

[156] *See* NMFS00039 ("Chinook and chum salmon limits and conditions that affect the limits are set in regulations, and changes to those regulations are outside the scope of the

***Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.***
**Case No. 3:23-cv-00074-SLG**
          32

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 41 of 48

Presenting decades' worth of aggregated bycatch data without context, Plaintiffs disingenuously suggest that the BSAI groundfish fishery is to blame for declining salmon returns in Western Alaska.[157]  This of course disregards the comprehensive measures to reduce bycatch over the last seventeen years and ignores that most salmon bycatch in the pollock fishery are Asian hatchery chum salmon not destined for Western Alaska rivers.[158]

Plaintiffs misleadingly contend that the modest increase in the pollock TAC for 2023 and 2024—which is still below the 10-year average TAC for Bering Sea pollock—will result in more salmon bycatch, claiming "at higher levels of fishing, more bycatch is likely."[159] While this may sound intuitive, NMFS concluded no such correlation existed, noting "[t]he best scientific information available does not suggest that a reduction in the pollock TAC would measurably increase salmon escapement to western Alaska."[160]

In fact, NMFS found that the level of fishing effort represented by the pollock TAC did *not* predictably impact salmon bycatch in either direction.  NMFS observed that "[w]hile pollock catches have been consistent from year to year since 2011, Chinook and chum bycatch has varied independently of stable pollock TACs."[161]

Furthermore, the overall TAC for pollock does not affect allowable bycatch.  As mentioned above, "the pollock fleet is constrained by the limit of Chinook salmon set in regulation, regardless of the size of the pollock harvest."[162]  For example, the PSC limit for

---

annual harvest specification process."); 2SUPP00044; *see also* NMFS00611-14 (detailing NEPA review for salmon bycatch management measures).

[157] Dkt. 32 at 2, 11.

[158] NMFS00038-39; NMFS00079-80.

[159] Dkt. 32 at 23; NMFS00040.

[160] NMFS00040.

[161] *Id.*

[162] NMFS00039; 2SUPP00044.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

33

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 42 of 48

Chinook salmon for 2023 and 2024 would be 45,000 fish regardless of whether the pollock TAC was set at 1.3 million mt or some lesser amount. NMFS reasonably concluded that "reducing the pollock TAC would not meaningfully increase salmon returns to Western Alaska given the small percentages of salmon stocks taken as bycatch in the pollock fishery and the constraining PSC limit that applies at any level of pollock harvest."[163]

Still, the 2023-24 and 2024-25 Harvest Specifications and SIRs consider Chinook and chum salmon abundance. The agency "acknowledge[d] the western Alaska salmon crisis and the impact it is having on culture and food security throughout western Alaska."[164] Indeed, consistent with regulation and the BSAI FMP, the PSC limits for Chinook salmon are based on past bycatch performance, whether approved Chinook salmon bycatch IPAs have been formed, and whether or not it is a low Chinook salmon abundance year.[165] Utilizing the State of Alaska's 3-System Index for Western Alaska,[166] NMFS determined that 2022 and 2023 were low Chinook abundance years, resulting in a downward adjustment

---

[163] NMFS00040; *see also* NMFS00039 ("[r]educing the pollock TAC likely would have an extremely small effect on salmon returns, and therefore on in-river harvest opportunities, because of the low level of bycatch salmon in the pollock fishery.").

[164] NMFS00039; 2SUPP00044.

[165] NMFS00038; 2SUPP00044.

[166] NMFS00038-39. Plaintiffs cite "extremely low" Chinook salmon runs in 2023 measured by the State of Alaska's 3-System Index, Dkt. 66 at 5, but neglect to mention that the Unalakleet River weir used to count salmon was out of operation for nine days corresponding to the normal peak passage of Chinook salmon, making total escapement estimates "highly uncertain." 2SUPP34154-55. Additionally, three of the four weirs on the Kuskokwim River were inoperable, resulting in extended periods of missed passage and the "inability to produce escapement estimates." 2SUPP34155-56.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

34

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 43 of 48

of the PSC limit for 2023 and 2024 to 45,000 Chinook salmon and a bycatch performance standard of 33,318 Chinook salmon.[167]

In issuing the 2023-24 and 2024-25 Harvest Specifications, NMFS noted that existing measures implemented through Amendment 91 and Amendment 110 to the BSAI FMP "have reduced salmon bycatch in the pollock fishery compared with what they would have been without these measures."[168] As a result of these salmon avoidance measures, the entire BSAI pollock fishery has been well below the 45,000-fish PSC limit for Chinook salmon, catching 8,342 Chinook salmon in 2022 and 11,855 Chinook salmon in 2023—no small feat considering the fishery harvests over a million metric tons of pollock annually.[169] Significantly, bycatch Chinook are from stocks across Alaska as well as the Pacific Northwest and Russia and are not all destined for western Alaska rivers.[170]

Although avoidance of chum salmon must not come at the expense of Chinook salmon, NMFS noted that the agency and the Council "are currently engaged in a comprehensive process to evaluate existing measures and develop alternatives that may be necessary to further reduce chum salmon bycatch."[171] Further, NMFS determined that "[c]onsistent annual genetic data show the majority of chum bycatch is of Asian hatchery origin, and thus does not affect returns to western Alaska rivers,"[172] and that bycatch from

---

[167] *Id.*; 2SUPP00036, 2SUPP00044. The bycatch performance standard is less than the overall PSC limit and if exceeded in three of seven years will reduce the overall PSC limit in future years, thereby incentivizing reduced bycatch below the performance standard.

[168] NMFS00038; 2SUPP00044.

[169] NMFS17565; NMFS00039; 2SUPP01363.

[170] 2SUPP00049.

[171] NMFS00039; 2SUPP00044.

[172] NMFS00039; NMFS00079-80.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG                    35

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 44 of 48

the pollock fishery effects "less than 1 percent of the chum salmon returns in Western Alaska."[173]

The SIRs and their appendices address salmon bycatch management measures employed since the adoption of the Harvest Strategy EIS[174] as well as current concerns related to declining salmon runs.[175]  The extensive administrative record demonstrates that NMFS, in issuing the 2023-24 and 2024-25 Harvest Specifications, carefully considered the health of the salmon stocks in Western Alaska and set the PSC limit for Chinook salmon in accordance with lower salmon abundance as required by the FMP.  Plaintiffs' suggestions to the contrary are unavailing.

**D.     NMFS's Decision Not to Supplement the Harvest Strategy EIS is Based on the Best Available Science and Entitled to Deference.**

The process undertaken by the Council and NMFS to set the annual harvest specifications is transparent and driven by science.[176]  Unhappy with the outcome, Plaintiffs seek to elevate their own subjective opinions above the agency's expert determinations.  But the decision to prepare or not prepare a Supplemental EIS is in the sound discretion of the agency.[177]  Here, the administrative record reflects that NMFS, with input from the public and the Council's expert panels, carefully evaluated the best available science and took the requisite "hard look" at new information including updated information on climate change, ocean conditions, and the health of Western Alaska salmon runs.[178]  NMFS prepared detailed

---

[173] NMFS00078-79.

[174] NMFS00611-14; 2SUPP00103-08; 2SUPP01433.

[175] *See, e.g.* NMFS05439-40 (noting declining adult salmon runs throughout the Arctic and Yukon-Kuskokwim region in recent years); NMFS05453-55 ("Noteworthy topics: Factors Affecting 2022 Western Alaska Chinook Salmon Runs & Subsistence Harvest").

[176] *See* Part II.C *supra*.

[177] *Sierra Club*, 701 F.2d at 1037.

[178] *S. Utah Wilderness Alliance*, 542 U.S. at 72-73.

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
Case No. 3:23-cv-00074-SLG

36

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 45 of 48

SIRs and determined "the new information available is not of a scale and scope that require an SEIS."[179]  This determination is reasonable, consistent with NEPA, and is entitled to deference.[180]

## V.  CONCLUSION

For the reasons set forth above, APA and UCB respectfully request that the Court deny Plaintiffs' motion for summary judgment and grant the Federal Defendants' and APA's and UCB's cross-motions for summary judgment.


DATED this 19th day of July, 2024.

SUMMIT LAW GROUP, PLLC


 s/ James C. Feldman
James C. Feldman, (Alaska Bar #1702003)
Jeffrey M. Feldman, (Alaska Bar #7605029)
jamesf@summitlaw.com
jefff@summitlaw.com

***Counsel for At-Sea Processors Association and United Catcher Boats***

---

[179] NMFS000592; NMFS00045; 2SUPP00046.

[180] *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236 ("Deference is particularly important when the agency is making predictions, within its area of special expertise, at the frontiers of science.") (citations and internal quotations omitted).

***Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.***
**Case No. 3:23-cv-00074-SLG**

37

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 46 of 48

## <u>CERTIFICATE OF COMPLIANCE WITH WORD LIMITS</u>

I certify that this document contains 10,475 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1) and the Court's Scheduling Order at Docket 65.

*s/ James C. Feldman*
James C. Feldman

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

38

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 47 of 48

## <u>CERTIFICATE OF SERVICE</u>

I, **Lisa Britton,** hereby certify that on July 19, 2024, I filed a true and correct electronic original of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:23-cv-00074-SLG who are registered CM/ECF users will be served by the CM/ECF system.

DATED this 19th day of July, 2024, at Seattle, Washington.

SUMMIT LAW GROUP, PLLC

_s/ Lisa Britton_
**Lisa Britton,** Legal Assistant
_lisab@summitlaw.com_

*Ass'n of Vill. Council Presidents, et al. v. National Marine Fisheries Serv., et al.*
**Case No. 3:23-cv-00074-SLG**

39

Case 3:23-cv-00074-SLG   Document 67   Filed 07/19/24   Page 48 of 48