# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS, *et al*., | |
|         Plaintiffs, | |
|         and | Case No. 3:23-cv-00074-SLG |
| CITY OF BETHEL, | **FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
|         Intervenor-Plaintiff, | |
|         v. | |
| NATIONAL MARINE FISHERIES SERVICE, *et al*., | |
|         Defendants, | |
|         and | |
| AT-SEA PROCESSORS ASSOCIATION, *et al.,* | |
|         Intervenor-Defendants. | |

Federal Defendants – National Marine Fisheries Service ("NMFS"), United States Department of Commerce, Gina M. Raimondo, in her official capacity as Secretary of Commerce, and Samuel D. Rauch, III, in his official capacity as Deputy Assistant Administrator for Regulatory Programs – respectfully cross-move under Federal Rule of Civil Procedure 56 for summary judgment on all claims in Plaintiffs' and Intervenor-Plaintiff's Complaints and Supplemental Complaints. *See* ECF Nos. 1, 29, 52, and 54.

Federal Defendants are entitled to summary judgment because NMFS complied with the requirements of the National Environmental Policy Act (NEPA) in adopting the 2023-2024 and 2024-2025 harvest specifications for the groundfish fisheries of the Bering Sea and Aleutian Islands. This cross-motion is supported by the previously filed Administrative Records (ECF Nos. 19, 30, 35, 62, and 63), the accompanying Federal Defendants' Brief in Support of Cross-Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment, and upon such oral and/or documentary evidence as may be presented in any hearing on this motion.

Dated: July 19, 2024     Respectfully submitted,

          TODD KIM
          Assistant Attorney General
          Environment and Natural Resources Division
          United States Department of Justice

          JENNIFER A. SUNDOOK
          Trial Attorney
          Natural Resources Section
          Ben Franklin Station, P.O. Box 7611
          Washington, D.C.  20044-7611
          Phone:  (202) 341-2791
          Fax:  (202) 305-0506
          Jennifer.Sundook@usdoj.gov

          *Attorneys for Federal Defendants*

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

JENNIFER A. SUNDOOK
Trial Attorney
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C.  20044-7611
Phone:  (202) 341-2791
Fax:  (202) 305-0506
Jennifer.Sundook@usdoj.gov


*Attorneys for Federal Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ASSOCIATION OF VILLAGE COUNCIL PRESIDENTS, *et al*., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | Case No. 3:23-cv-00074-SLG |
| CITY OF BETHEL, | ) ) | FEDERAL DEFENDANTS' BRIEF IN SUPPORT OF CROSS-MOTION FOR |
| Intervenor-Plaintiff, | ) ) | SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR |
| v. | ) ) | SUMMARY JUDGMENT |
| NATIONAL MARINE FISHERIES SERVICE, *et al*., | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |

Fed. Defs.' Opening Brief
*AVCP v. NMFS*, No. 3:23-cv-00074-SLG

| AT-SEA PROCESSORS | ) |
| ASSOCIATION, *et al.,* | ) |
| | ) |
| Intervenor-Defendants. | ) |

Fed. Defs.' Opening Brief
*AVCP v. NMFS*, No. 3:23-cv-00074-SLG

Case 3:23-cv-00074-SLG   Document 68   Filed 07/19/24   Page 4 of 54

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 2

        A.      The Magnuson-Stevens Act .................................................................. 3

        B.      The Fishery Management Plan and Measures to Reduce Salmon
                Bycatch ................................................................................................. 4

        C.      The Harvest Specifications .................................................................. 7

                1.      The Harvest Specifications EIS ................................................ 8

                2.      The Harvest Specifications Process .......................................... 11

                3.      Comments on the BSAI Groundfish Specifications ................ 15

                4.      The Supplemental Information Reports .................................... 16

III.    STANDARD OF REVIEW ................................................................................ 20

IV.     ARGUMENT .................................................................................................... 21

        A.      Plaintiffs fail to satisfy the causation and redressability elements of
                standing. ............................................................................................. 21

        B.      Any argument relating to the lack of an EIS specific to the annual
                harvest specifications decision is waived. .......................................... 25

        C.      NEPA does not require a new EIS each year for the annual harvest
                specifications decision. ....................................................................... 28

        D.      The Service reasonably determined that the harvest specifications
                decisions did not require supplemental NEPA analysis. ...................... 30

                1.      Legal Standard ......................................................................... 30

                2.      NMFS appropriately used the SIRs to consider whether new
                        information is significant and would require a supplemental
                        EIS. ......................................................................................... 32

                3.      NMFS did not use the harvest specification process as a
                        substitute for analyzing whether significant information
                        required supplemental NEPA analysis. .................................... 34

*Fed. Defs.' Opening Brief*                                                                                    i

        4.    NMFS's conclusion that changes in the BSAI ecosystems do
              not present significant new circumstances or information is
              reasonable and well-supported. ....................................................... 36

V.    CONCLUSION ..................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Evans,*
371 F.3d 475 (9th Cir. 2004) ...................................................... 39

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.,*
126 F.3d 1158 (9th Cir. 1997) .................................................... 39

*Barnes v. U.S. Dep't of Transp.,*
655 F.3d 1124 (9th Cir. 2011) .................................................... 27

*Blue Mountains Biodiversity Project v. Blackwood,*
161 F.3d 1208 (9th Cir. 1998) .................................................... 36

*Cantrell v. City of Long Beach,*
241 F.3d 674 (9th Cir. 2001) ...................................................... 21

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971)................................................................... 20

*City of Sausalito v. O'Neill,*
386 F.3d 1186 (9th Cir. 2004) .................................................... 31

*Conservation Law Found. of New England, Inc. v. Franklin,*
989 F.2d 54 (1st Cir. 1993)........................................................... 4

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ................................................................... 25

*Flaherty v. Bryson,*
850 F. Supp. 2d 38 (D.D.C. 2012)........................................... 4, 23

*Friends of Endangered Species, Inc. v. Jantzen,*
760 F.2d 976 (9th Cir. 1985) ...................................................... 39

*Friends of the Clearwater v. Dombeck,*
222 F.3d 552 (9th. Cir. 2000) ..................................................... 33

*Greenpeace Action v. Franklin,*
14 F.3d 1324 (9th Cir. 1992) ...................................................... 39

*Havasupai Tribe v. Robertson,*
943 F.2d 32 (9th Cir. 1991) ........................................................ 25

*Idaho Sporting Congress, Inc. v. Alexander,*
222 F.3d 562 (9th Cir. 2000) ...................................................... 33

*'Ilio'ulaokalani Coal. v. Rumsfeld,*

Case 3:23-cv-00074-SLG   Document 68   Filed 07/19/24   Page 7 of 54

464 F.3d 1083 (9th Cir. 2006) ....................................................................27

*Johnson v. Dir., Off. of Workers' Comp. Programs*,
183 F.3d 1169 (9th Cir. 1999) ....................................................................25

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) .....................................................................39

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976)...................................................................................40

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
42 F.3d 517 (9th Cir. 1994) .......................................................................31

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024)...............................................................................21

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...................................................................................21

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)................................................................1, 30, 31, 38, 40

*Mayo v. Reynolds*,
875 F.3d 11 (D.C. Cir. 2017) .....................................................................28

*Metro. Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983)...................................................................................24

*Mt. Graham Red Squirrel v. Espy*,
986 F.2d 1568 (9th Cir. 1993) ....................................................................21

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*,
983 F.3d 1077 (9th Cir. 2020) .................................................27, 28, 29, 30, 40

*N.C. Fisheries Ass'n v. Gutierrez*,
518 F. Supp. 2d 62 (D.D.C. 2007).............................................................39

*Native Ecosystems Council v. Tidwell*,
599 F.3d 926 (9th Cir. 2010) .....................................................................37

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
696 F.3d 849 (9th Cir. 2012) .....................................................................22

*Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.*,
460 F.3d 1125 (9th Cir. 2006) ....................................................................39

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*,
113 F.3d 1505 (9th Cir. 1997) ....................................................................31

*Protect Our Cmtys. Found. v. LaCounte*,

939 F.3d 1029 (9th Cir. 2019) ...................................................................... 31

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ....................................................................... 20

*Sierra Club v. U.S. Army Corps of Eng'rs*,
701 F.2d 1011 (2d Cir. 1983) ....................................................................... 40

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
671 F.3d 1113 (9th Cir. 2012) ..................................................................... 36

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
*Com.*, 438 F.3d 937 (9th Cir. 2006) ........................................................... 25

*United Cook Inlet Drift Ass'n v. NMFS*,
No.21-cv-0025, 2022 WL 2222879 (D. Alaska June 21, 2022) ................... 4

*Universal Health Servs., Inc. v. Thompson*,
363 F.3d 1013 (9th Cir. 2004) ..................................................................... 28

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ..................................................................................... 25

*W. Coal Traffic League v. ICC*,
735 F.2d 1408 (D.C. Cir. 1984) ................................................................... 30

*Warm Springs Dam Task Force v. Gribble*,
621 F.2d 1017 (9th Cir. 1980) ............................................................... 32, 33

*Wash. Env't Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) ............................................................... 22, 23

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
5 F.4th 997 (9th Cir.) ................................................................................... 21

*Wisconsin v. Weinberger*,
745 F.2d 412 (7th Cir. 1984) ....................................................................... 36

**Statutes**

5 U.S.C. § 706(2) .............................................................................................. 20

16 U.S.C. § 1851(a)(1) ............................................................................... 7, 8, 11

16 U.S.C. § 1851(a)(2) ............................................................................... 12, 34

16 U.S.C. § 1852(a) ............................................................................................ 3

16 U.S.C. § 1852(a)(1)(G) .................................................................................. 4

16 U.S.C. § 1852(g)(1)(B) ........................................................................... 11, 12

16 U.S.C. § 1855(f) ................................................................. 25

16 U.S.C. §§ 1801–1891d ......................................................... 3

28 U.S.C. § 2401(a) ................................................................ 29

**Regulations**

40 C.F.R. § 1502.9(d)(1) ........................................... 27, 29, 30, 35

40 C.F.R. pts. 1500–08 ............................................................ 40

46 Fed. Reg. 18 ...................................................................... 40

50 C.F.R. § 600.310(f)(3) ......................................................... 11

50 C.F.R. § 600.315 ................................................................ 12

50 C.F.R. § 600.315(d) ............................................................ 12

50 C.F.R. § 670.20(a)(2) ....................................................... 8, 11

50 C.F.R. § 679.20(a)(2) ......................................................... 12

50 C.F.R. § 679.20(c) ......................................................... 15, 19

50 C.F.R. § 679.21(e)(1) ........................................................... 6

50 C.F.R. § 679.21(f) ........................................................... 6, 24

50 C.F.R. § 679.20 ................................................................. 14

50 C.F.R. pt. 600 ................................................................... 11

74 Fed. Reg. 3178 .................................................................. 11

## TABLE OF ACRONYMS

| | |
|---|---|
| ABC | Acceptable biological catch |
| AP | Advisory Panel |
| APA | Administrative Procedure Act |
| AVCP | Association of Village Council Presidents |
| BSAI | Bering Sea and Aleutian Islands |
| EA | Environmental Assessment |
| EBS | Eastern Bering Sea |
| EEZ | Exclusive economic zone |
| EFH | Essential fish habitat |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| ESP | Ecosystem and Socioeconomic Profile |
| ESR | Ecosystem status report |
| FEIS | Final Environmental Impact Statement |
| FMP | Fishery Management Plan |
| FMU | Fishery management unit |
| GOA | Gulf of Alaska |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NS | National Standards |
| OFL | Overfishing level |
| OY | Optimum Yield |
| PSC | Prohibited species catch |
| PSEIS | Programmatic Supplemental Environmental Impact Statement |
| SAFE | Stock Assessment and Fishery Evaluation |
| SEIS | Supplemental Environmental Impact Statement |
| SIR | Supplementary Information Report |
| SSC | Scientific and statistical committee |
| TAC | Total allowable catch |
| TCC | Tanana Chiefs Conference |

# I. INTRODUCTION

The question of when the impact of climate change on an ecosystem is significant enough to require supplemental process under the National Environmental Policy Act (NEPA) "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989).

The foundation of Plaintiffs'[1] challenge to the annual harvest specifications decision is that changes to the Bering Sea and Aleutian Islands (BSAI) ecosystems required new or supplemental process under NEPA. However, National Marine Fisheries Service ("NMFS" or the "Service") agency experts have concluded these changes are not significant in the context of the impact of the harvest strategies on the environment. This decision was supported by a tremendous amount of science. In the annual Supplemental Information Reports (SIR), NMFS considered the need for supplemental NEPA documentation by reviewing the most recent and best scientific information available concerning the past, present, and possible future conditions of fish stocks, fish habitat, marine ecosystems, physical oceanography, climate data, biological data, and socio-ecological dimensions. NMFS rationally concluded, based on the best science available and most up-to-date data on climate change, that no supplemental NEPA process was required to implement the annual BSAI groundfish harvest specifications.

This decision was reasonable and well-supported. NMFS implements the annual groundfish harvest specifications based on one of the harvest strategies analyzed in the

---

[1] For brevity, this brief uses the term "Plaintiffs" to also include Amici Curiae.

Harvest Specifications EIS. When the Harvest Specifications EIS was finalized, climate change was a present phenomenon. This EIS analyzed the potential environmental impacts of alternative harvest strategies and considered the effects of warming oceans, rising surface air temperatures, and decreases in sea ice on the BSAI ecosystems. Plaintiffs attempt to overwhelm the Court with a litany of changes in the BSAI ecosystems, generally divorced from the context of the annual harvest specifications decision. But NMFS agency experts reviewed comprehensive, current data on the BSAI ecosystems and concluded that the changes Plaintiffs describe do not represent a significant change relative to the environmental impacts of the harvest strategies analyzed in the Harvest Specifications EIS. This Court should defer to this scientific determination supported by agency expertise.

## II.     <u>BACKGROUND</u>

Each year, the harvest specifications decision is the result of a robust process that assesses the most current scientific data to specify the catch limits that govern the commercial harvest of groundfish in the BSAI. In addition to complying with NEPA, the process must conform to the standards of the Magnuson-Stevens Fishery Conservation and Management Act (MSA), which governs the development of fishery management plans (FMP). NMFS implements the annual BSAI groundfish harvest specifications in conformance with the BSAI FMP's preferred harvest strategy analyzed in the Harvest Specifications EIS. Consequently, the harvest specifications decision and its effect on salmon and other marine resources in the BSAI is best understood within the context of these many interrelated authorities and processes.

**A. The Magnuson-Stevens Act**

The MSA, 16 U.S.C. §§ 1801–1891d, establishes a national program for conservation and management of fishery resources with federal jurisdiction over such resources within the U.S. exclusive economic zone (EEZ). *Id.* §§ 1801(a)(6), 1811(a). NMFS, acting under authority delegated from the Secretary of Commerce, is responsible for managing fisheries pursuant to the MSA.

Regulation of fisheries is accomplished through FMPs, plan amendments, and implementing regulations. *Id.* §§ 1852(h)(1), 1853, 1854(a)–(c). The MSA sets forth required provisions for FMPs, including that FMPs must contain measures "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A). To address and prevent overfishing, FMPs must establish mechanisms for annual catch limits and accountability measures. *Id.* § 1853(a)(15).

In addition, all FMPs and their implementing regulations must be consistent with ten National Standards (NS). *Id*. § 1851(a). NS1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." *Id.* § 1851(a)(1). NS2 requires that measures be based on the "best scientific information available." *Id.* § 1851(a)(2).

To assist in fishery management, the MSA established eight regional fishery management councils. 16 U.S.C. § 1852(a). Councils are "simply advisory bodies and

have no legal authority." *United Cook Inlet Drift Ass'n v. NMFS*, No. 21-cv-0025, 2022 WL 2222879, at *19 (D. Alaska June 21, 2022). Ultimately, NMFS is responsible for implementing and ensuring compliance with the MSA and other laws. *Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 57 (1st Cir. 1993); *Flaherty v. Bryson,* 850 F. Supp. 2d 38, 54 (D.D.C. 2012). The council here is the North Pacific Fishery Management Council (the Council), with jurisdiction over the fisheries in federal waters of the Arctic Ocean, Bering Sea, and Pacific Ocean, extending from the seaward boundary of Alaska to the outer boundary of the EEZ. 16 U.S.C. § 1852(a)(1)(G); *id.* § 1802(11).

Voting members of the councils include federal, state, and territorial fishery management officials, and individuals nominated by state governors and appointed by the Secretary who are knowledgeable regarding the conservation and management of fishery resources within the councils' geographic areas. *Id.* § 1852(b). Each council has a scientific and statistical committee (SSC) that provides ongoing scientific advice for fishery management decisions, as well as a fishing industry advisory committee and other advisory panels to assist the council in carrying out its functions under the Act. *Id.* § 1852(g). Councils, SSCs, fishing industry advisory committees, and advisory panels conduct their business in public meetings, pursuant to procedures prescribed by the MSA and written procedures established by each council. *Id.* § 1852 (f)(6), (h), (i).

**B.**     <u>**The Fishery Management Plan and Measures to Reduce Salmon Bycatch**</u>

The BSAI FMP and implementing regulations govern the groundfish fisheries of the BSAI. The BSAI groundfish fishery is widely considered to be among the best

managed fisheries in the world. 2SUPP06169; NMFS05829. This fishery produces high levels of catch, revenue, exports, employment, and other economic activity while maintaining ecological sustainability. 2SUPP06169; NMFS05829.

The Council's management approach for the BSAI groundfish fisheries is "to apply judicious and responsible fisheries management practices, based on sound scientific research and analysis, proactively rather than reactively, to ensure the sustainability of fishery resources and associated ecosystems for the benefit of future, as well as current generations." NMFS00108. The BSAI FMP sets forth management objectives, including: adopting conservative harvest levels, promoting conservation while providing for optimum yield, adjusting acceptable biological catch levels to account for uncertainty and ecosystem factors, incorporating ecosystem-based considerations into decisions, reducing bycatch, avoiding impacts to seabirds and marine mammals, and increasing Alaska Native participation in fishery management. NMFS00108-00111. Under the FMP and implementing regulations, the optimum yield range for groundfish in the BSAI is 1.4 to 2.0 million metric tons. NMFS00118-119; 50 C.F.R. § 679.20(a)(1)(i)(A). The BSAI FMP also sets out the annual harvest specifications process the Council and NMFS follow, consistent with the preferred harvest strategy analyzed in the Harvest Specifications EIS. NMFS00119-00123.

There have been several amendments to the FMP to address and reduce salmon bycatch. In 2009, NMFS implemented Amendment 91, the Chinook salmon bycatch management program, to minimize, to the extent practicable, Chinook salmon bycatch in the Bering Sea pollock fishery. Then, in 2016, NMFS implemented Amendment 110 to

improve the management of Chinook and chum salmon bycatch. Under current regulations implementing Amendments 91 and 110, the Bering Sea pollock fishery is subject to a bycatch limit, also known as a prohibited species catch (PSC) limit, that is based on past bycatch performance, participation in NMFS-approved Chinook salmon bycatch incentive plan agreements, and whether NMFS determines it is a low Chinook salmon abundance year, which is based on the State of Alaska's three-system index. 50 C.F.R. § 679.21(f); 2SUPP00043-00045; 2SUPP05192; NMFS00038-39. Other than these threshold determinations, the regulations do not give NMFS discretion to set a different bycatch limit.[2] NMFS updates and announces the bycatch limit and performance standard for the Bering Sea pollock fishery in the annual harvest specifications. NMFS00032-33; 2SUPP00035-00036.

These amendments to the FMP have been effective in reducing salmon bycatch. NMFS00614. The 2022 data showed the lowest number of Chinook salmon bycatch in the BSAI groundfish fisheries since 2000. 2SUPP01450-01451. The 2023 data showed the lowest number of chum salmon bycatch in the BSAI groundfish fisheries since 2012. 2SUPP01447-01448. NMFS experts have further concluded that the number of salmon caught as bycatch in the BSAI groundfish fisheries that would have returned to western Alaska would be relatively small. NMFS00040; 2SUPP00048-00049. The majority of

---

[2] The same applies for bycatch limits for crab and herring. Regulations specify that NMFS use the most recent information available on abundance to determine the annual bycatch limit. *See* 50 C.F.R. § 679.21(e)(1). The regulations do not give NMFS discretion to set a bycatch limit for crab and herring different from the limits prescribed in regulation.

chum bycatch is of Asian hatchery origin, and thus would not have returned to Alaska rivers. NMFS00039. NMFS experts have also found that the numbers of salmon caught as bycatch in the ocean that would have returned to western Alaska rivers would be slight due to ocean mortality and the large proportion of salmon in the Bering Sea from other river systems. 2SUPP00048-00049; NMFS00040. Due to these factors, NMFS experts concluded that the bycatch expected to have returned to western Alaska rivers is less than 2-3 percent of the run size for Chinook salmon. NMFS00040; 2SUPP00048-00049.

NMFS and the Council continue to examine ways to minimize salmon bycatch and recently initiated an action to modify chum salmon bycatch management measures, with ongoing work to develop and evaluate potential alternatives to further reduce chum bycatch. NMFS00613; 2SUPP00044; 2SUPP00105. Any action recommended by the Council and implemented by NMFS to regulate chum bycatch will be analyzed under NEPA, but is separate from the harvest specifications process. 2SUPP00105.

## C.    The Harvest Specifications

In the BSAI, harvests of groundfish are managed by NMFS subject to annual limits for each target species. These annual limits are "harvest specifications" and the process of establishing them is the "harvest specifications process." 2SUPP00072. NMFS designed the process be flexible and responsive to the best, most current scientific information available to inform the harvest specifications for the upcoming fishing years in compliance with applicable law. Under the MSA, the harvest specifications must achieve optimum yield on a continuing basis and prevent overfishing. 16 U.S.C. § 1851(a)(1). Additionally, the harvest specifications implement FMP objectives including

adopting conservative harvest levels, promoting conservation while providing for optimum yield, and incorporating ecosystem-based considerations into decisions. *See* NMFS00108-00111.

## 1. The Harvest Specifications EIS

NMFS implements the harvest specifications annually in reliance on the Harvest Specifications EIS, which examines the effects of five alternative harvest strategies. NMFS00644; NMFS00045; NMFS01254; 2SUPP00051-00052; 2SUPP00067. In addition to a no-action alternative that would have set total allowable catch (TAC) at zero, the EIS evaluates the impacts of four action alternatives. NMFS00644. These alternatives are high-level management strategies ranging from a more aggressive strategy of specifying the maximum permissible TACs (Alternative 1) to a less aggressive strategy of specifying TACs to sum 1.4 million metric tons, the lower boundary of the optimum yield range set by the FMP and implementing regulations. (Alternative 4). *Id.*; 50 C.F.R. § 679.20(a)(1)(i)(A). Importantly, although the harvest specifications process determines the annual TAC for each target species, the sum of which must fall within the optimum yield range (1.4 to 2.0 million metric tons), changes to the optimum yield range are outside the harvest specifications process. NMFS00040; 2SUPP00048; NMFS00123; 50 C.F.R. § 670.20(a)(2).

The Harvest Specifications EIS thoroughly evaluates the consequences of each harvest strategy on the ecosystem and its components. Specifically, the EIS considers impacts on marine resources in the BSAI including target species, non-specified species, forage fish species, prohibited species (including salmon, Pacific halibut, and crab),

marine mammals, seabirds, essential fish habitat, and the ecosystem, as well as social and economic impacts and environmental justice impacts. *See* NMFS00644-00649 (summary of impacts).

In analyzing the affected environment, the Harvest Specifications EIS recognizes that the action area for the harvest strategy is subject to periodic climatic and ecological "regime shifts" that impact ecosystem relationships. NMFS00737-00745. The EIS considers warming trends in the BSAI and makes predictions for future regime shifts. NMFS00738-00740. The EIS further considers the impacts of the loss of sea ice and ocean acidification on abundance, distribution, recruitment, and prey for target species, salmon, crab stocks, and ice-dependent seals. NMFS00740-00741.

The EIS examines "systemic ecosystem impacts" on three categories of ecosystem attributes: predator-prey relationships, energy flow and balance, and diversity. NMFS00885-00886. Specifically, the EIS considers the availability of prey species relative to predator demands, the spatial and temporal impacts of the fisheries on foraging for marine mammals and seabirds, removal of top predators, introduction of non-native species, energy redirection and removal, and species functional and genetic diversity. NMFS00883-00903 (Ecosystem Chapter).

Against this background analyzing the affected environment, NMFS disclosed and assessed the impacts of alternative harvest strategies on target species and non-specified species (like jellyfish and grenadiers), forage fish, and prohibited species. NMFS00750-00757; NMFS00764-00779; NMFS00788-00791; NMFS00798-00801; NMFS00815-00821. For crab and salmon, the EIS analyzes impacts of the alternative harvest strategies

on mortality, genetic structure of the populations, reproductive success, prey availability, and habitat. NMFS00815-00821. Based on the then-current conditions for salmon and crab, the EIS noted recent "collapsed salmon runs" and a decline in the biomass of all crab stocks in the Bering Sea. NMFS00740; NMFS00971.

For marine mammals, the EIS discloses and assesses the potential impacts of the harvest strategies on incidental take of marine mammals, impacts to their prey species, and disturbance from vessel traffic, nets, and underwater sound that could modify marine mammal behavior. NMFS00828-00849. The EIS contemplates that incidental take would continue to occur and that harvests of marine mammal prey species may limit foraging success through localized depletion and dispersion of prey, making it more energetically costly for foraging marine mammals to obtain necessary prey. NMFS00842.

The Harvest Specifications EIS includes a similar assessment for seabirds, examining impacts on prey availability and habitat. NMFS00857-00867. The EIS contemplates that fishing under the alternative harvest strategies would reduce or disperse the biomass of prey species available to seabird populations or otherwise displace or interfere with normal seabird foraging. NMFS00858.

In its chapter on environmental justice, the Harvest Specifications EIS considers the potential effects of salmon bycatch on subsistence salmon fisheries in Alaska. NMFS00971. The EIS recognizes and considers collapsed salmon runs that had occurred at that time, specifically in the Yukon and Kuskokwim areas, when considering the impact of alternative harvest strategies on salmon bycatch. *Id.*; NMFS00805-00822.

## 2.    The Harvest Specifications Process

Under the preferred harvest strategy, NMFS sets TACs for each target species within the acceptable biological catch (ABC) amounts recommended through the harvest specifications process. NMFS01094. TACs—which are the annual catch target for each target species—are set equal to or lower than the ABCs—which are set equal to or lower than the overfishing levels (OFL).[3]  NMFS00117; NMFS00119-00123.  Put simply: TAC ≤ ABC ≤ OFL.  NMFS00040; 2SUPP00048. In addition, the sum of all TACs must fall within the optimum yield range of 1.4 to 2.0 million metric tons. NMFS00040; 2SUPP00049; NMFS00123; 50 C.F.R. § 670.20(a)(2).

The harvest specifications process is designed to prevent overfishing of each target species while achieving optimum yield in the BSAI groundfish fishery on a continuing basis, consistent with the MSA and the FMP's objectives. 16 U.S.C. § 1851(a)(1). The annual harvest specifications process also sets the criteria necessary for NMFS to determine if a stock is overfished or subject to overfishing. *Id*. §§ 1853(a)(10), 1854(e); NMFS00127-1128.

The harvest specifications process involves numerous stages of review by the Plan

---

[3] OFL is the amount of annual catch determined by abundance that if exceeded would result in overfishing; the ABC is reduced from OFL and is the amount of annual catch that accounts for scientific uncertainty in the estimate of OFL, while TAC is reduced from ABC and accounts for management uncertainty and social and economic factors. *See* NMFS00117; NMFS00119-00123; 2SUPP05281; 50 C.F.R. § 679.20(a)(3)(ii) (listing socioeconomic considerations that inform TACs); 2SUPP00048; 50 C.F.R. § 600.310(f)(3), (f)(4); MSA Provisions, 74 Fed. Reg. 3178, 3180 (Jan. 16, 2009) (codified at 50 C.F.R. pt. 600) (Figure 2).

Team, SSC, Advisory Panel (AP), and the Council.[4] The Plan Team and SSC review and recommend the OFLs and ABCs, and the Council's AP then reviews and recommends TACs, which informs the Council's recommendations to NMFS. NMFS00120; NMFS01266; 2SUPP00020-00021. NMFS implements the Council-recommended TACs if consistent with the MSA and other applicable law and publishes the harvest specifications in the Federal Register. 2SUPP00072; 50 C.F.R. § 679.20(a)(2), (c).

The harvest strategy establishes an annual process that incorporates the best scientific information available consistent with requirements of the MSA and implementing regulations. 16 U.S.C. § 1851(a)(2); 50 C.F.R. § 600.315. For the groundfish harvest specifications, the best scientific information available is compiled annually in the Stock Assessment and Fishery Evaluation report (SAFE).

> [The SAFE is] a public document or a set of related public documents, that provides [NMFS] and the Councils with a summary of scientific information concerning the most recent biological condition of stocks, stock complexes, and marine ecosystems . . . . Each SAFE report summarizes, on a periodic basis, the best scientific information available concerning the past, present, and possible future condition of the stocks, EFH [essential fish habitat], marine ecosystems, and fisheries being managed under Federal regulation.

50 C.F.R. § 600.315(d); *see e.g.*, 2SUPP5276-2SUPP06693 (2023 SAFE).

The SAFE includes the stock assessments for each stock, the Economic Status Report, stock-specific Ecosystem and Socioeconomic Profiles, and the Ecosystem Status Reports for the Bering Sea and Aleutian Islands. Most stock assessments are drafted by

---

[4] Members of the SSC include federal and state employees, academics, and independent experts with strong scientific or technical credentials and experience. 16 U.S.C. § 1852(g)(1)(B). The AP is made up of individuals representing commercial, recreational, and other interests who are knowledgeable about the fisheries. *Id*. § 1852(g)(4).

scientists at the Alaska Fisheries Science Center, a component of the National Oceanic and Atmospheric Administration (NOAA) charged with the scientific research that informs management decisions, and the assessments are updated to reflect the most recent information. NMFS00591.

The Ecosystem Status Reports for the BSAI, which are drafted by scientists and staff from NOAA, other federal and state agencies, academic institutions, tribes, and nonprofits, compile and summarize information about the status of Alaska marine ecosystems and represent the best scientific information available. *See* NMFS00043; NMFS00606; 2SUPP00045; 2SUPP00096-00098; NMFS05430-05656 (Eastern Bering Sea (EBS) 2022); NMFS05661-05799 (Aleutian Islands (AI) 2022); 2SUPP06354-06594 (EBS 2023); 2SUPP06598-06690 (AI Islands 2023). The Ecosystem Status Reports are updated annually and include physical oceanography, climate and biological data, ecosystem trends, and socio-ecological dimensions to provide context for the specification of OFL, ABC, and TAC. NMFS00043; 2SUPP00045; 2SUPP00096-00098; 2SUPP00106. Ongoing research incorporated into the Ecosystem Status Reports has increased NMFS's understanding of the interactions among ecosystem components, including impacts from changing environmental conditions related to climate change. NMFS00043.

Each year, the Plan Team, and then the SSC, review the Ecosystem Status Reports and the stock assessments that comprise the SAFE. The Plan Team, SSC, Council, and NMFS apply the preferred harvest strategy in the BSAI FMP and analyzed in the Harvest Specifications EIS based on the most up-to-date science. The updated SAFEs result in a

new OFL and ABC for the stocks—which limits the specification of TAC, as TAC cannot exceed ABC and ABC cannot exceed OFL. *See* NMFS00591; NMFS01266; 2SUPP00078; 2SUPP05278. NMFS implements the OFLs, ABCs, and TACs through rulemaking. NMFS00018-19; NMFS00045; 2SUPP00021; 2SUPP00051-00052; 2SUPP00045-00047.[5] NMFS confirms each year's groundfish harvest specifications are consistent with the BSAI FMP's preferred harvest strategy analyzed in the Harvest Specifications EIS, do not constitute a change from that strategy, and are within the scope analyzed in the EIS. NMFS00588; NMFS01254; 2SUPP00074; 2SUPP00067.

Based on the most current scientific data, the Council recommended a pollock TAC of 1.3 million metric tons for 2023. NMFS00020-21. While this was a reduction from a 2023 ABC of 1.91 million, it was an increase from the 2022 TAC of 1.111 million and reflected an increase in recruitment and spawning biomass estimates from the previous year. NMFS27303-27306; NMFS00040. For 2024, the Council recommended the same TAC from 2023 of 1.3 million metric tons, a significant reduction from a 2024 ABC of 2.313 million metric tons.[6] 2SUPP00023; 2SUPP37600-37604.

---

[5] Plaintiffs assert NMFS has discretion to divide catch limits among seasons and sectors and decide what types of boats can fish. Pls.' Principal Brief Under Local Rule 16.3(c)(1) ("Pls.' Br.") 20–21, ECF No. 32. Allocations among different gears and sectors, and season dates and allowances, are prescribed in regulations that were implemented in rulemakings separate from the harvest specifications process. *See* 50 C.F.R. §§ 679.20, 679.23.

[6] The TACs for all species sum to 2 million metric tons, which is within the required optimum yield range for the BSAI. NMFS00021; 2SUPP00023. Actual harvest in recent years has been less than the amount authorized. 2SUPP06184.

### 3. **Comments on the BSAI Groundfish Specifications**

In addition to reviewing the information presented in the SAFEs, Council bodies and the Council invite public comment at every stage of the Council process, and NMFS publishes the specifications for public comment and considers tribal consultation. 50 C.F.R. § 679.20(c). In responding to comments received regarding the final harvest specifications for both 2023-2024 and 2024-2025, NMFS acknowledged "the western Alaska salmon crisis and the impact it is having on culture and food security throughout western Alaska" and explained that "[s]cience indicates climate change as the primary driver of poor salmon returns in western Alaska." NMFS00039; 2SUPP00044; *see* 2SUPP00048-00049. NMFS further responded by recognizing "the significant importance of salmon for Alaska Native people and tribes in terms of food security, cultural practices, and a way of life." NMFS00039; *see also* 2SUPP00043. NMFS explained that the pollock TACs are higher to reflect an observed increase in pollock abundance, but noted that the TACs were still specified well below the ABCs, which is the upper limit for specification of TACs. NMFS00040; 2SUPP00048. In terms of salmon bycatch, NMFS explained that the best science available does not indicate that a reduction in pollock TAC would measurably increase salmon escapement to western Alaska. NMFS00040.

More comments alleged that the harvest specifications "use an outdated EIS" which "does not consider climate change." NMFS00040; NMFS00042; 2SUPP00045. NMFS responded to these comments by stating that the Harvest Specifications EIS examined physical and oceanographic conditions in the BSAI and addressed regime

shifts, warming and loss of sea ice, and acidification. NMFS00043; 2SUPP00047. NMFS noted that the framework process for the preferred harvest strategy under the BSAI FMP and Harvest Specifications EIS allows for the effects of climate change to be considered in the annual process for setting the harvest specifications. NMFS00043; 2SUPP00047-00048; *see also* 2SUPP00045.

NMFS further responded by pointing out that it has not changed the harvest strategy or specifications process from what was analyzed in the Harvest Specifications EIS. NMFS00041; 2SUPP00046. The Harvest Specifications EIS evaluates the consequences of alternative harvest strategies on ecosystem components and on the ecosystem as a whole. Each year, the harvest strategy uses the best scientific information available in the annual SAFEs to derive the annual harvest specifications. NMFS00041; 2SUPP00046. Furthermore, each year, NMFS considers new information and circumstances with the purpose of evaluating the need to supplement the EIS and documents that evaluation in a Supplemental Information Report (SIR). NMFS00040-43; 2SUPP00044-00047. To date, no SIR has concluded there is new, significant information or circumstances that requires a supplement to the EIS. 2SUPP00046.

### 4. **The Supplemental Information Reports**

Separate from the annual harvest specifications process, NMFS considers new information and circumstances to evaluate the need to supplement the EIS. NMFS documents this evaluation in a SIR, which NMFS has prepared every year for the agency's annual implementation of the groundfish harvest specifications. NMFS00040-43; 2SUPP00044-00047. The conclusions in the SIR are informed by the best available,

most recent information, primarily contained in the most recent SAFEs, which (1) summarize the best available scientific information concerning the past, present, and possible future condition of the stocks, marine ecosystems, and fisheries that are managed under Federal law; (2) document significant trends or changes in the resource, marine ecosystems, and the fisheries over time; and (3) assess the relative success of existing State of Alaska and Federal fishery management programs. NMFS00591; 2SUPP00078.

In the SIRs, NMFS examines new information on species abundance and condition, environmental and ecosystem factors, and socio-economic conditions to determine if the information presents a seriously different picture of the impacts considered by the Harvest Specifications EIS. See NMFS00592; 2SUPP00081. NMFS also reviews whether any new circumstances would change the analysis in the Harvest Specifications EIS of the impacts of the harvest strategy on the human environment.

Each year, NMFS's review in the SIRs is informed by a plethora of environmental and ecosystem data presented in stock-specific risk tables, stock assessments, and Ecosystem Status Reports that comprise the SAFEs. For example, the 2023 EBS pollock risk table "assessed several environmental and ecosystem considerations that warranted an elevated level of concern, including environmental/oceanographic factors related to climate change, status in fish condition over year classes, declining trends in northern fur seal pup production on St. Paul Island, and mixed trends in the status of potential competitors like jellyfish and salmon." 2SUPP00045; 2SUPP05838-05846; 2SUPP05970-05975. The risk tables for 2022 EBS pollock, as well as other species like EBS Pacific cod and BSAI yellowfin sole, included a similar discussion of

"environmental/ecosystem" considerations. *See* NMFS02524-02527; *see also* NMFS02407-02410 (2022 AI pollock); 2SUPP05697-06702 (2023 EBS Pacific cod); NMFS02116-02120 (2022 EBS Pacific cod); 2SUPP06067-06068 (2023 BSAI yellowfin sole); NMFS03067-03068 (2022 BSAI yellowfin sole).

The Ecosystem Status Reports (ESRs) provide comprehensive information on current oceanographic conditions, such as sea-ice extent and thickness, sea surface and bottom temperatures, cold pool extent, surface winds and air temperatures, warm periods and marine heatwaves, and ocean transport, as well as emerging stressors like ocean acidification and harmful algal blooms. 2SUPP06384-06425; 2SUPP06538-06548 (2023 EBS); 2SUPP06628-06649; 2SUPP06662-06664 (2023 AI). The ESRs examine the condition of the ecosystems across a multitude of relevant components that include primary biological production, e.g., phytoplankton and zooplankton, 2SUPP06429-06460; biomass of species like jellyfish, forage fish, and herring, 2SUPP06461-06473; groundfish condition as indicators of prey availability and habitat condition within the systems, 2SUPP06490-06498; patterns in foraging and energetics of key target species, 2SUPP06499-06505; and groundfish recruitment predictions. 2SUPP06512-06518.

As reviewed in the SIRs, the ESRs also assess the status of prohibited species like salmon. The 2023 ESRs addressed Northern Bering Sea juvenile salmon abundance, EBS juvenile salmon condition and trends, abundance of the annual inshore run size of Bristol Bay sockeye salmon, factors affecting the Yukon and Kuskokwim chum salmon runs and subsistence harvests, and trends in commercial salmon catch in the Bering Sea, as well as increasing abundance and changing role of Eastern Kamchatka pink salmon in the AI

ecosystem. 2SUPP06474-064892; 2SUPP06650-06652. In addition to the ESRs, the SIR examined salmon bycatch numbers and trends and the ecosystem considerations presented in the EBS pollock stock assessment. 2SUPP00103-00107.

For crab, the SIR looked at impacts analyzed in the EIS on crab and crab bycatch and the most recent information on crab and crab bycatch. 2SUPP00109-00112. The ESR noted that trends are variable but the biomass of several species decreased or remained depressed. 2SUPP06522-06524. The SIR noted no crab bycatch limits in the BSAI were exceeded in 2023. 2SUPP00109-00112. The SIR also provided an overview of actions to address management of Bristol Bay red king crab and EBS snow crab, including the overfished declaration for ESB snow crab and development of a rebuilding plan. *Id.*

For seabirds, the SIR looked at the impacts analyzed in the EIS and information from the ESRs, which examined information regarding time of breeding; breeding and reproductive success; distribution, diet, and mortality; and connections between seabirds, physical environmental conditions, climate change, biological indicators, availability of prey in the ecosystem, and foraging conditions. 2SUPP06525-06531 (2023 EBS ESR); 2SUPP06653-06661 (2023 AI ESR).

For marine mammals, the SIR assessed their current status relative to the impacts analyzed in the EIS. 2SUPP00113-00117; 2SUPP00120-00136. For example, the SIR noted humpback whale take does occur incidental to the BSAI groundfish fisheries, but that federal fisheries off Alaska do not target humpback whale primary prey species and collisions with fishing vessels are rare. 2SUPP000124-00125. The SIR includes a similar analysis for sperm, fin, and killer whales. 2SUPP00125-000127; 2SUPP00132-00135.

The SIR also reviewed information and circumstances concerning ribbon, ringed, bearded, and spotted seals ("ice seals"). 2SUPP00120- 2SUPP00123. For ESA-listed ice seals, the 2024 SIR noted that groundfish fishing operations do not directly compete for primary prey resources for bearded seals, nor do they have a nexus to the primary threats affecting ringed seals, and the takes of listed seals incidental to fishing operations are very low relative to the total population. 2SUPP00122.

Ultimately, the SIRs used the most recent data available, including all components of the SAFEs, to support the agency's determination that supplementation of the Harvest Specifications EIS was not required because (1) the 2023-2024 and 2024-2025 harvest specifications, which were set according to the preferred harvest strategy, do not constitute a substantial change in the action; (2) the information presented does not indicate that there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts; and (3) the 2023-2024 and 2024-2025 harvest specifications will result in environmental, social, and economic impacts within the scope of those already analyzed and disclosed in the Harvest Specifications EIS. NMFS00635; NMFS01254; 2SUPP00143; 2SUPP00067.

## III.   <u>STANDARD OF REVIEW</u>

Judicial review of administrative actions is governed by the APA, 5 U.S.C. § 706(2). *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, reviewing courts may set aside an agency's action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. (citation omitted). This standard of review is narrow and "[t]he court is not

empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Courts are at their most deferential "where, as here, the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).[7]

## IV.    ARGUMENT

### A.    <u>Plaintiffs fail to satisfy the causation and redressability elements of standing.</u>

To establish standing, a plaintiff bears the burden of establishing three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). First, plaintiffs must have "suffered an 'injury in fact'" which is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical[.]'" *Id.* at 560 (citations omitted). Next, plaintiffs must show "a causal connection between the injury and the conduct complained of" which is directly traceable "to the challenged action" and not the result of an "independent action of [a] third party not before the court." *Id.* (citation omitted). Finally, plaintiffs must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citation omitted). "Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir.

---

[7] The Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo* does not affect this analysis. 144 S. Ct. 2244 (2024). There, the Court distinguished agency policymaking and factfinding from legal questions and explicitly stated: "Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential." *Id.* at 2261 (emphasis original).

2001).  However, "a claim of procedural injury does not relieve Plaintiffs of their burden—even if relaxed—to demonstrate causation and redressability." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir.), *cert. denied*, 142 S. Ct. 713 (2021).

The injury of which Plaintiffs complain is a lack of marine resources.  Simply put, climate change, not the harvest specifications decision, is the driving force affecting the availability of these marine resources in the BSAI ecosystem.  Plaintiffs themselves recognize this: "The changes in the ocean have negatively affected marine mammals, seabirds, crabs, and other ocean resources on which citizens and members of AVCP's and TCC's member tribes and communities depend."  Pls.' Br. 14.  NMFS agency experts have also come to this conclusion, specifically regarding salmon: "Science indicates climate change as the primary driver of poor salmon returns in western Alaska." NMFS00039; *see also* 2SUPP00048-00049.  Climate change is, thus, an intervening cause that has substantially contributed to Plaintiffs' injury.

In this case—where Plaintiffs primarily complain of a lack of marine resources due to the BSAI groundfish fishery's bycatch or attenuated effects on the ecosystem—the causal chain between the harvest specifications decision and the lack of marine resources available to Plaintiffs is too weak.  When an independent third party is responsible for a plaintiff's injury, the causal chain may be so attenuated it cannot support standing.  *See Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1143–44 (9th Cir. 2013) (finding no standing because "a multitude of independent third parties are responsible for the changes contributing to Plaintiffs' injuries"); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696

F.3d 849, 867 (9th Cir. 2012) (Pro, J., concurring) (same).  Like in *Bellon*, "Plaintiffs

offer only vague, conclusory statements" that there is a link between changed ocean

conditions and the harvest specifications decision that in turn "result[s] in their purported

injuries." 732 F.3d at 1142.

Plaintiffs cite to a District of Columbia district court case to support standing, but

that case is distinguishable from the facts presented here.  In *Flaherty v. Bryson*, the court

found standing because "[t]he harm caused by depletion of river herring by commercial

fishing is clearly traceable to Defendants' decision not to restrict river herring catch" and

"there is no doubt that increased regulation of river herring catch would contribute to the

rebuilding of that stock." 850 F. Supp. 2d 38, 50 (D.D.C. 2012).  Neither is true here.

"While salmon bycatch in the pollock fishery may be a contributing factor in the decline

of salmon, NMFS expects the numbers of the ocean bycatch that would have returned to

western Alaska would be relatively small due to ocean mortality and the large number of

other river systems contributing to the total Chinook or chum salmon bycatch."

NMFS00040; 2SUPP00048-00049.  This applies with even more force to chum salmon

because "annual genetic data show the majority of chum bycatch is of Asian hatchery

origin, and thus does not affect returns to western Alaska rivers." NMFS00039.  Thus,

most of the salmon bycatch in the BSAI groundfish fishery would not have returned to

Alaska river systems where Plaintiffs reside.  Unlike in *Flaherty*, the decline of salmon

and other marine resources experienced by Plaintiffs is not clearly traceable to the harvest

specifications decisions.

Plaintiffs' argument for redressability is even weaker.  The "relatively small"

number of salmon that would return to western Alaska if not caught as bycatch would not remedy Plaintiffs' injury. This number is too insignificant to make a meaningful impact on the marine resources "on which citizens and members of AVCP's and TCC's tribes and communities depend." Pls.' Br. 15. As such, "[r]educing the pollock TAC likely would have an extremely small effect on salmon returns, and therefore on in-river harvest opportunities, because of the low level of bycatch of salmon in the pollock fishery." NMFS00039.

What's more, "[w]hile it seems plausible that, for any given set of environmental conditions, including salmon abundance, bycatch would decline if pollock TACs and harvest were lower, it is not clear that they would decline proportionately." NMFS00931. In the last decade, "Chinook and chum bycatch has varied independently of stable pollock TACs." NMFS00040. Significantly, regulations set limits on how many Chinook salmon can be caught in the pollock fishery, such that the pollock fleet is constrained by the limit of Chinook salmon set in regulation, regardless of the size of the pollock TAC and harvest. If NMFS decreased the TAC in any given year, the Bering Sea pollock fleet could still catch salmon up to the bycatch limit set in regulation. 50 C.F.R. § 679.21(f). This means that even if NMFS decreased the pollock TAC in any given year, the number of salmon bycatch may not decrease because it could continue up to the limits prescribed in regulation, which are outside of the scope of the annual harvest specification process. 50 C.F.R. § 679.21(f).

Plaintiffs' speculation that a change in the harvest specifications decision would increase their access to marine resources "lengthens the causal chain beyond the reach of

NEPA." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 775 (1983).

A reduction in the harvest specifications' catch limit is unlikely to increase the number of

marine resources available to Plaintiffs. Even under this relaxed standard, Plaintiffs have

failed to carry their burden to show causation and redressability.[8]

### B.  Any argument relating to the lack of an EIS specific to the annual harvest specifications decision is waived.

"Persons challenging an agency's compliance with NEPA must 'structure their

participation so an agency's compliance with NEPA must 'structure their participation so

that it . . . alerts the agency to the [persons'] position and contentions,' in order to allow

the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*,

541 U.S. 752, 764–65 (2004) (omission in original) (quoting *Vt. Yankee Nuclear Power*

*Corp. v. Nat. Res. Def. Council, Inc*., 435 U.S. 519, 553 (1978)) (holding that parties

forfeited the objection that an Environmental Assessment (EA) failed to consider

proposed alternatives by not identifying alternatives during EA's public comment

period).  Absent exceptional circumstances, plaintiffs have an obligation to present their

---

[8] This Court also lacks jurisdiction to hear Plaintiff-Intervenor's claim under the MSA. The MSA provides for judicial review in accordance with the APA of "actions that are taken by the Secretary under regulations which implement a fishery management plan" but only if "a petition for such review is filed within 30 days." 16 U.S.C. § 1855(f).  This thirty-day time limit applies whenever a party challenges "[r]egulations promulgated by the Secretary under the [MSA]." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937, 940 (9th Cir. 2006) (first alteration in original) (citation omitted). The harvest specifications decision is action taken under regulations that implement the FMP and was published on March 10, 2023.  Plaintiff-Intervenor moved for intervention on July 28, 2023, 140 days after the harvest specifications decision was published.  Its petition was thus not within 30 days as required by the MSA. Because its initial petition is untimely, its Joinder to the Supplemental Complaint, ECF No. 54, is also untimely.

criticisms of a proposed project to the agency whenever the agency affords the public the opportunity to participate in the decision-making process. *See Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991); *Johnson v. Dir., Off. of Workers' Comp. Programs*, 183 F.3d 1169, 1171 (9th Cir. 1999) (finding exceptional circumstances warranted review when agency subsequently decided the same issue, so there was no risk to usurping the agency's authority).

During the public comment period for the 2023-2024 harvest specifications, NMFS received six comment letters, including from AVCP, raising seventeen distinct comments and responded to each comment in the final harvest specifications posted in the Federal Register. NMFS00018; NMFS00038-00045. While NMFS received and responded to a comment that the harvest specifications "use an outdated EIS," it did not receive a comment that alleged that the harvest specifications required its own "project-specific EIS." NMFS00040-00042; Pls.' Br. 17–18.[9]

Because Plaintiffs failed to raise the argument during the comment period that NMFS must prepare an EIS for each annual harvest specifications, NMFS was deprived of the opportunity to consider whether NEPA requires an entirely new process for each harvest specifications decision. This objection to NMFS's compliance with NEPA was

---

[9] For the 2024-2025 harvest specifications, NMFS received five comment letters, raising seventeen distinct comments during the comment period and responded to each in the final harvest specifications. 2SUPP00020; 2SUPP00043-00051. AVCP and TCC did not submit a comment letter, but one comment did allege that the Harvest Specifications EIS is outdated and NMFS must prepare a new or supplemental EIS. 2SUPP00045-00047. No comments alleged that each annual harvest specifications decision requires its own EIS.

not fairly included in the comments regarding an outdated EIS. Those comments assumed that the harvest specification decision had an EIS. NMFS00040; 2SUPP00045. This new argument that the harvest specifications decision entirely lacks any supporting NEPA document was not considered by NMFS.

Nor does this argument concern "a flaw so obvious that there was no need for petitioners to point it out specifically in order to preserve their ability to challenge [it]." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1134–35 (9th Cir. 2011) (internal quotations omitted). The Ninth Circuit has interpreted the "so obvious" standard to require that the agency had "independent knowledge of the issues that concern petitioners." *Id.* at 1132 (citing *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006)). While NMFS was clearly aware of the concern that the Harvest Specifications EIS was outdated, it was not on notice of the allegation that the annual harvest specifications decisions had no EIS at all.

Plaintiffs allege that the harvest specifications decisions require an entirely new EIS "analyzing it in the current environmental context." Pls.' Br. 18. This argument is novel. There is no specific requirement under NEPA that every major federal action be continually analyzed "in the current environmental context." As discussed *infra* ¶ C, supplementation is only required when there are substantial changes in the proposed action or relevant significant new circumstances or information. *See N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1090 (9th Cir. 2020); 40 C.F.R. § 1502.9(d)(1). No public comments suggested to NMFS that each harvest specifications decision entirely lacked any supporting NEPA process, particularly when NMFS

implements the annual harvest specifications decision in reliance on an EIS—the Harvest Specifications EIS. NMFS00045; 2SUPP00051-00052.

The Ninth Circuit has held that "a party's failure to make an argument before the administrative agency in comments on a proposed rule barred it from raising that argument on judicial review." *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019–1020 (9th Cir. 2004). There are no exceptional circumstances warranting review of this argument. Plaintiffs' argument that the harvest specifications decisions lack an EIS analyzing it in the current environmental context is therefore waived.

## C. NEPA does not require a new EIS each year for the annual harvest specifications decision.

Even if this Court finds the issue has not been waived, Plaintiffs' argument is without merit because the annual harvest specifications decision is within the scope of a completed NEPA analysis—the Harvest Specifications EIS. NEPA "does not . . . require the agency to take a new look every time it takes a step that implements a previously-studied action, so long as the impacts of that step were contemplated and analyzed by the earlier analysis." *N. Alaska Env't Ctr.*, 983 F.3d at 1091 (omission in original) (quoting *Mayo v. Reynolds*, 875 F.3d 11, 14–15 (D.C. Cir. 2017)). The appropriate inquiry is "whether the initial EIS defined its scope as including the subsequent action." *Id.* at 1086.

The Harvest Specifications EIS was clearly intended to encompass future harvest specifications decisions that used one of the five harvest strategies it analyzed. The Harvest Specifications EIS analyzes the impacts of "a harvest strategy . . . for the

management of the groundfish fisheries and the conservation of marine resources, as required by the Magnuson-Stevens Act and as described in the management policy, goals, and objectives in the FMPs." NMFS000643. The 2023-2024 and 2024-2025 harvest specifications decisions implement, and are consistent with, the preferred harvest strategy in the Harvest Specifications EIS. NMFS00018-00019; NMFS00045; 2SUPP00021; 2SUPP00051-00052; 2SUPP00045-00047. Thus, the harvest specification decision is explicitly contemplated in the defined scope of the Harvest Specifications EIS and the agency's record of decision.[10]

The 2023-2024 and 2024-2025 harvest specifications decisions are still within the scope of the Harvest Specifications EIS, regardless of whether the "current environmental context" has changed. Pls.' Br. 18. What matters is whether the potential *impact* of the harvest strategies has changed. Plaintiffs assume that if there have been changes to the environment, the potential impacts of the harvest strategies must have also changed. However, NMFS experts specifically considered that possibility in the SIRs and concluded that these environmental changes are not significant in the context of the

---

[10] To the extent that Plaintiffs claim the Harvest Specifications EIS should have included additional analysis of certain information or alternatives in order to cover future harvest specifications decisions, or that NMFS erroneously concluded in that EIS that some impacts were not significant, that is a challenge to the Harvest Specifications EIS itself, which is time-barred. *See* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."); *cf. N. Alaska Env't Ctr.,* 983 F.3d at 1085, 1096 (concluding that where NEPA coverage for a lease sale came from an EIS covering multiple sales, Plaintiffs could challenge whether supplementation was necessary, but not the adequacy of the original EIS because it was outside the statute of limitations).

potential impacts of the harvest specifications decision. NMFS00592; 2SUPP00081; *see* 40 C.F.R. § 1502.9(d)(1). But even if these environmental changes were significant new information (they are not), "the appropriate rubric for considering these allegations—given the existence of an initial EIS—is supplementation," not an entirely new environmental analysis. *N. Alaska Env't Ctr.*, 983 F.3d at 1081.

NEPA does not force federal agencies "to behave like Penelope, unravelling each day's work to start the web again the next day." *W. Coal Traffic League v. ICC*, 735 F.2d 1408, 1411 (D.C. Cir. 1984). As the Supreme Court recognized, "[t]o require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989) (in the context of supplementation to an existing EIS). In short, the harvest specifications decisions do not require an annual EIS because they are within the scope of the Harvest Specifications EIS and meet NEPA's procedural requirements.

**D.** **The Service reasonably determined that the harvest specifications decisions did not require supplemental NEPA analysis.**

**1.** **Legal Standard**

When a major Federal action remains to occur, NEPA requires agencies to supplement an existing EIS when "(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) There are substantial new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1). A new or supplemental EIS is

not required unless "the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374 (cleaned up). Courts have approved of using SIRs and other similar non-NEPA documents to consider whether new information or changed circumstances require the preparation of a supplemental EIS. *See, e.g., Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997); *Marsh*, 490 U.S. at 383–85; *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 529–30 (9th Cir. 1994).

A court reviewing a determination that supplemental NEPA analysis is not required applies the arbitrary and capricious standard. *Marsh*, 490 U.S. at 375–76. An agency's determination whether supplementation is required "implicates substantial agency expertise" and courts defer to "the informed discretion of the responsible federal agencies." *Id.* at 376–77 (citation omitted). A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency. *Id.* at 378 (citation omitted). Courts will generally "uphold agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the factors found and the choices made.'" *See Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019) (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004)).

**2. NMFS appropriately used the SIRs to consider whether new information is significant and would require a supplemental EIS.**

NMFS thoroughly and thoughtfully considered whether a supplement to the Harvest Specifications EIS was needed due to ecosystem changes. In the annual SIRs for the harvest specifications, the Service considered the most recent SAFEs, which "summarize the best available scientific information concerning the past, present, and possible future condition of the stocks, marine ecosystems, and fisheries" in addition to documenting "significant trends or changes in the resource, marine ecosystems, and the fisheries over time." NMFS00591; 2SUPP00078. Based on this review, the Service reasonably concluded there is no significant, new information concerning ecosystem conditions that was not already considered in the scope of the original EIS. NMFS00592; 2SUPP00081. NEPA does not require more.

Plaintiffs allege the 2023 SIR is insufficient because it "did not actually consider any new information about the status of the ecosystem and explain its significance, or lack thereof . . . as NEPA requires." Pls.' Br. 26 (referencing *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980)). This is inaccurate. The SIRs did, in fact, evaluate new information about the status of the BSAI ecosystems and concluded this information was not "of such significance as to require implementation of formal NEPA filing procedures." *Warm Springs Dam*, 621 F.2d at 1024; *see* NMFS00635; 2SUPP00143. The *Warm Springs Dam* case, cited by Plaintiffs, is distinguishable from this case. *See* Pls.' Br. 26, 29. There, the relevant agency had not

prepared a SIR or other document to consider whether new information regarding the location of a fault line near the proposed dam was significant enough to warrant supplemental NEPA analysis. *Warm Springs Dam*, 621 F.2d at 1025. Here, NMFS *did* complete a SIR for each annual harvest specifications decision where it evaluated the contemporary changes in the BSAI ecosystems and concluded supplementation was not required.

Plaintiffs also challenge the SIR, alleging NMFS used it as "an evaluation outside the NEPA process to consider significant new information." Pls.' Br. 26. However, Plaintiffs put the cart before the horse—NMFS did not conclude information was significant. Plaintiffs cite to *Idaho Sporting Congress, Inc. v. Alexander* for the requirement that "once an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." 222 F.3d 562, 566 (9th Cir. 2000); Pls.' Br. 26. The Service does not disagree. However, Plaintiffs are missing the requisite first step. In this case, NMFS did *not* use the SIR as a substitute for an EIS. Rather, it used the SIR to determine whether new information presented each year, including the information in the 2022 and 2023 SAFEs, was significant. Having determined it was not significant, no further NEPA documentation or process was required.[11]

---

[11] *Idaho Sporting Congress* and *Friends of the Clearwater v. Dombeck,* 222 F.3d 552 (9th. Cir. 2000), also cited by Plaintiffs, are further distinguishable from this case because the agencies waited until litigation had commenced—years after the new information came to light—to evaluate the need for supplemental NEPA. *Warm Springs Dam*, 621 F.2d at 1025; *Friends of the Clearwater,* 222 F.3d at 558 (finding the Forest Service had violated NEPA, "which demands timely and reasoned agency action"). Here, NMFS

*Fed. Defs.' Opening Brief* 33

### 3. NMFS did not use the harvest specification process as a substitute for analyzing whether significant information required supplemental NEPA analysis.

In a similar vein, Plaintiffs' assertion that NMFS concluded "that it did not need to consider new information because it was considered through the harvest specifications process," Pls.' Br. 34, is also without merit. The SIRs considered the data used to implement the harvest specifications—i.e., the SAFEs and its components—to analyze whether there is significant new information that requires supplementation to the EIS. The SIR concluded that the data used to implement the harvest specifications was not significant new information because it is within the scope of the potential environmental impacts considered by the Harvest Specifications EIS.

The preferred harvest strategy in the EIS "anticipated that information on changes in species abundance would be used each year in setting the annual harvest specifications." NMFS00592. The harvest specifications process's flexibility was "designed to adjust to new information" and dually ensures compliance with both the MSA and NEPA. 2SUPP00079; NMFS00592. The flexibility of the process serves NMFS's obligation under the MSA to "use the best scientific information available" for each annual harvest specifications decision. 2SUPP00079; NMFS00592; 16 U.S.C. § 1851(a)(2). The harvest specifications process implements the most up-to-date information on the relevant ecosystem factors analyzed in the Harvest Specifications EIS. Consequently, the changed ecosystem factors referenced in Plaintiffs' briefs have been

_____

annually considered the significance of new information, before publication of the annual harvest specifications decision, and before the commencement of litigation.

thoroughly and thoughtfully integrated into the harvest specifications process.[12]  The

integration of new information on changed ecosystem factors is consistent with the

Harvest Specifications EIS, which expressly contemplates that such factors would inform

the specification of OFL, and that ABC could be reduced "to take account of special

circumstances, including ecosystem considerations." NMFS00884; *see also*

2SUPP00096-00098. Thus, because this new data is within the scope of information the

EIS contemplated would be used to inform the harvest specifications decision, it "does

not represent a significant change relative to the environmental impacts of the harvest

strategy analyzed in the Harvest Specifications EIS." NMFS00592; 2SUPP00081.

 To assess significance, NMFS specifically focused on the new information

presented each year to support the harvest specifications decision and found that "the new

information available is not of a scale and scope that require an SEIS." NMFS00592; *see*

*also* 2SUPP00077-2SUPP00081. NMFS recognizes that, in any given year, there could

be significant new information that falls outside the scope of the Harvest Specifications

EIS which would require a supplement.  Ultimately, NMFS evaluated the significance of

the updated data gathered in the harvest specifications process and concluded that this

information "does not present a seriously different picture of the likely environmental

harms of the remaining action to occur—the implementation of the [ ] groundfish harvest

---

[12] *See, e.g.,* 2SUPP05840-05846 and 2SUPP05970-05975 (2023 EBS pollock);
NMFS02524-02531 (2022 EBS pollock); NMFS02408-02409 and NMFS02412-02415
(2022 AI pollock); 2SUPP05699-06701 and 2SUPP00490-00515 (2023 EBS Pacific
cod); NMFS02118-02120 and NMFS02235-02260 (2022 EBS Pacific cod),
2SUPP06067-06068 (2023 BSAI yellow fin sole); NMFS03067-03068 (2022 BSAI
yellowfin sole).

specifications—beyond what was considered in the Harvest Specifications EIS."
2SUPP00081.

**4.** **NMFS's conclusion that changes in the BSAI ecosystems do not present significant new circumstances or information is reasonable and well-supported.**

Plaintiffs assert that the Harvest Specifications EIS does not analyze the effects of the "harvest specifications in the context of today's environment." Pls.' Br. 17. However, this is not the standard under NEPA. Supplementation of an EIS is required only if "[t]here are substantial new circumstances or information relevant about the significance of adverse effects that bear on the analysis." 40 C.F.R. § 1502.9(d)(1). To determine the significance of new information, the appropriate test is whether the new information presents a "seriously different picture of the likely environmental harms." *Tri-Valley CAREs v. U.S. Dep't of Energy,* 671 F.3d 1113, 1130 (9th Cir. 2012) (citing *Wisconsin v. Weinberger*, 745 F.2d 412, 416–417 (7th Cir. 1984)). In determining that ocean conditions and other indicia of climate change did not warrant supplemental NEPA analysis, NMFS thoroughly reviewed up-to-date data on species abundance and condition, environmental and ecosystem factors, and socio-economic conditions and rationally concluded it did "not represent a significant change relative to the environmental impacts of the harvest strategy analyzed in the Harvest Specifications EIS." NMFS00592; 2SUPP00081; 2SUPP00098.

Climate change was a reality in 2007 and was considered in the Harvest Specifications EIS. The EIS recognized that ocean conditions change and the action area for the harvest strategy "is subject to periodic climatic and ecological 'regime shifts'"

*Fed. Defs.' Opening Brief* 36

that can lead to changes in ecosystem relationships and the relative success of different species. NMFS00737. The EIS further specifically considered the impacts of the alternative harvest strategies on salmon, crab, marine mammals, and seabirds. *See* NMFS00815-NMFS00821; NMFS00828-NMFS00849; NMFS00857-NMFS00867.

As the effect of climate change and the impact of different strategies on other marine animals were considered in the Harvest Specifications EIS, the authority Plaintiffs rely upon is inapposite. In *Blue Mountains Biodiversity Project v. Blackwood*, "the largest fire in the history of [the region] dramatically altered the forest ecosystem . . . several years after the EIS for the Forest Plan was prepared." 161 F.3d 1208, 1214 (9th Cir. 1998) (cited by Pls.' Br. 27). Unlike the fire in *Blue Mountains Biodiversity Project*, climate change is not a singular, catastrophic event that occurred after the EIS and therefore could not have been considered by it.[13] The Harvest Specifications EIS did, in fact, consider possible ecosystem changes in the context of the impact of the harvest specifications decision on the environment.

---

[13] Plaintiffs reference interactions between fishing vessels and spectacled eiders as contradicting NMFS's analysis in the Harvest Specifications EIS. Pls.' Br. 30. However, in that EIS, NMFS recognized that eiders existed in the action area, though the overlap between their foraging areas and groundfish fisheries was slight. NMFS00864. Documented interactions between spectacled eiders and their habitat and fishing vessels does not contradict this analysis. Additionally, the authority that Plaintiffs cite to support that this information necessitates a new EIS concerned using a "proxy-on-proxy" approach when the species—the sage grouse, in that case—was not in the action area. *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 935 (9th Cir. 2010). The court found this approach to be unreliable when the sage grouse did not exist in the area at the time it was used. *Id.* at 935–36. As there is no flawed "proxy-on-proxy" approach in the instant case, this authority is inapposite.

Furthermore, NMFS used the SIR to consider whether to supplement the Harvest Specifications EIS based on the current ecosystem by reviewing up-to-date data on species abundance and condition, environmental and ecosystem factors, and socio-economic conditions.[14]  The SIR analyzed a wealth of data and information on ocean conditions, climate change, the status of marine resources, and impacts on marine resources like target species, bycatch species, marine mammals, and seabirds—i.e., the ecosystem data Plaintiffs present. *See, e.g.,* Pls.' Suppl. Br. (Am.) 3–5, ECF No. 66; 2SUPP06598-06615; 2SUPP06354-06368; 2SUPP06474-06489.  NMFS rationally concluded this information did "not represent a significant change relative to the environmental impacts of the harvest strategy analyzed in the Harvest Specifications EIS."  NMFS00592; 2SUPP00081; 2SUPP00098. Like in *Marsh*, NMFS "carefully scrutinized the proffered information" and reasonably concluded it "did not present significant new information requiring supplementation" of the EIS. *Marsh*, 490 U.S. at 383.

Plaintiffs' argument assumes that "changed ocean conditions," "seabird and marine mammal mortality events," and "multi-species salmon collapse," is new information "sufficient to show that the [harvest specifications decision] will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered[.]" *Marsh*, 490 U.S. at 374 (second alteration in original and citation

---

[14] *See, e.g.,* NMFS05430-05656 (2022 EBS ESR); NMFS05661-05799 (2022 AI ESR); NMFS01264-03163 (2022 stock assessments); NMFS05803-06089 (Economic SAFE); 2SUPP06354-06594 (2023 EBS ESR); 2SUPP06598-06690 (2023 AI ESR); 2SUPP5276-6149 (2023 stock assessments); 2SUPP06150-06353 (Economic SAFE).

omitted).  Plaintiffs provide a laundry list of changes in the BSAI ecosystems and

speculate that these changes must affect the harvest specifications decisions' impact on

the environment beyond what the Harvest Specifications EIS considered.  However,

through the SIRs, NMFS reviewed up-to-date data on species abundance and condition,

environmental and ecosystem factors, and socio-economic conditions and concluded they

were not significant changes that would require a new EIS.

At best, Plaintiffs present the conflicting views of specialists.  When there are such

conflicting views, "an agency must have discretion to rely on the reasonable opinions of

its own qualified experts even if, as an original matter, a court might find contrary views

more persuasive." *Marsh*, 490 U.S. at 378.  As the Ninth Circuit recognized in

*Greenpeace Action v. Franklin*, a case similarly involving a challenge to NMFS's harvest

specifications, "[t]o set aside the Service's determination in this case would require us to

decide that the views of [Plaintiffs'] experts have more merit than those of the Service's

experts, a position we are unqualified to take." 14 F.3d 1324, 1333 (9th Cir. 1992); *see*

*also N. C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 80 (D.D.C. 2007) ("Fisheries

regulation requires highly technical and scientific determinations that are within the

agency's expertise, but are beyond the ken of most judges.").  The *Greenpeace Action*

court additionally concluded that an EIS is not required "whenever qualified experts

disagree[.]"  *Greenpeace Action*, 14 F.3d at 1335; *see also Friends of Endangered*

*Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985) ("NEPA does not require that

we decide whether an [EIS] is based on the best scientific methodology available, nor

does NEPA require us to resolve disagreements among various scientists as to

methodology."); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) ("[C]ourts must also be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency."); *Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004) (same); *Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1133 (9th Cir. 2006) (same).

Plaintiffs assume that the passage of time proves that environmental conditions have changed significantly enough to require further NEPA process. However, the passage of time alone is not enough to require supplementation to an EIS. *See Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997) ("We note that significant circumstantial change is the triggering factor requiring a new or supplemental EIS, not the passage of time alone[.]"); *Sierra Club v. U.S. Army Corps of Eng'rs,* 701 F.2d 1011, 1036 (2d Cir. 1983) ("[T]he mere passage of time rarely warrants an order to update the information to be considered by an agency."). While it is true that agency guidance recommends that an EIS more than 5 years old should be carefully reexamined, Pls.' Br. 37 (citing Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18,036 (Mar. 23, 1981) (codified at 40 C.F.R. pts. 1500–08)), NMFS has done just that through its annual SIRs. NMFS has concluded, based on voluminous data informed by the most up-to-date science, that the new circumstances described by Plaintiffs are not significant in the context of the impact of the harvest specifications decisions on the environment. [15]

---

[15] For this reason, Plaintiffs' attack on the 2004 Programmatic Supplemental EIS (PSEIS) is also unwarranted. *See* Pls.' Br. 27, n.7. The age of the EIS is inapposite; what matters

In the end, Plaintiffs' dispute "involves primarily issues of fact" which require "a high level of technical expertise[.]" *Marsh*, 490 U.S. at 376–77 (citation omitted). As the Supreme Court has cautioned, in these situations, courts must defer to "the informed discretion of the responsible federal agencies." *Id.* (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). NMFS has thoroughly considered the most current data using the best fishery science and has concluded changes in the BSAI ecosystems does not present significant new information or circumstances in the context of the 2023-2024 and 2024-2025 harvest specifications decisions. NEPA does not require more.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Federal Defendants on all claims and deny Plaintiffs' motion for summary judgment in its entirety.

---

is whether new information affects the potential environmental impacts on the action. Furthermore, this EIS is outside of the scope of Plaintiff's challenge. When determining what action an EIS supports, the relevant question is what the NEPA document states. *N. Alaska Env't Ctr*, 983 F.3d at 1093–1094. The stated action that the Harvest Specifications EIS analyzes is the "choice of a harvest strategy for the federally managed groundfish fisheries in the Gulf of Alaska (GOA) and the Bering Sea and Aleutian Islands (BSAI) management areas." NMFS00661. Therefore, the Harvest Specifications EIS is the correct NEPA document to evaluate in this case challenging the implementation of that harvest strategy in the 2023-2024 and 2024-2025 BSAI groundfish harvest specifications.

Respectfully submitted on this 19th day of July, 2024.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

JENNIFER A. SUNDOOK
Trial Attorney
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C.  20044-7611
Phone:  (202) 341-2791
Fax:  (202) 305-0506
Jennifer.Sundook@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is 11,400 words as counted using the word count feature of Microsoft Word, excluding the caption, table of contents, table of authorities, signature blocks, certificate of compliance, and certificate of service.

*/s/ Jennifer A. Sundook*
JENNIFER A. SUNDOOK
*Attorney for Federal Defendants*