**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

ASSOCIATION OF VILLAGE
COUNCIL PRESIDENTS, *et al.*,

        Plaintiffs,

        and

CITY OF BETHEL,

        Intervenor-Plaintiff,

        v.

NATIONAL MARINE FISHERIES
SERVICE, *et al.*,

        Defendants,

        and

AT SEA-PROCESSORS
ASSOCIATION, *et al.,*

        Intervenor-Defendants.

Case No. 3:23-cv-00074-SLG

## DECISION AND ORDER

Before the Court at Docket 32 is Plaintiffs Association of Village Council

Presidents and Tanana Chiefs Conference's Principal Brief under Local Rule

16.3(c)(1). At Docket 33, Intervenor-Plaintiff City of Bethel joined Plaintiffs' brief in

full and offered an additional argument with respect to standing. Plaintiffs also filed

an amended supplemental brief at Docket 66. Intervenor-Defendants At-Sea

Processors Association and United Catcher Boats responded in opposition and

cross-moved for summary judgment at Docket 67. Defendants National Marine Fishery Service; United States Department of Commerce; Howard Lutnick,[1] in his official capacity as Secretary of Commerce; and Samuel D. Rauch, III, in his official capacity as Deputy Assistant Administrator for Regulatory Programs (collectively "Federal Defendants") also responded in opposition and cross-moved for summary judgment at Docket 68. Plaintiffs replied at Docket 71[2] and Intervenor-Plaintiff responded in opposition to Federal Defendants' cross-motion at Docket 70. At Docket 37-1, amici curiae Ocean Conservancy, SalmonState, Native Peoples Action, Kuskokwim Inter-Tribal Fish, and Alaska Marine Conservation Council jointly lodged a brief in support of Plaintiffs, which the Court accepted at Docket 41.

The Court heard oral argument on September 26, 2024.[3]

## BACKGROUND

Alaska's Bering Sea and Aleutian Islands region is home to a complex marine ecosystem that supports the subsistence, economic, and cultural needs of many communities in western Alaska. It also hosts the largest and most productive groundfish fishery in the world. This suit arises from the apparent tension between Federal Defendants' management of the fishery and the needs of Alaskan

---

[1] The Court substitutes Howard Lutnick, who was recently confirmed as Secretary, pursuant to Federal Rule of Civil Procedure 25(d).

[2] The Court also reviewed Plaintiff's Notice of Errata Regarding Documents 32 & 71 filed at Docket 80 and has noted the corrections provided.

[3] Docket 86.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 2 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 2 of 45

communities in times of significant change in the Bering Sea and Aleutian Islands region.

Plaintiffs Association of Village Council Presidents and Tanana Chiefs Conference are two Alaska Native regional tribal organizations that support the interests of 98 member tribes and communities, whose tribal members live along the Yukon and Kuskokwim rivers in southwestern Alaska, their tributaries, and on the coast of the Bering Sea.[4] Intervenor-Plaintiff City of Bethel is a city located on the banks of the Kuskokwim River in southwestern Alaska.[5] Federal Defendants manage the Bering Sea and Aleutian Islands groundfish fishery.[6] Intervenor-Defendants are two trade associations that represent trawl catcher-processor and catcher vessels that harvest groundfish in the fishery.[7]

Together, Plaintiffs and Intervenor-Plaintiff assert that Federal Defendants acted arbitrarily and capriciously and violated the National Environmental Policy Act ("NEPA") in adopting the 2023–2024 and 2024–2025 groundfish harvest specifications in the Bering Sea and Aleutian Islands region.[8] Specifically, they claim that these harvest specifications improperly relied on outdated environmental impact

---

[4] Docket 32-1 at ¶¶ 6–8; Docket 32-5 at ¶¶ 8–9.

[5] Docket 18 at ¶ 3.

[6] Docket 1 at ¶¶ 21-24.

[7] Docket 10 at 2.

[8] Docket 52 (Plaintiffs' Supplemental Complaint); Docket 29 (Intervenor's Complaint); Docket 54 (City of Bethel's Joinder to Plaintiffs' Supplemental Complaint).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 3 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 3 of 45

statements despite dramatic changes to the ecosystem that Plaintiffs assert necessitate an updated environmental analysis.[9]

## A. Regulatory Background

### 1. The Magnuson-Stevens Act

The Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d, provides for the exclusive federal management of fisheries within the United States' Exclusive Economic Zone.[10]  In order to conserve and manage federal fisheries, the Act establishes eight regional fishery management councils, which develop Fishery Management Plans ("FMPs") and plan amendments, and propose implementing regulations.[11]  The North Pacific Fishery Management Council (the "Council") is the regional council that has "authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska."[12]  Although the Secretary of Commerce is responsible for reviewing and  implementing FMPs, the Secretary has delegated that authority to the National Marine Fisheries Service ("NMFS").[13]

---

[9] Docket 1 at ¶¶ 116–139; Docket 52 at ¶¶ 24–48.

[10] 16 U.S.C. § 1811(a); *see* 16 U.S.C. § 1802(11) (defining "exclusive economic zone").

[11] 16 U.S.C. §§ 1852(h), 1853(c).

[12] 16 U.S.C. § 1852(a)(1)(G).

[13] 16 U.S.C. § 1854 (outlining the Secretary's responsibilities and authority); *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 889 (9th Cir. 2010) (discussing the Secretary's delegation of authority to NMFS).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 4 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 4 of 45

The Magnuson-Stevens Act directs the Council to prepare and submit an FMP for each fishery under its authority that requires conservation and management.[14] Among other things, FMPs must "establish a mechanism for specifying annual catch limits in the plan . . . , implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery," "assess and specify . . . the maximum sustainable yield and optimum yield," and "include conservation and management measures that, to the extent practicable and in the following priority— (A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided."[15] Additionally, FMPs must meet national standards, including a requirement that "[c]onservation and management measures shall be based upon the best scientific information available."[16] "The term 'bycatch' means fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards."[17]

### 2. The Fishery Management Plan and the Harvest Specifications Process

In 1982, NMFS and the Council first established and implemented an FMP for Groundfish of the Bering Sea and Aleutian Islands Management Area, the fishery at

---

[14] 16 U.S.C. § 1852(h)(1).

[15] 16 U.S.C. § 1853(a)(15), (3), (11); *see also* 16 U.S.C. § 1802(33) (defining optimum yield).

[16] 16 U.S.C. § 1851(a)(2).

[17] 16 U.S.C. § 1802(2).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 5 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 5 of 45

the center of this case.[18]  This FMP and subsequent amendments set a management policy and objectives for the fishery, including its optimum yield, defined as the amount of fish that "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems."[19]  In the years at issue here, the FMP set the annual optimum yield for the Bering Sea and Aleutian Islands groundfish fishery at 1.4 million to 2.0 million metric tons.[20]

In addition to establishing the optimum yield range, the FMP also provides that "harvest specifications" be made annually.[21]  Among the harvest specifications is the total allowable catch ("TAC")—annual catch targets for each target species—the sum of which must fall within the optimum yield range the FMP specifies.[22]  The harvest specifications also include overfishing limits ("OFL")—the catch level above which overfishing occurs—and acceptable biological catch ("ABC")—a level of a stock that accounts for the scientific uncertainty in the estimate of OFL and any other scientific uncertainty.[23]

---

[18] NMFS00085.

[19] NMFS00107–117; 16 U.S.C. § 1802(33)(A).

[20] NMFS00116–119; *see also* 50 C.F.R. § 679.20(a)(1)(i)(A).

[21] NMFS00119; *see also* 50 C.F.R. § 679.20(a).

[22] NMFS00116–117.

[23] NMFS00117.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 6 of 45

The Council develops recommendations with respect to these and other harvest specifications based on information and recommendations provided by scientists from NMFS, academia, state fish and wildlife agencies, tribes, and the public.[24] Consistent with the FMP's national standards, each year the Council prepares a Stock Assessment and Fishery Evaluation ("SAFE") report using "the best scientific information available."[25] The SAFE report includes three sections: a scientific assessment of stocks, an economic analysis of the Alaska groundfish fisheries, and an analysis of ecosystem considerations.[26] This third section incorporates Ecosystem Status Reports for the Bering Sea and Aleutian Islands, which scientists and staff from federal and state agencies, academic institutions, tribes, and other institutions draft.[27] At each stage in the process, the Council invites and responds to public comments.[28]

---

[24] NMFS00120 (noting that "[t]he Council will develop its harvest specifications recommendations for Secretarial consideration using . . . recommendations of the Groundfish Plan Team and SSC and information presented by the Plan Team and SSC in support of these recommendations;. . . information presented by the Advisory Panel and the public; and . . . other relevant information"); *see also* 16 U.S.C. § 1852(g)(1)–(2) (requiring that each Regional Fishery Management Council establish and maintain a scientific and statistical committee and allowing each council to establish advisory panels as necessary).

[25] 16 U.S.C. § 1851(a)(2); 50 C.F.R. § 600.315(d); NMFS00590–91; *see also* 2SUPP05276–6693 (2023 SAFE report).

[26] NMFS00591; NMFS000637.

[27] NMFS00043; NMFS00606.

[28] 50 C.F.R. § 679.20(c).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 7 of 45

Based on the annual SAFE report, each year the Council determines and recommends a new OFL and ABC, which in turn limit TAC.[29]  After the Council recommends harvest specifications, NMFS confirms that they comply with the Magnuson-Stevens Act, are consistent with the FMP's harvest strategy, and fall within the scope of the Harvest Specifications EIS, which the Court discusses below.[30]  NMFS, on behalf of the Secretary of Commerce, then implements the harvest specifications through notice-and-comment rulemaking and publishes them in the Federal Register.[31]

### 3.  The Programmatic EIS and the Harvest Specifications EIS

In 1998, NMFS issued an SEIS to update the EIS used when it first implemented an FMP for the groundfish fishery.[32]  In 2004, NMFS again updated this EIS and analyzed the FMP and potential alternatives in a Supplemental Programmatic Environmental Impact Statement ("2004 EIS").[33]  This EIS included a discussion of the potential effect of salmon bycatch on subsistence salmon fisheries in the Yukon-Kuskokwim region.[34]  Then, in 2015, NMFS considered whether it was

---

[29] See e.g., NMFS00591; NMFS01266.

[30] NMFS00018–43 (Final 2023 and 2024 Harvest Specifications); 2SUPP00020–51 (Final 2024 and 2025 Harvest Specifications).

[31] See e.g., NMFS00018–48; 2SUPP0020–54.

[32] NMFS23380.

[33] NMFS23604–827 (2004 Final Programmatic Supplemental EIS).

[34] NMFS00971–72.

necessary to update the 2004 EIS, but ultimately determined that "the current status of resources can be considered within the range of variability analyzed in the 2004 [EIS]" such that "a supplemental NEPA document is not necessary."[35]

Shortly after completing the 2004 EIS, NMFS identified the need to determine a harvest strategy—the process used to calculate the annual harvest specifications. Accordingly, in January 2007, NMFS prepared a separate Environmental Impact Statement ("the Harvest Specifications EIS"), which examined four alternative harvest strategies to "determine annual harvest specifications."[36] The Harvest Specifications EIS evaluated each strategy, along with one no action alternative, to assess their impact on marine resources in the Bering Sea and Aleutian Islands region, including impacts of target species, non-target fish species, forage fish species, marine mammals, seabirds, fish habitat, and the ecosystem as a whole.[37] It further considered the social and economic impacts as well as the environmental justice impacts of each alternative.[38] Ultimately, NMFS adopted Alternative 2, which "[s]et TACs that fall within the range of ABCs recommended by the Council's Groundfish Plan Teams and TACs recommended by the Council."[39] The Harvest

---

[35] NMFS23444.

[36] NMFS00639–1093, 661 (Harvest Specifications EIS); NMFS01094–98 (Record of Decision).

[37] NMFS00644–48.

[38] NMFS00648–49.

[39] NMFS00644; NMFS01094.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 9 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 9 of 45

Specifications EIS incorporated by reference the 2004 EIS, which "functions as a baseline analysis for evaluating subsequent management actions."[40]

### 4. Supplementary Information Reports

Each year, in conjunction with establishing the annual harvest specifications, NMFS prepares a Supplementary Information Report ("SIR"). The purpose of the SIR is to "evaluate[] the need to prepare a Supplemental EIS" for the annual harvest specifications.[41] The SIR "describes the decision maker's evaluation of new information, changed circumstances, or proposed changes to" the harvest strategy.[42] The primary source of new information for the SIR is the annual SAFE report, as it represents the best available scientific information.[43]

In both the 2023 and 2024 SIRs, NMFS concluded that the 2023–2024 and 2024–2025 harvest specifications would not result in environmental, social, or economic impacts beyond those analyzed in the 2007 Harvest Specifications EIS and, accordingly, that a supplemental EIS was not necessary.[44]

---

[40] NMFS00670–71.

[41] *E.g.*, 2SUPP00073.

[42] *E.g.*, 2SUPP00074.

[43] NMFS00590–91.

[44] NMFS00635; 2SUPP00143.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 10 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 10 of 45

**B.    Factual Background**

**1.    The Bering Sea and Aleutian Islands Groundfish Fishery**

The federal groundfish trawling fishery off the coast of Alaska is the largest such fishery in the world, harvesting about 2 million metric tons of fish each year.[45] Operators catch pollock and other groundfish using pelagic trawls—large, cone-shaped nets that are towed through the water by a vessel.[46] Pelagic trawls can have an opening 160 to 400 feet wide and 40 to 100 feet high.[47] The mesh is large at the opening—up to 100 feet—and becomes progressively smaller towards the far end, diminishing to 4 to 4.5 inches.[48] Pelagic trawls are imprecise and, because groundfish and salmon occur in the same areas, groundfish trawls accidentally catch thousands of Chinook and chum salmon each year.[49] In addition, although pelagic, or mid-water trawls, are distinct from bottom trawls, or nets dragged along the ocean floor, pelagic trawls can capture benthic, or bottom-dwelling species, and indirectly damage sea floor habitat.[50]

---

[45] SUPP00179; NMFS06098 (2021 Stock Assessment and Fishery Evaluation Report for the Groundfish Fisheries of the Gulf of Alaska and Bering Sea/Aleutian Islands Area).

[46] NMFS00081; NMFS18089.

[47] NMFS00081.

[48] NMFS00081.

[49] NMFS18089; SUPP00013 (1991–2022 Chinook bycatch); SUPP00015 (1991–2022 non-Chinook salmon bycatch).

[50] NMFS06770 (noting that pelagic trawls "damage or capture benthic [or bottom-dwelling] species"); NMFS24110–11 (discussing impacts to crab populations); SUPP05184–85 (discussing trawling's effects on benthic habitat).

## 2. Recent Changes in the Bering Sea and Aleutian Islands Ecosystem and Impacts to Western Alaska Communities

In recent times, the Bering Sea and Aleutian Islands ecosystem that supports the fishery has experienced significant changes. Between 2014 and 2021, the Bering Sea underwent an extended warm period, or a stanza, "unprecedented in terms of magnitude and duration."[51] This resulted in changes to the physical and biological environment that caused ripple effects throughout the ecosystem.

The warm stanza caused immediate ecosystem responses: a decrease in the size of the "cold pool"—a mass of cold, dense water near the sea floor—and a loss of sea ice with corresponding changes in salinity and impacts to the vertical mixing in the water column.[52] The warm stanza and its impacts to the physical environment also caused significant biological impacts on the base of the food web that cascaded to other species.[53] Specifically, the warmer temperatures resulted in shifts in the production of copepods, a species of zooplankton that form the base of the food web.[54] Smaller, less nutrient-rich copepods are less susceptible to temperature-driven changes and, as a result, in 2018 and 2019, they were relatively more abundant than larger, more nutritious, copepods.[55] Simultaneously, warmer marine

---

[51] NMFS05438–40 (2022 Eastern Bering Sea Ecosystem Status Report).

[52] NMFS05438–39.

[53] *E.g.*, NMFS05441–42.

[54] SUPP01138–39 (2019 Ecosystem Status Report); NMFS05439.

[55] SUPP01138–39.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 12 of 45

temperatures increased the metabolic needs of fish.[56]  The fish that consume the copepods were thus pressured in two ways—they needed greater energy, but had reduced access to their usual food source.[57]  The impacts on those fish in turn impacted the "body condition and survival" as well as the biomass of the groundfish that foraged on those fish.[58]  And these disruptions in the marine ecosystem had other impacts: seabird die-offs,[59] "unusual mortality events" for whales[60] and ice seals,[61] and declines in Chinook, chum, and coho salmon stocks.[62]  By the fall of 2021, however, there was a return to "more average thermal conditions" in the Eastern Bering Sea and, in November 2022, NMFS concluded that "the extended warm phase experienced by the [Eastern Bering Sea] ha[d] ended."[63]  Temperatures

---

[56] NMFS05442; SUPP00591 (2021 Aleutian Islands Ecosystem Status Report).

[57] NMFS05442 ("Adult fish condition reflects prey availability and growth potential, both impacted by climate-driven changes in metabolic demand (higher in warmer conditions) and trophic interactions (changes in prey quality and quantity)."); SUPP00338 ("For groundfish in the southeastern Bering Sea, bioenergetic indices estimated through 2019 point towards continued increases in thermal exposure and a resulting increase in metabolic demands, as well as declines in foraging and growing conditions.").

[58] SUPP01138–39; SUPP01274 (noting a decrease in the biomass of pollock in 2018).

[59] SUPP01289–90 (noting that "[a] seabird die-off event, unprecedented in terms of spatial and temporal scale, occurred in 2018").

[60] SUPP01082–83 (discussing an unusual mortality event of gray whales, an "ecosystem sentinel" in 2019 and preliminary evidence of emaciation); SUPP03852–53 (discussing an unusual mortality event for fin and humpback whales in 2015 and 2016).

[61] SUPP01084 (discussing the unusual deaths of ice seals 2018 and 2019 from apparent emaciation).

[62] SUPP01995; NMFS05439 (noting declines in juvenile Chinook and unprecedented failures in adult Chinook, chum, and coho runs in the Arctic-Yukon-Kuskokwim region between 2013 and 2022).

[63] NMFS05438, 41 (2022 Eastern Bering Sea Ecosystem Status Report).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 13 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 13 of 45

in the Aleutian Islands also "cooled, but remained above average, . . . periodically crossing the threshold to marine heatwave status."[64]

The Bering Sea and Aleutian Islands' marine resources are essential to many western Alaska communities. Many residents of these communities, including those in the Yukon-Kuskokwim Delta on the Bering Sea coast, practice a subsistence lifestyle[65] and depend on a variety of marine resources.[66] Salmon, in particular, provide a crucial source of food and culture.[67] As changes to the marine ecosystem in the Bering Sea and Aleutian Islands region have depleted salmon stocks, salmon bycatch in the groundfish fishery has further diminished stocks and escapement, which is the number of salmon that "escape" fisheries in the ocean and survive to return to freshwater streams to spawn.[68] Some of the Chinook and non-Chinook salmon taken as bycatch by the groundfish fishery originated in western Alaska.[69]

---

[64] 2SUPP06610 (2023 Aleutian Islands Ecosystem Status Report); *see also* NMFS05673 (2022 Aleutian Islands Ecosystem Status Report).

[65] Docket 32-1 at ¶¶ 12–14; Docket 32-2 at ¶ 15; Docket 32-4 at ¶ 9; Docket 32-5 at ¶ 12; Docket 32-6 at ¶ 11.

[66] Docket 32-1 at ¶ 14 (discussing subsistence harvests of sea birds, ice seals, and other marine resources); Docket 32-2 at ¶ 15 (same); Docket 32-3 at ¶¶ 12–13, 18 (same); Docket 32-4 at ¶¶ 18 (same).

[67] Docket 32-1 at ¶¶ 13–15; Docket 32-2 at ¶¶ 13, 19, 25; Docket 32-3 at ¶¶ 11, 16–19; Docket 32-4 at ¶ 9; Docket 32-5 at ¶¶ 7, 13–16; Docket 32-6 at ¶¶ 13–16.

[68] SUPP00027 (discussing Chinook bycatch and the "impact rate," or estimated effect of bycatch on salmon runs, for western Alaska Chinook stocks); SUPP00061 (analyzing chum bycatch in the pollock fishery).

[69] SUPP00009 ("[I]n 2020, 54% of the Chinook salmon bycatch [in offshore trawl fisheries in the Bering Sea and Aleutian Islands region] was estimated to have originated from coastal western Alaska with 2.3% attributed to the middle/upper Yukon River systems."); *see also* 2SUPP00106

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 14 of 45

## C. Procedural Background

On March 10, 2023, NMFS published the Final Harvest Specifications for Groundfish for the 2023–2024 season in the Federal Register.[70] With this final rule, NMFS also completed a SIR, which concluded that "a supplemental EIS is not necessary to implement the 2023 and 2024 harvest specifications."[71] The SIR determined that "(1) the 2023 and 2024 harvest specifications, which were set according to the preferred harvest strategy, do not constitute a substantial change in the action; and (2) the information presented does not indicate that there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts that are not addressed through the annual process of using the preferred harvest strategy to set the harvest specifications."[72] Further, the SIR found that "the 2023 and 2024 harvest specifications will result in environmental, social, and economic impacts within the scope of those analyzed and disclosed in the [Harvest Specifications] EIS."[73]

---

("[O]nly 21 percent of chum bycatch in the A and B seasons is of western Alaska origin . . . .").

[70] NMFS00018–48 (Final 2023 and 2024 Harvest Specifications).

[71] NMFS00635. In the SIR, NMFS examined ecosystem considerations related to salmon bycatch, marine mammals, and seabirds. NMFS00611–14 (salmon); NMFS00617–19 (marine mammals); NMFS00619–21 (seabirds).

[72] NMFS00635.

[73] NMFS00635.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 15 of 45

Plaintiffs initially filed this action challenging the 2023–2024 Final Harvest Specifications for Groundfish, asserted two NEPA claims, and sought declaratory and injunctive relief.[74] During the pendency of this case, NMFS published Final Harvest Specifications for the 2024–2025 season.[75] Plaintiffs then filed a supplemental complaint, alleging that NMFS's 2024–2025 Final Harvest Specifications had the same deficiencies as the prior year's specifications challenged in their initial complaint.[76]

Plaintiffs ask the Court to enter a declaratory judgment that Federal Defendants' "decisions to adopt the 2023-2024 groundfish harvest specifications and the 2024-2025 groundfish harvest specifications for the Bering Sea and Aleutian Islands" and their "reliance on the 2004 Alaska Groundfish Fisheries Programmatic Supplemental Environmental Impact Statement and the 2007 Alaska Groundfish Harvest Specifications Final Environmental Impact Statement" are arbitrary, capricious, and not in accordance with NEPA.[77] Plaintiffs seek an order vacating the 2023–2024 and 2024–2025 harvest specifications and an order that requires NMFS to prepare a new EIS or supplement the prior EISs.[78]

---

[74] Docket 1.

[75] 2SUPP00020–54.

[76] *See generally* Docket 52.

[77] Docket 52 at 11 (incorporating the allegations in Plaintiffs' Complaint at Docket 1).

[78] Docket 52 at 11.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 16 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 16 of 45

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[79]

## LEGAL STANDARD

Agency decisions under the Magnuson-Stevens Act and NEPA are reviewed pursuant to Section 706(2) of the Administrative Procedure Act ("APA").[80]  Section 706 provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations."[81]  Agency action is arbitrary and capricious if it:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[82]

---

[79] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[80] 16 U.S.C. § 1855(f)(1)(B) ("[T]he appropriate court shall only set aside" actions under the Magnuson-Stevens Act "on a ground specified in [5 U.S.C. §§ ]706(2)(A), (B), (C), or (D).").

[81] 5 U.S.C. § 706(2).

[82] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (quoting *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011)).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 17 of 45

By contrast, an agency action is proper if "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."[83]

When an agency action is based on factual conclusions drawn from the administrative record, the reviewing court must determine whether those conclusions are supported by "substantial evidence."[84] "'Substantial evidence' is 'more than a mere scintilla but less than a preponderance.'"[85] A court's review of an agency's findings under § 706(2) is narrow: "a court is not to substitute its judgment for that of the agency," and such deference is especially appropriate where "the challenged decision implicates substantial agency expertise."[86] This standard is "extremely deferential," requiring the reviewing court to "uphold the [agency's] findings unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result."[87] "Whether agency action is 'not in accordance with law' is a question of

---

[83] *Id.* (quoting *Greater Yellowstone Coal.*, 665 F.3d at 1023).

[84] *Id.* at 1068; *see also Dickinson v. Zurko*, 527 U.S. 150, 163–64 (1999).

[85] *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[86] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000).

[87] *Monjaraz-Munoz v. I.N.S.*, 327 F.3d 892, 895 (9th Cir. 2003) (emphasis in original) (quoting *Singh-Kaur v. I.N.S.*, 183 F.3d 1147, 1149–50 (9th Cir. 1999)). The Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo* is not to the contrary. 603 U.S. 369, 392 (2024) ("Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential.") (emphasis in original).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 18 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 18 of 45

statutory interpretation, rather than an assessment of reasonableness in the instant case."[88]

## DISCUSSION

## A.    Plaintiffs and Intervenor-Plaintiffs Have Standing.

As a threshold matter, the Court must address whether Plaintiffs and Intervenor-Plaintiff have standing.[89]  Federal Defendants assert that Plaintiffs do not satisfy the causation and redressability requirements of Article III standing.[90]  In their view, climate change is an intervening cause that substantially contributed to Plaintiffs' alleged injury and renders the causal connection between NMFS's harvest specifications and Plaintiffs' injury too attenuated to support standing.[91]  With respect to redressability, Federal Defendants insist that Plaintiffs' requested relief would only allow a small number of salmon to return to western Alaska and therefore would not redress Plaintiffs' alleged inability to adequately access marine resources.[92]  In a footnote, Federal Defendants also posit that this Court lacks jurisdiction to hear

---

[88] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

[89] *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) ("Standing is a threshold matter central to our subject matter jurisdiction.").

[90] Docket 68 at 32–36.

[91] Docket 68 at 33–34.

[92] Docket 68 at 34–36.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 19 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 19 of 45

Plaintiff-Intervenor's claim under the Magnuson-Stevens Act because such a claim is untimely.[93]

Plaintiffs respond that they have standing because members of the tribes and communities they represent depend on marine resources, including salmon, for subsistence and as integral parts of their culture, and that Federal Defendants' decision to authorize groundfish fisheries with what they allege is an insufficient environmental analysis harms these interests.[94] With respect to causation, Plaintiffs maintain that Federal Defendants' decision is a contributing cause of their injuries, which NMFS acknowledges, and that the declines in salmon and other marine resources are traceable to the harvest specification decisions because large scale commercial fishing influences the ecosystem and bycatch in the groundfish fishery has removed thousands of Chinook salmon that could have returned to western Alaska rivers to spawn, increasing the risk of harm to Plaintiffs' subsistence, economic, and cultural interests.[95] And Plaintiffs submit that their injuries are redressable, as "allowing any additional salmon to return to western Alaska rivers to spawn alleviates some of [Plaintiffs'] injuries related to declining salmon" and

_____

[93] Docket 68 at 36 n.8.

[94] Docket 32 at 21–24; Docket 71 at 5–6.

[95] Docket 71 at 6–8.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 20 of 45

requiring NMFS to prepare a new EIS or update its prior EISs could lead it to consider a more precautionary approach to its management of the fishery.[96]

Article III of the Constitution confines the jurisdiction of the federal courts "to 'cases' and 'controversies.'"[97] Federal courts enforce this jurisdictional limitation through the doctrine of standing.[98] Plaintiffs bear the burden of demonstrating the "irreducible constitutional minimum of standing," which requires three elements.[99] A plaintiff must show (1) an injury in fact, meaning an "invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) causation, "such that the injury is fairly traceable to the challenged action of the defendant"; and (3) redressability, meaning that "the injury will likely be redressed by a favorable decision."[100] A plaintiff "must demonstrate standing separately for each form of relief sought."[101]

"To demonstrate standing to bring a procedural claim—such as one alleging a NEPA violation—a plaintiff must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his

---

[96] Docket 71 at 9–11.

[97] *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1138 (9th Cir. 2013) (quoting U.S. Const. art. III, § 2).

[98] *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–42 (2006).

[99] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[100] *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (citing *Lujan*, 504 U.S. at 560–61).

[101] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 21 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 21 of 45

standing."[102]  "Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, the causation and redressability requirements are relaxed."[103]  But "a claim of procedural injury does not relieve Plaintiffs of their burden—even if relaxed—to demonstrate causation and redressability."[104]

### 1.    Plaintiffs have Article III standing.

The record supports, and Federal Defendants do not dispute, that Plaintiffs have suffered an injury-in-fact.  All parties acknowledge a depletion of the resources in the marine ecosystem in the Bering Sea and Aleutian Islands region.[105]  The members of the tribes and communities that comprise Plaintiffs' organizations depend on these as resources for subsistence; the resources also have significant economic and cultural value to Plaintiffs' members.[106]  Impacts to marine resources in the Bering Sea and Aleutian Islands, and in particular, salmon, thus harm Plaintiffs' members.[107]  Moreover, they harm Plaintiffs as organizations, which both have

---

[102] *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (internal quotation marks and citation omitted).

[103] *Id.* (internal quotation marks and citation omitted).

[104] *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021).

[105] Docket 32 at 15–20; Docket 68 at 33.

[106] Docket 32-1 at ¶¶ 13–15; Docket 32-2 at ¶¶ 13, 19, 25; Docket 32-3 at ¶¶ 11, 16–19; Docket 32-4 at ¶ 9; Docket 32-5 at ¶¶ 7, 13–16; Docket 32-6 at ¶¶ 13–16.

[107] *See Friends of the Earth*, 528 U.S. at 181 (citation omitted) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 22 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 22 of 45

missions to protect their members' traditional cultural values and practices, including subsistence.[108]

Further, Plaintiffs' injuries are fairly traceable to Federal Defendants' conduct. A plaintiff "must show that the injury is causally linked or 'fairly traceable' to the [defendant's] alleged misconduct, and not the result of misconduct of some third party not before the court."[109] But "[a] causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible."[110] "Nor does standing require the defendant's action to be the sole source of injury."[111]

Federal Defendants' harvest specifications set the total allowable catch of groundfish, which affects bycatch, which in turn affects the number of salmon that return to western Alaska rivers to spawn. Although Federal Defendants insist that their experts have concluded that "'[s]cience indicates climate change as the primary driver of poor salmon return in western Alaska'" and that "[c]limate change is, thus, an intervening cause that has substantially contributed to Plaintiffs' injury," they also acknowledge that salmon bycatch "may be a contributing factor in the decline of

---

[108] Docket 32-1 at ¶¶ 10, 13, 16–21; Docket 32-5 at ¶¶ 10–12, 18–26; *see also Friends of the Earth,* 528 U.S. at 181.

[109] *Bellon*, 732 F.3d at 1141 (citing *Lujan*, 504 U.S. at 560–61).

[110] *Id.* at 1141–42 (internal quotation marks and citation omitted).

[111] *Id.* at 1142.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 23 of 45

salmon."[112]  Additionally, the Council noted that "[t]he cause(s) of the decline in Chinook salmon returns is not well understood, but it is likely that climate warming in both the marine and freshwater environments and, to some extent, bycatch in the [Eastern Bering Sea] fisheries may be factors."[113]  With respect to chum salmon, NMFS estimated that the annual bycatch of chum that originated in western Alaska by the pollock fleet in the groundfish fishery over a five year period averaged 49,927 fish per year.[114]  That this salmon bycatch in the fishery that Federal Defendants manage is likely a "contributing factor" rather than a "primary driver" of the declining salmon runs in western Alaska does not weaken the causal chain to the point that it cannot support Plaintiffs' standing.

Nor are Plaintiffs' injuries too attenuated from Federal Defendants' actions. Rather, as described above, they are two steps removed.  And the links in the chain of causation connecting the agency's actions to Plaintiffs' injury are plausible, not merely hypothetical. As Federal Defendants acknowledge, bycatch from the groundfish fishery is a potential factor in salmon declines.[115]  That stands to reason.

_____

[112] Docket 68 at 33–34 (internal quotation marks omitted) (first quoting NMFS00039; and then quoting NMFS00040).

[113] NMFS27678.

[114] 2SUPP00106.

[115] *See* NMFS00040; NMFS27678.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 24 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 24 of 45

As another district court has noted, "as a practical matter, the volume of a fishery's total annual catch is inextricably linked to the amount of its bycatch."[116]

Federal Defendants suggest that this case is akin to *Bellon*. In *Bellon*, the plaintiffs sought to compel state agencies to regulate greenhouse gas emissions from the oil refineries located in the state of Washington under a cooperative federal-state scheme; Plaintiffs asserted that the agencies' failure to set and apply regulatory standards contributed to those refineries' greenhouse gas pollution, impairing their recreational, aesthetic, economic, and health interests.[117] The Ninth Circuit held that traceability was lacking because the plaintiffs there "offer[ed] only vague, conclusory statements that the Agencies' failure to set [certain regulatory] standards at the Oil Refineries contributes to greenhouse gas emissions, which in turn, contribute to climate-related changes that result in their purported injuries."[118] The Court held that "Plaintiffs' causal chain—from lack of [regulatory] controls to [their] injuries—consists of a series of links strung together by conclusory, generalized statements of 'contribution,' without any plausible scientific or other evidentiary basis that the refineries' emissions are the source of their injuries."[119] Thus, the Circuit Court held that the plaintiffs had failed to connect their localized injuries to the greenhouse gas

---

[116] *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 108 (D.D.C. 2011).

[117] 732 F.3d at 1136–37, 1140.

[118] *Id.* at 1142.

[119] *Id.*

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 25 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 25 of 45

emissions of the Washington state oil refineries, in part because science could not "identify a specific source of CO2 emissions" and "designate it as the cause of specific climate impacts at an exact location."[120]  In this case, there is no such indeterminacy. As discussed, Plaintiffs have concretely connected their injuries—the depletion of marine resources, particularly salmon, in western Alaska—to Federal Defendants' management of the groundfish fishery in the Bering Sea and Aleutians Islands region.[121]  Although climate change is one cause of Plaintiffs' injuries, scientists have quantified the bycatch of the groundfish fishery and identified it as another likely cause of Plaintiffs' injuries.

The third requirement, redressability, is also met here.  Standing requires that "the injury will likely be redressed by a favorable decision."[122]  "[T]he 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'"[123]  In cases such as this that involve procedural claims, the redressability requirement is relaxed and "is satisfied when 'the relief requested— that the agency follow the correct procedures—may influence the agency's ultimate decision.'"[124]  Having concluded that Plaintiffs' injuries are traceable to Federal

---

[120] *Id.* at 1142–44.

[121] *See supra*, at 23–25.

[122] *Townley*, 722 F.3d at 1133 (9th Cir. 2013) (citing *Lujan*, 504 U.S. at 560–61).

[123] *Bellon*, 732 F.3d at 1146 (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

[124] *WildEarth Guardians*, 795 F.3d at 1156 (quoting *Salmon Spawning & Recovery All. v. Gutierrez*,

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 26 of 45
Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 26 of 45

Defendants' alleged failure to adequately consider recent changes to the Bering Sea and Aleutian Islands region's ecosystem in their management of the groundfish fishery, it follows this Court must also conclude that, if NMFS followed different procedures, the agency could conclude that different, more protective management is appropriate and that such management could help remediate Plaintiffs' injuries.[125]

### 2. Intervenor-Plaintiff has Article III standing.

Separately, Federal Defendants assert that this Court lacks jurisdiction to hear Intervenor-Plaintiff's claim because Intervenor-Plaintiff did not intervene before the 30-day limit for challenges to regulations implementing an FMP under the Magnuson-Stevens Act had lapsed.[126] Intervenor-Plaintiff responds that the Court already ruled that it has standing by allowing intervention at Docket 26 and that, in any case, the addition of Intervenor-Plaintiff as a party is an amendment to Plaintiffs' Complaint that "relates back" to the Complaint.[127]

---

545 F.3d 1220, 1126 (9th Cir. 2008)).

[125] *Id.* at 1154 (emphasis omitted) (noting that plaintiffs seeking to enforce a procedural right "must show only that they have a procedural right that, if exercised, could protect their concrete interests" for purposes of the traceability and redressability elements of standing); *see also Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) ("A plaintiff . . . who asserts inadequacy of a government agency's environmental studies under NEPA need not show that further analysis by the government would result in a different conclusion. It suffices that, as NEPA contemplates, the [agency's] decision could be influenced by the environmental considerations that NEPA requires an agency to study." (citing *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001))).

[126] Docket 68 at 36 n.8.

[127] Docket 70 at 2–3.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 27 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 27 of 45

"Arguments raised only in footnotes . . . are generally deemed waived."[128]  And in any case, Intervenor-Plaintiff's claim is timely as it relates back to Plaintiffs' original complaint, which was timely filed.[129]  The Ninth Circuit has not addressed whether an intervenor's complaint relates back to the date of the original pleading.[130]  However, the District Court for the Eastern District of California agreed with other district courts in sister jurisdictions and concluded that "a complaint in intervention relates-back to the date of the original complaint, despite expiration of the statute of limitations, where '(1) the proposed intervenor is the real party in interest, or there is a 'community of interest' between proposed intervenor's and plaintiff's claims; (2) intervenor's motion is timely within the meaning of Rule 24; and (3) no prejudice to defendants would result.'"[131]  This Court finds the Eastern District's analysis persuasive and applies it here.

---

[128] *Est. of Saunders v. Comm'r of Internal Revenue*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) (first citing *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010); and then citing *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam)).

[129] *See* 16 U.S.C. § 1855(f) (requiring a petition for judicial review be "filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register"); *see also* NMFS00018–48 (Final 2023 and 2024 Harvest Specifications published March 10, 2023); Docket 1 (complaint filed April 7, 2023).

[130] *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 629 F. Supp. 2d 1091, 1102 (E.D. Cal. 2009), *aff'd in part, rev'd in part on other grounds*, 618 F.3d 1066 (9th Cir. 2010) ("The Ninth Circuit . . . has never addressed whether an intervenor's complaint may relate-back to the original complaint where the statute of limitations has otherwise expired.").

[131] *Id.* at 1104 (quoting *New York v. Gutierrez*, Case No. 08-cv-2503, 2008 WL 5000493, at *13 (E.D.N.Y. Nov. 20, 2008)).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 28 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 28 of 45

In this case, there is a community of interest between Plaintiff and Intervenor-Plaintiff's claims as these parties all seek the same relief and have similar subsistence, economic, and cultural interests in salmon and other marine resources.[132] Intervenor-Plaintiff's motion was timely filed within the meaning of Rule 24[133] and Federal Defendants and Intervenor-Defendants are not prejudiced, as Intervenor-Plaintiff asserts the same claims as Plaintiffs.[134] Therefore, this Court has jurisdiction to hear Intervenor-Plaintiff's claims.

**B.     Plaintiffs Have Not Waived Any Arguments.**

Federal Defendants and Intervenor-Defendants assert that Plaintiffs waived any argument that NEPA requires a standalone, or project-specific, EIS for each annual harvest specifications decision because they did not raise this issue during the appropriate comment period before the agency.[135]   In their briefing, Plaintiffs respond that they put Federal Defendants on notice that a new EIS was required by raising in their comments that no NEPA document analyzed the impacts of NMFS's harvest specifications decision "with a view to the current, drastic changes to the environment" and, in any event, the agency had independent knowledge of the

---

[132] *See* Docket 29 at 5, ¶¶ 5–6.

[133] *See Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 822 (9th Cir. 2021) ("Timeliness hinges on three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay.") (internal quotation marks and citation omitted).

[134] *See generally* Docket 29.

[135] Docket 68 at 36–39; Docket 67 at 23–25.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 29 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 29 of 45

issue.[136]  Additionally, Plaintiffs suggest that NMFS "could either produce an EIS for the annual harvest specifications decisions or it could produce a broader, supplemental EIS for the overall strategy—similar to the 2007 harvest specifications strategy EIS or the 2004 programmatic EIS for the fisheries management plans—as long as that document also analyzes the effects of the annual harvest specifications decisions. In either case, the Service could tier to the EIS in future years, so long as there are not significant changes requiring supplemental NEPA analysis."[137]  Further, at oral argument, Plaintiffs clarified that they are not arguing that each annual harvest specifications decision requires a standalone, or project-specific, EIS.[138]  Given Plaintiffs' clarification, the Court finds that Plaintiffs have not waived their argument that a new or supplemental EIS is needed for the specific years challenged here.

**C.  NMFS 2023–2024 and 2024–2025 Decisions that the Harvest Specifications Did Not Require a Supplemental EIS Do Not Violate NEPA.**

Plaintiffs assert that the 2023–2024 and 2024–2025 harvest specifications decisions are major federal actions with potentially significant effects on the human environment and thus required either an EIS or a supplemental EIS to comply with NEPA.[139]  In their view, Federal Defendants' reliance on the 2007 Harvest Specifications EIS is arbitrary and violates NEPA because the 2007 EIS does not

---

[136] Docket 71 at 11–12.

[137] Docket 71 at 15.

[138] Docket 94 at 6–7.

[139] Docket 32 at 25–33; Docket 66 at 5.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 30 of 45

consider the current environmental context, particularly with respect to changed ocean conditions, seabird and marine mammal mortality events, and salmon declines.[140] Furthermore, Plaintiffs contend that NMFS cannot analyze this new information in its annual harvest specifications process in lieu of a NEPA document because the new information about the current environment is significant and requires a supplemental EIS.[141]

Federal Defendants and Intervenor-Defendants do not contest that the harvest specifications decisions are major federal actions that may have significant effects on the human environment.[142] But Federal Defendants maintain that the annual harvest specifications decisions do not require a separate EIS as the decisions "[are] within the scope of a completed NEPA analysis—the [2007] Harvest Specifications EIS."[143] And they insist that NMFS appropriately used annual SIRs to assess whether new information required a supplemental EIS and properly concluded no supplementation was necessary.[144] Intervenor-Defendants offer similar arguments and further submit that the 2007 Harvest Specifications EIS has satisfied NEPA for

---

[140] Docket 32 at 33–42; Docket 66 at 6–8.

[141] Docket 32 at 42–44 (citing *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000)).

[142] *See* Docket 68 at 39–41; Docket 67 at 25–29.

[143] Docket 68 at 39–41.

[144] Docket 68 at 43–44.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 31 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 31 of 45

17 years and that completing an EIS annually would be impracticable.[145]  And they assert that Federal Defendants properly concluded that they did not need to supplement the 2007 Harvest Specifications EIS after considering new information, and that this Court must defer to that decision.[146]

"NEPA imposes procedural requirements designed to force agencies to take a hard look at environmental consequences of their actions."[147]  "To that end, NEPA requires agencies to prepare a detailed EIS for any 'major Federal actions significantly affecting the quality of the human environment.'"[148]  In the normal course, an agency first prepares a less exhaustive EA, which is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]."[149]  Not only must agencies complete an EIS prior to taking major federal action, they also must

> prepare supplements to either draft or final environmental impact statements if a major Federal action is incomplete or ongoing, and:
>
> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

---

[145] Docket 67 at 29–32. As noted above, Plaintiffs are not seeking a new EIS for each set of annual harvest specifications.

[146] Docket 67 at 32–46.

[147] *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 991 (9th Cir. 2023) (internal quotation marks and citations omitted).

[148] *Id.* (quoting 42 U.S.C. § 4332(C)).

[149] 40 C.F.R. § 1508.9(a).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 32 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 32 of 45

(ii) There are significant new circumstances or information about the significance of adverse effects that bear on the analysis.[150]

Under this standard, "an agency is not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action, so long as the impacts of that step were contemplated and analyzed by the earlier analysis."[151]

### 1. The 2007 Harvest Specifications EIS includes subsequent annual harvest specifications in its scope.

The Court first addresses whether the 2023–2024 and 2024–2025 annual harvest specifications decisions fall within the scope of the 2007 Harvest Specifications EIS. The relevant inquiry to determine what type of NEPA analysis is required for an ongoing action is *not* "whether the previous EIS adequately analyzed the impacts of the subsequent action."[152] Rather, "in deciding whether a previous EIS is the EIS for a subsequent action, [the Ninth Circuit has found] it appropriate to rely on an EIS's defined scope."[153] "If the defined scope of the initial EIS included the subsequent action, NEPA requirements for the subsequent action would fall under the supplementation rubric."[154] And if the defined scope of the initial EIS is

---

[150] 40 C.F.R. § 1502.9(d)(1).

[151] *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017); *accord N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1091 (9th Cir. 2020).

[152] *N. Alaska Env't Ctr*, 983 F.3d at 1090.

[153] *Id.* at 1093.

[154] *Id.*

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 33 of 45

ambiguous, then a court "must determine whether the agency's interpretation of the scope is reasonable."[155]

The 2007 Harvest Specifications EIS purports to analyze the impacts of "harvest strategy to determine the annual harvest specifications for the federally managed groundfish fisheries in the [Gulf of Alaska] and [Bering Sea and Aleutian Islands] management areas."[156] That EIS further provides that "[t]he action being analyzed is the alternative harvest strategies, or in other words, the principles for determining the TACs."[157] Although the harvest strategy and the annual harvest specifications are distinct actions, the latter is an implementation of the principles established in the former and is thus within its defined scope. *Mayo v. Reynolds*, a case decided by the D.C. Circuit, provides a direct analogue.[158] In that case, a plaintiff challenged annual decisions authorizing recreational elk hunting in Grand Teton National Park on the grounds that the park had authorized the annual hunts without NEPA review.[159] The Court concluded that an earlier EIS that had analyzed an elk management plan and alternatives "was clearly sufficient to cover elk hunting during the ensuing fifteen years . . . absent a material change [in the action] causing

---

[155] *Id.* at 1094 (citing *Ka Makini 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 959 & n.3 (9th Cir. 2002)).

[156] NMFS00643.

[157] NMFS00662.

[158] 875 F.3d 11 (D.C. Cir. 2017).

[159] *Id.* at 14.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 34 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 34 of 45

unforeseen environmental consequences."[160]  In so deciding, the Court noted that "an agency is not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action."[161]  "So long as the impacts of the steps that the agency takes were contemplated and analyzed by the earlier NEPA analysis, the agency need not supplement the original EIS or make a new assessment."[162]

Here, in the 2007 Harvest Specifications EIS, NMFS studied strategies for determining annual harvest specifications—essentially a management plan similar to that in *Mayo*.  Further, requiring an EIS for each annual harvest specifications decision would be impractical, if not impossible.  Plaintiffs acknowledged as much at oral argument, suggesting that NMFS could remedy the alleged NEPA violation by supplementing the 2004 or 2007 EIS and tiering to that supplemented analysis in future years.[163]  Consistent with the Magnuson-Stevens Act, the FMP requires that harvest specifications be made annually.[164]  The agency reasonably concluded that the scope of the 2007 EIS adopted a strategy for the preparation of the annual harvest

---

[160] *Id.* at 21.

[161] *Id.* (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989)).

[162] *Id.* (citation omitted).

[163] Docket 94 at 6.

[164] NMFS00119; *see also* 16 U.S.C. § 1853(a)(4) (requiring a fishery management plan to "assess and specify . . . the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield").

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 35 of 45
Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 35 of 45

specifications that applied to the 2023–24 and 2024–25 harvest specification decisions. Accordingly, "the appropriate rubric" for considering Plaintiffs' contentions that Federal Defendants did not appropriately consider new information is whether supplementation of that EIS is required.

### 2. NMFS's determination in its SIRs that it did not need to supplement the 2007 Harvest Specifications EIS did not violate NEPA.

Plaintiffs insist that "[e]ven if the 2007 harvest specifications EIS included the 2023-2024 and 2024-2025 harvest specifications decisions, the Service's decision to rely on the 2007 EIS was arbitrary because 1) neither the SIRs nor the harvest specifications process considered the relevant NEPA question—whether conditions today are significantly different from conditions in 2007; and 2) the record shows changes since 2007 are significant and must be analyzed in a supplemental EIS."[165] Federal Defendants respond that NMFS properly employed SIRs to consider whether new information was significant and would require a supplemental EIS and reasonably concluded that no such EIS was necessary.[166] Intervenor-Defendants add that NMFS used SIRs to evaluate the very issues Plaintiffs insist require supplementation—changed ocean conditions, seabird and marine mammal mortality events, and salmon abundance—among other information to reasonably conclude

---

[165] Docket 71 at 16; *see also* Docket 32 at 44–48.

[166] Docket 68 at 43–52.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 36 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 36 of 45

that supplementation was unnecessary.[167]   And they reiterate that the process is scientifically-driven and entitled to deference.[168]

As noted above, an agency cannot simply rely on its original EIS when a major federal action is ongoing.[169]   Rather, it "must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval.'"[170]   An agency must supplement an EIS when "[t]here are substantial new circumstances or information about the significance of adverse effects that bear on the analysis."[171]   "New circumstances are circumstances which significantly change the underlying project, and new information is intervening information not already considered."[172] "If there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared."[173] By contrast,

---

[167] Docket 67 at 32–44.

[168] Docket 67 at 45–46.

[169] *See supra*, at 32–33.

[170] *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (alteration in original) (quoting *Marsh*, 490 U.S. at 374).

[171] 40 C.F.R. § 1502.9(d)(1).

[172] *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1069 (9th Cir. 2023) (internal quotation marks and citation omitted).

[173] *Marsh*, 490 U.S. at 374 (internal quotation marks and citation omitted).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 37 of 45

"[s]upplementation is not required when an agency takes a 'hard look' at the new circumstances or information in an SIR and determines that the impact will not be significantly different from those it already considered."[174]

Although SIRs are not mentioned in NEPA or its implementing regulations, "courts have upheld agency use of SIRs and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS."[175] However, the Ninth Circuit has "repeatedly warned that once an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute."[176] Ultimately, "[i]t is inconsistent with NEPA for an agency to use an SIR, rather than a supplemental EA or EIS," to present information and analysis that was required in earlier NEPA documents or to correct earlier deficiencies.[177]

This Court reviews an agency's decision not to supplement an EIS under the arbitrary and capricious standard.[178] Review under this standard is "searching and careful" but "narrow," especially where, as here, the challenged decision implicates

---

[174] *Id.* (citation omitted).

[175] *Idaho Sporting Cong. Inc*, 222 F.3d at 566; *see also Earth Island Inst.*, 87 F.4th at 1069.

[176] *Idaho Sporting Cong. Inc*, 222 F.3d at 566.

[177] *Id.* at 567.

[178] *Dombeck*, 222 F.3d at 556 (citing *Marsh*, 490 U.S. at 377).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 38 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 38 of 45

substantial agency expertise.[179]  Indeed, "[w]hether new information requires supplemental analysis is a 'classic example of a factual dispute the resolution of which implicates substantial agency expertise.'"[180]  And "[a] dispute as to whether an SEIS is required must be resolved in favor of the expert agency so long as the agency's decision is based on a reasoned evaluation of the relevant factors."[181]

Plaintiffs here maintain that NMFS did not properly use SIRs to consider whether new information or circumstances were significant so as to require supplementation of the 2007 Harvest Specifications EIS.  Plaintiffs challenge the SIRs on two fronts: first, they assert that the SIRs failed to consider "whether conditions today are significantly different from conditions in 2007" and second, they assert that the SIRs came to the wrong conclusion and that the agency "record shows changes since 2007 are significant and must be analyzed in a supplemental EIS."[182]

Contrary to Plaintiffs' assertions, NMFS did consider whether conditions today are significantly different from conditions in 2007 in the SIRs.  In the two SIRs most relevant to the harvest specifications challenged in this case—the 2023 and 2024 SIRs—NMFS considered the corresponding annual SAFEs, which themselves

---

[179] *Id.* (internal quotation marks and citations omitted).

[180] *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (quoting *Marsh*, 490 U.S. at 376).

[181] *Kunaknana v. U.S. Army Corps of Eng'rs*, Case No. 3:13-cv-00044-SLG, 2015 WL 3397150, at *3 (D. Alaska May 26, 2015) (internal quotation marks omitted) (first citing *Marsh*, 490 U.S. at 376; and then citing *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003)).

[182] Docket 71 at 16; *see also* Docket 32 at 44–48.

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 39 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 39 of 45

include Ecosystem Status Reports.[183]  These Ecosystem Status Reports catalogue

new information about physical changes to the ocean,[184] seabird mortality events,[185]

marine mammal mortality events,[186] and salmon abundance.[187]   And NMFS

considered whether this, and other,[188] information warranted the supplementation of

the 2007 Harvest Specifications EIS in its annual SIRs.  In its SIRs, NMFS wrote

> This year there is no additional or new information that falls outside the
> scope of the Harvest Specifications EIS's process for the consideration
> of new information (i.e., the new information is not of a scale or scope
> that it could not be incorporated and integrated into the SAFE reports
> and the harvest specifications based on those reports through the

---

[183] NMFS00590–92 (February 2023 SIR); 2SUPP00077–81 (February 2024 SIR); NMFS01264–315 (2022 SAFE used in 2023 SIR); 2SUPP06150–353 (2023 SAFE used in 2024 SIR).

[184] NMFS05460–94 (2022 Eastern Bering Sea Ecosystem Status Report's ("ESR") discussion of physical oceanographic conditions, including climate, surface and bottom temperatures, sea ice, and the cold pool); NMFS05686–706 (2022 Aleutian Islands ESR's discussion of physical oceanographic conditions); 2SUPP06384–425 (2023 Eastern Bering Sea ESR's discussion of physical oceanographic changes); 2SUPP06628–43 (2023 Aleutian Islands ESR's discussion of physical oceanographic conditions).

[185] NMFS05571–77 (2022 Eastern Bering Sea ESR's discussion of seabirds, including mortality); NMFS05734–43 (2022 Aleutian Islands ESR's discussion of seabirds); NMFS05739–40 (discussion of mortality); 2SUPP06525–31 (2023 Eastern Bering Sea ESR's discussion of seabirds, including mortality); 2SUPP06653–61 (2023 Aleutian Islands ESR's discussion of seabirds, including mortality).

[186] NMFS05578–80 (2022 Eastern Bering Sea ESR's discussion of marine mammals, including unusual mortality events); NMFS05744–48 (2022 Aleutian Islands ESR's discussion of marine mammals); 2SUPP06661 (2023 Aleutian Islands ESR's conclusion there was no new information regarding marine mammals).

[187] NMFS05534–42 (2022 Eastern Bering Sea ESR's discussion of salmon abundance, size, and other indices); NMFS05717–19 (2022 Aleutian Islands ESR's discussion of salmon); 2SUPP06474–89 (2023 Eastern Bering Sea ESR's discussion of salmon, including Yukon and Kuskokwim Chum runs and subsistence harvests); 2SUPP06650–52 (2023 Aleutian Islands ESR's discussion of salmon).

[188] For example, the SIRs also relied on annual Alaska Marine Mammal Stock Assessments. NMFS00623 n.77; see NMFS22408–806 (2018 Alaska Marine Mammal Stock Assessment); 2SUPP29786–884 (2023 Alaska Marine Mammal Stock Assessment).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 40 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 40 of 45

harvest specifications process and implementation of the harvest strategy analyzed in the Harvest Specifications EIS).[189]

It then concluded that:

> After reviewing the information. . . presented in the SAFE reports, [the regional administrator] ha[s] determined that (1) the 2023 and 2024 harvest specifications, which were set according to the preferred harvest strategy, do not constitute a substantial change in the action; and (2) the information presented does not indicate that there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts that are not addressed through the annual process of using the preferred harvest strategy to set the harvest specifications. Additionally, the 2023 and 2024 harvest specifications will result in environmental, social, and economic impacts within the scope of those analyzed and disclosed in the EIS. Therefore, a supplemental EIS is not necessary to implement the 2023 and 2024 harvest specifications. Further, at this time, the available information does not indicate a need to prepare additional supplemental NEPA documentation for the 2023 and 2024 harvest specifications.[190]

By reviewing up-to-date information and considering whether the information indicated a substantial change in the impacts of the harvest specifications process not considered in the 2007 Harvest Specifications EIS, NMFS considered whether supplementation was necessary and articulated its conclusion that it was not, as NEPA requires. Its harvest specifications decisions are therefore not arbitrary and capricious on this basis.

---

[189] 2SUPP00079 (2024 SIR); *see also* NMFS00592 (2023 SIR) ("This year there is no additional or new information that falls outside the scope of the Harvest Specifications EIS's process for the consideration of new information that would inform the harvest specifications process. Thus, the new information available is not of a scale and scope that require an SEIS.").

[190] NMFS00635 (2023 SIR); *see also* 2SUPP00143 (2024 SIR's identical conclusion).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 41 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 41 of 45

Additionally, Plaintiffs maintain that the record reflects that the new information about climatic changes, seabird and marine mammal mortality events, and salmon abundance was so significant that it must be analyzed in a supplemental EIS.[191] In particular, Plaintiffs stress that the warm stanza the Eastern Bering Sea experienced was "unprecedented" in terms of magnitude and duration, and thus not accounted for in the 2007 Harvest Specifications EIS.[192] Plaintiffs also assert that "[n]owhere has the Service addressed whether changes its own experts described as unprecedented are significant and explained its conclusion."[193]

In evaluating whether new information or circumstances are "significant" so as to require a supplemental EIS, an agency must consider whether "the action will affect the quality of the human environment in a significant manner or to a significant extent not already considered."[194] Here, NMFS appropriately considered the new information under this standard in its SIRs, as the Court has quoted its conclusions above. NMFS's conclusion—that the new information is not of a scale or scope to place it outside what was considered in the Harvest Specifications EIS—is inherently a factual determination that NMFS makes based on its expertise. In particular, although NMFS determined that it was a low abundance year for Chinook salmon

---

[191] Docket 71 at 16–25; *see also* Docket 32 at 44–48.

[192] Docket 71 at 20–21 (citing NMFS05438–40).

[193] Docket 71 at 17.

[194] *Marsh*, 490 U.S. at 374 (internal quotation marks and citation omitted).

Case No. 3:23-cv-00074-SLG, *Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.*
Decision and Order
Page 42 of 45

Case 3:23-cv-00074-SLG     Document 97     Filed 03/11/25     Page 42 of 45

based on salmon runs in the Unalakleet, Upper Yukon, and Kuskokwim rivers,[195] it nonetheless concluded "[t]he information and circumstances presented in the 2023 SAFE reports indicate the annual implementation of the groundfish harvest specifications will not affect the human environment in a significant manner or to a significant extent not already considered in the Harvest Specifications EIS" as that EIS had "analyzed impacts of the harvest strategy on salmon, salmon bycatch, directed salmon fisheries, and subsistence harvests, including in the context of salmon run failures."[196]  As the Court discussed above, it will defer to NMFS's substantial expertise on these fact-based determinations.[197]

The harvest specifications decisions are not arbitrary and capricious because NMFS concluded, based on its reasoned evaluation of the new information regarding changes in the Bering Sea and Aleutian Islands region, that the harvest specifications would not result in significant impacts to the human environment that were not considered in the 2007 Harvest Specifications EIS, such that a supplemental EIS was not required.

---

[195] 2SUPP00105.

[196] 2SUPP00106.

[197] See Marsh, 490 U.S. at 377; see also Loper Bright Enters. v. Raimondo, 603 U.S. 369, 392 (2024) ("Section 706 does mandate that judicial review of agency policymaking and factfinding be deferential.") (emphasis in original); see supra, at 38–39.

Case No. 3:23-cv-00074-SLG, Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al.
Decision and Order
Page 43 of 45

Case 3:23-cv-00074-SLG    Document 97    Filed 03/11/25    Page 43 of 45

### 3.    Plaintiffs do not demonstrate that the 2004 programmatic EIS for the FMP must be supplemented.

Finally, in a footnote, Plaintiffs assert that the 2004 programmatic EIS, which the 2007 Harvest Specifications EIS incorporates by reference and uses as the "overarching analytical framework" and "baseline analysis for evaluating subsequent management actions," did not consider and address the more recent drastic change conditions in the North Pacific ecosystem.[198]  Federal Defendants respond that the age of an EIS is not determinative of its adequacy and that the 2004 programmatic EIS is outside the scope of Plaintiffs' challenge.[199]

"Arguments raised only in footnotes, or only on reply, are generally deemed waived."[200]  And in any event, Plaintiffs have not identified reasons that the 2004 programmatic EIS must be supplemented.   Plaintiffs assert that the 2007 EIS incorporates the 2004 EIS by reference and relies on its analysis.  But they do not point to any specific portion of the 2004 EIS's analysis that they claim is outdated.  Although clearly a significant amount of time has passed since both the 2007 and 2004 EISs were prepared, the passage of time alone is not enough to require supplementation.[201]  Therefore, without further detail, the Court cannot conclude that

---

[198] Docket 32 at 35 n.7 (citing NMFS06565–66); *see also* Docket 71 at 15–16.

[199] Docket 68 at 51–52 n.15.

[200] *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) (first citing *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010); and then citing *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam)).

[201] *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997) ("[S]ignificant circumstantial change is the triggering factor requiring a new or supplemental

the harvest specifications decisions in the 2007 EIS are arbitrary or capricious because they are supported by an EIS that incorporates another, older EIS from 2004.

## CONCLUSION

For the foregoing reasons, IT IS ORDERED that:

1.      Plaintiffs' Motion at Docket 32 is DENIED.

2.      Federal Defendants' Cross-Motion for Summary Judgment at Docket 68 is GRANTED.    Plaintiffs' and Intervenor-Plaintiffs' claims are DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to enter final judgment accordingly.

DATED this 11th day of March 2025, at Anchorage, Alaska.


                                        _/s/ Sharon L. Gleason_
                                        UNITED STATES DISTRICT JUDGE

_____
EIS, not the passage of time alone.").

Case No. 3:23-cv-00074-SLG, _Assoc. of Village Council Pres., et al. v. Nat'l Marine Fisheries Svc., et al._
Decision and Order
Page 45 of 45

Case 3:23-cv-00074-SLG      Document 97      Filed 03/11/25      Page 45 of 45